## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW YORK; STATE OF OREGON; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; STATE OF ILLINIOIS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON, | C.A. No. _____ |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health; CENTERS FOR MEDICARE AND MEDICAID SERVICES; MEHMET OZ in his official capacity as Administrator for the Centers for Medicare and Medicaid Services; HEALTH RESOURCES AND SERVICES ADMINISTRATION; THOMAS J. ENGELS, in his official capacity as Administrator of the Health Resources and Services Administration; SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION; CHRISTOPHER CARROLL in his official capacity as Principal Deputy Assistant Secretary of the Substance Abuse and Mental Health Services Administration ("SAMHSA"), | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.     The States of New York, Oregon, California, Colorado, Delaware, Illinois, Michigan, Minnesota, Nevada, Rhode Island, Vermont, and Washington bring this action to challenge a novel and ambiguous funding condition adopted by the United States Department of

Health and Human Services (HHS) that makes hundreds of billions of dollars in federal health, education, and research grants to the Plaintiff States contingent on their certification that they are "compliant with Title IX of the Education Amendments of 1972 . . . including the requirements set forth in Presidential Executive Order 14168, titled Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." HHS Grants Policy Statement, effective October 1, 2025 (attached as Exhibit A). These grants fund essential programs such as training for medical personnel, cutting edge research, and the treatment and prevention of diseases. Plaintiff States have long certified their compliance with Title IX—it is HHS's grafting of an executive order into Title IX that Plaintiff States challenge. HHS continues to impose this condition despite orders from three courts enjoining and vacating it as unlawful.

2.    Executive Order 14168 (hereinafter, "Gender Ideology EO" or "EO"), 90 Fed. Reg. 8615 (Jan. 20, 2025) (attached as Exhibit B), is a critical component of the Administration's ongoing campaign targeting transgender youth and adults—people whose gender identity does not align with their birth sex—for discrimination. The Administration's purpose is manifest in the EO itself: it seeks to establish and enforce a national policy "to recognize two sexes, male and female [which] are not changeable and are grounded in fundamental and incontrovertible reality." EO 14168 § 2. It directs federal agencies to enforce federal law consistent with its terms, and to leverage critical federal funding to require federal funding recipients to carry out its discriminatory agenda.

3.    Under the leadership of Secretary Robert F. Kennedy, Jr., HHS has wasted no time in illegally implementing the EO's discriminatory directives. As noted, HHS has for years required grant recipients, including Plaintiff States, to certify compliance with Title IX—the landmark civil rights law intended to prevent sex discrimination in federally funded education programs. But

following the issuance of the EO, HHS now requires certification of compliance with Title IX "including the requirements of" the Gender Ideology EO. HHS swiftly adopted this as a standard term and condition applicable to all grant awards agency-wide, including in (a) notices of award for various grants issued by HHS sub-agencies; (b) the standard terms and conditions for several HHS sub-agencies; and (c) the HHS Grants Policy Statement, the principal document governing *all* HHS discretionary grants awarded after October 1, 2025. HHS also requires grant recipients to agree that "compliance with . . . the requirements of" the Gender Ideology EO is a "material term"—meaning that violation is grounds to terminate funding—and threatens that false certification is a federal crime under the federal False Claims Act, 31 U.S.C. § 3729 *et seq*. These conditions are collectively referred to herein as the "Gender Conditions."

4.    The President cannot amend statutory law by executive order, and HHS's efforts to carry out the directives of the Gender Ideology EO by attempting to shoehorn them into Title IX are unlawful on multiple grounds. First, by imposing the Gender Conditions, HHS has acted arbitrarily and capriciously in violation of the Administrative Procedure Act (APA). The Gender Conditions reverse previous policies—in effect across multiple federal agencies and administrations, including the first Trump administration—recognizing that federal laws prohibiting sex discrimination, including Title IX, protect against discrimination on the basis of gender identity. To the extent HHS claims that the Gender Ideology EO requires such a change, an executive order is not a sufficient basis for an agency's adoption of a wholly new policy position, which under the APA must be supported by a reasoned and deliberative process.

5.    This abrupt shift is also unlawful because HHS effectuated it without considering several "important aspect[s] of the problem," *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983), including, first and foremost, the existence of transgender,

nonbinary, intersex, and gender diverse people. HHS further disregarded the reliance interests of funding recipients, including Plaintiff States, their agencies, and sub-grantees, and the communities they serve.

6.      Further, in adopting the Gender Conditions agency-wide, and thus changing its interpretation of Title IX to purportedly incorporate the EO, HHS effectively issued a legislative rule with potential to impact the States as funded entities without notice and comment, in violation of the APA's procedural requirements. *See* 5 U.S.C. §§ 533, 706(2).

7.      If interpreted how Plaintiff States fear HHS intends, the Gender Conditions are patently contrary to law and exceed the agency's authority. Defendants do not have the authority to graft new terms onto a federal statute by means of an EO or a funding condition. The EO itself acknowledges that it "shall be implemented consistent with applicable law." To the extent HHS contends the Gender Conditions impose obligations beyond Title IX, that would usurp Congress's spending authority in violation of separation of powers and the Spending Clause of the United States Constitution. The Gender Conditions jeopardize a vast amount of funding used by Plaintiff States to support vital health centers and health education programs; scientific research and medical education in universities; and community programs focused on improving infectious disease prevention and treatment, immunization, and maternal and infant health. Congress has funded these programs *without* any requirement to exclude entities that recognize transgender, nonbinary, intersex, or gender diverse individuals.

8.      With or without congressional authorization, the States cannot be forced to accept a condition on funding that fails to provide unambiguous notice as to what it means and that is retroactive. Taking the funding condition on its face, it is not clear what HHS means by requiring compliance on the part of States with "the requirements" of the EO because the EO directs action

by *federal agencies*, not States. Moreover, the factual assertions and terms contained in the Gender Ideology EO are vague and scientifically inaccurate, and HHS has not explained how they could be incorporated into Title IX. HHS also purports to apply the funding condition to nearly all awards, including open grants from previous awards, upon drawdown. This uncertainty is intolerable, particularly in light of the amount of funding at stake and the critical importance of the services and research being funded. Defendants' categorical imposition of new, ambiguous, and retroactive conditions on Plaintiff States, on pain of losing hundreds of billions of dollars in funding, is unconstitutional including because State recipients lacked clear notice of the terms or what they meant at the time the funds were accepted.

9.     Three courts have already stayed application of the Gender Conditions and preliminarily enjoined HHS from enforcing them. *See Rhode Island Coalition Against Domestic Violence v. Kennedy*, 25-cv-00342-MRD (D.R.I. Oct. 25, 2025) (DuBose, Dist. Judge); *City of Fresno v. Turner*, 25-cv-07070 (N.D. Cal. Sept. 23, 2025); *King County v. Turner*, Case No. 25-cv-00814-BJR (W.D. Wash. Aug. 12, 2025). Those court orders remain in effect. Yet HHS has continued to require Plaintiff States to certify compliance with the Gender Conditions in applying for new grants or accepting funds from prior grants.

10.     Plaintiff States contest that the directives of the EO can apply to Plaintiff States at all. But given HHS's attempt to fold them into a certification of compliance with Title IX and to require States to agree to their materiality, HHS apparently believes them to apply. Between the uncertainty of the Gender Conditions' meaning and reach, the potential conflict with Plaintiff States' own civil rights laws, and the threat that HHS will withhold funding, undertake investigations, or attempt enforcement against State recipients under the False Claims Act, Plaintiff States face significant risks (though Plaintiff States do not concede that they are subject to liability

under the FCA at all). On the other hand, compliance with the EO's definitions, by their terms, would require Plaintiff States to act contrary to the civil rights laws of their respective states and, Plaintiff States contend, contrary to applicable federal law. Plaintiff States are thus forced into an untenable position that can only be resolved through the present lawsuit.

11.     Plaintiffs thus seek from this Court a declaration and order setting the Gender Conditions aside as unlawful, and a grant of injunctive relief barring Defendants, including HHS and its officials and agencies, from implementing or enforcing them. Without the requested relief, Plaintiff States and their residents will suffer imminent and irreparable harm, including the potential loss of hundreds of billions of dollars in federal funds the heightened threat of civil and criminal liability under the False Claims Act, and ongoing injury to their sovereignty.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702 because this action arises under the laws of the United States, including the U.S. Constitution and the APA, 5 U.S.C. §§ 701, *et seq.*

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Rhode Island is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Rhode Island.

## PARTIES

### A. Plaintiffs

14.     The State of New York is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

15.     The State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

16.     The State of California is a sovereign state in the United States of America. California is represented by Rob Bonta, the Attorney General of California, who is the chief law enforcement officer of California.

17.     Plaintiff the State of Colorado is a sovereign state in the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

18.     The State of Delaware is a sovereign state of the United States. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

19.     The State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign state of the United States. Attorney General Raoul is authorized to pursue this action under Illinois law. *See* 15 ILCS 205/4.

20.     The State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer for the State of Michigan.

21.     The State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The

Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.

22.　　The State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

23.　　The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

24.　　The State of Vermont is a sovereign state of the United States of America. Vermont is represented by its Attorney General, Charity Clark, who is authorized to act on behalf of the State in this matter. *See* 7 V.S.A. § 152.

25.　　Plaintiff State of Washington, represented by and through the Attorney General, is a sovereign state of the United States of America. Attorney General Nick Brown is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code 43.10.030 to pursue this action.

26.　　Plaintiff States; state agencies including health, education, and other agencies; public universities and affiliated research institutions; and other state instrumentalities (collectively referred to herein as "State Recipients") collectively receive more than $300 billion dollars in federal funds from HHS to which HHS has attached the Gender Conditions.

**B. Defendants**

27.　　Defendant United States Department of Health and Human Services is a cabinet agency within the executive branch of the United States government.

28.     Defendant Robert F. Kennedy, Jr. is Secretary of Health and Human Services and is the United States Department of Health and Human Services' highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

29.     Defendant Centers for Medicare and Medicaid Services ("CMS") is a federal agency within the Department of Health and Human Services.

30.     Dr. Mehmet Oz is the Administrator of CMS. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

31.     Defendant Health Resources and Services Administration is a federal agency within the Department of Health and Human Services.

32.     Defendant Thomas Engels is the Administrator of the Health Resources and Services Administration (HRSA). He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

33.     Defendant Substance Abuse and Mental Health Services Administration ("SAMHSA") is a federal agency within the Department of Health and Human Services.

34.     Defendant Christopher D. Carroll is the Principal Deputy Assistant Secretary of SAMHSA. He is sued in his official capacity.

35.     HHS and its Agencies provide financial assistance to education programs and activities subject to Title IX, including to Plaintiff States.

## FACTUAL ALLEGATIONS AND LEGAL BACKGROUND

### A.  HHS Funds Plaintiff States' Education and Health Agencies.

36.     Plaintiff States and their instrumentalities include numerous public elementary, secondary, and post-secondary education institutions, including community colleges and state universities. In fiscal year 2025, HHS awarded hundreds of billions of dollars to such entities and

institutions, as well as to state education agencies, for numerous purposes, including providing direct access to health care services through clinics and school-based health centers, providing health education, and performing vital medical and public health research.

37.    For example, in New York, State University of New York (SUNY), through its Research Foundation, received $16,477,490 for FY 2025 in HHS discretionary funds, for programs as diverse as training nurse anesthetists, studying long-term health effects of COVID-19 among World Trade Center responders, and building capacity for early intervention for people living with HIV/AIDS, to name just a few programs.

38.    In fiscal year 2025, HHS also awarded billions of dollars to Plaintiff States' health agencies. While most of those grants are not used for educational programs or activities, many are targeted for or include education programs and activities subject to Title IX. Those HHS funds were used to support a wide range of services, including family planning programs that include education on prevention of unintended pregnancy and sexually transmitted infections, prevention and treatment protocols for HIV, immunization programs, STD prevention and control, and programs designed to prevent maternal and infant mortality and improve health outcomes for newborns.

**B.  The Trump Administration's Attacks on Transgender Individuals.**

39.    As one of his first acts upon taking office on January 20, 2025, President Trump issued the Gender Ideology EO. The "purpose" of the Gender Ideology Order is to fight "[e]fforts to eradicate the biological reality of sex" and "defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male." EO 14168 § 1 (Exh. B). Subsequently, during his first two weeks in office, the President issued a flurry of additional executive orders targeting

transgender individuals in all facets of life, from military service to health care, to education and employment.

40.    The Gender Ideology EO declared that it is "the policy of the United States to recognize two sexes, male and female," which are "not changeable and are grounded in fundamental and incontrovertible reality." *Id*. § 2. It also promulgated the following definitions:

> "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

> "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

> "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

> "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

> "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

> "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

> "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

*Id*.

41.    The Gender Ideology EO mandates that all federal agencies adopt the above definitions "when interpreting or applying statutes, regulations, or guidance" and directs the Secretary of HHS to issue "clear guidance expanding on the sex-based definitions set forth in this order." The EO further directs each agency and all Federal employees to:

. . . enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes. Each agency should therefore give the terms "sex", "male", "female", "men", "women", "boys" and "girls" the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

*Id*. § 3(b).

42.    The EO directs federal agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology," as defined in the EO, and orders agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id*. § 3(e), (g).

43.    The EO addresses the implications of its edicts for Title IX, specifically, stating:

The prior Administration argued that the Supreme Court's decision in *Bostock v. Clayton County* [590 U.S. 644] (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock v. Clayton County* (2020) to sex-based distinctions in agency activities.

*Id*. § 3(f).

44.    At the same time, the EO states that it is to be implemented "consistent with applicable law." *Id*. § 8(ii)(b).

45.    The definitions dictated by the Gender Ideology EO are unscientific, patently biased, and counterfactual. And contrary to the EO's baseless assertions about the "incontrovertible" reality of only two, immutable sexes; transgender, nonbinary, intersex, and gender-diverse individuals exist.

**C. Department of Justice Announces Its Intent to Use the False Claims Act Against Recipients of Federal Funds It Deems to Have Violated "Federal Civil Rights Laws."**

46.     On May 19, 2025, Deputy Attorney General Todd Blanche issued a memorandum to several divisions of the Department of Justice (DOJ) and all U.S. Attorneys announcing the formation of a "Civil Rights Fraud Initiative" dedicated to "utiliz[ing] the False Claims Act to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates federal civil rights laws." https://www.justice.gov/dag/media/1400826/dl?inline, *preserved at* https://perma.cc/97ZJ-7Q62 at 2 (attached as Exhibit C, hereinafter "Blanche FCA Memo"). The False Claims Act (FCA) is a federal statute that makes it illegal to knowingly present a false or fraudulent claim for payment by the federal government; liability can result in treble damages, significant penalties, and loss of federal funding. *See generally* 31 U.S.C. § 3729. Among the purported examples of violations of the FCA identified by Blanche in the memo is "a university that accepts federal funds" and certifies compliance with civil rights laws, but "allows men to intrude into women's bathrooms or requires women to compete against men in athletic competitions." Exh. C at 1.

47.     Blanche describes the FCA as a "weapon" and promises to engage in "vigorous enforcement" of it through the Civil Rights Fraud Initiative. *Id*. He requests each relevant division of the DOJ, including the Civil Rights Division, to "identify a team of attorneys to aggressively pursue this work," and directs the Civil Fraud Section and Civil Rights Division of DOJ to "engage with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements for federal funding recipients," such as HHS. *Id*. at 2. He further "strongly encourages" private litigation, and asks individuals to report suspected discrimination by "federal-funding recipients" to federal authorities. *Id*.

13

**D. HHS Implements the Gender Ideology EO, Culminating in Adoption of the Gender Conditions.**

48.    Soon after the issuance of the Gender Ideology EO, on February 19, 2025, HHS announced that it was taking "action on President Trump['s] Executive Orders defending women and children and restoring the concept of biological truth in federal government" by releasing "guidance to the U.S. government, external partners, and the public to expand on the clear sex-based definitions in [the Gender Ideology EO]." U.S. Dep't of Health and Human Servs., *HHS Takes Action on President Trump's Executive Orders Defending Women and Children*, https://www.hhs.gov/press-room/eo-defending-women-and-children.html, *preserved at* https://perma.cc/S2C4-TJF6 (attached as Exhibit D) ("HHS Announcement"). The HHS Announcement quoted Secretary Kennedy proclaiming that "[t]his administration is bringing back common sense and restoring biological truth to the federal government[.] . . . The prior administration's policy of trying to engineer gender ideology into every aspect of public life is over." *Id*.

49.    The guidance referenced in the HHS Announcement promulgates definitions of various terms, including "Sex," "Female," "Male," etc., but omits the EO's specific language relating to the "large/small reproductive cell," instead defining "female" as "a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)," and "male" as "a person of the sex characterized by a reproductive system with the biological function of producing sperm." *See* OASH, Office on Women's Health, *Sex-Based Definitions*, *available at* https://womenshealth.gov/article/sex-based-definitions, *preserved at* https://perma.cc/TC32-P978.

50.    The HHS Announcement cited materials declaring that "[t]he sex of a human, female or male, is determined genetically at conception (fertilization), and is observable before

14

birth," and that "[a] person's sex is unchangeable and determined by objective biology. The use of hormones or surgical interventions do not change a person's sex because such actions do not change the type of gamete that the person's reproductive system has the biological function to produce." *Id*.

51.     Soon afterward, HHS, through its various subagencies, including the Health Resources and Services Administration (HRSA), Substance Abuse and Mental Health Services Administration (SAMHSA), National Institutes of Health (NIH), and Administration for Children and Families (ACF), began canceling grants they deemed in violation of the administration's agenda by promoting "gender ideology."

52.     At around the same time, HHS and its various subagencies began implementing the Gender Conditions and requiring grant recipients, including Plaintiff States, to certify their compliance with those conditions when drawing down funds on grant agreements. These Gender Conditions have now been implemented throughout the agency. Unless Plaintiff States make these certifications, they cannot access vitally needed funding. And if Plaintiff States submit a certification that HHS later deems to be "false," States risk loss of funding or attempted threats of federal FCA enforcement.

53.     For example, on May 14, 2025, HRSA changed its general grant terms and conditions (hereinafter "HRSA General Terms and Conditions") (attached as Exhibit E) to require recipients "whose programs are covered by Title IX" to certify that:

> Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in Presidential Executive Order 14168 titled Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government . . . and Recipient will remain compliant for the duration of the Agreement.

*Id.* § 1(i). The document states that such certification is triggered "by accepting this award, including the obligation, expenditure, or drawdown of award funds." *Id.*

54.    The HRSA General Terms and Conditions further specify that these "requirements are conditions of payment that go the essence of the Agreement and are therefore material terms of the Agreement," and that "[p]ayments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements." Further, the document requires recipients to "acknowledge[] that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement," and states that "a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the FCA, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001." *Id.*

55.    On July 2, 2025, HHS announced the formation of a "DOJ-HHS False Claims Act Working Group," to work in partnership with DOJ to "make referrals to DOJ of potential violations of the FCA that reflect Working Group priorities." DOJ-HHS False Claims Act Working Group (Jul. 2, 2025), *available at* https://www.hhs.gov/sites/default/files/hhs-doj-false-claims-act-working-group.pdf *preserved at* https://perma.cc/83PT-LLWM (attached as Exhibit F). Those priorities include the Gender Ideology EO, as set forth in the cited June 11, 2025 memorandum from Assistant Attorney General Brett Shumate, *available at* https://www.justice.gov/civil/media/1404046/dl?inline. HHS further "encourages whistleblowers

16

to identify and report violations of the federal False Claims Act involving priority enforcement areas," and includes a hotline number for that purpose. *Id.* at 2.

56.    On or around August 1, 2025, CMS issued new Standard Grant/Cooperative Agreement Terms and Conditions containing the Gender Conditions for "Programs that could implicate Title IX" which it describes as "i.e., awards to or for school, colleges, universities, 4-H programs, non-governmental organization (NGO) programs, sports programs, and education-related awards to prisons or other detention facilitates [*sic*]," a*vailable at* https://www.cms.gov/files/document/standard-terms-and-conditions-august-1-2025-pdf.pdf, *preserved at* https://perma.cc/G35B-BT24 (attached as Exhibit G).

57.    Like the HRSA General Terms and Conditions, the CMS 2025 Standard Terms and Conditions further specify that this certification is a "material term[]" of the agreement that "go[es] to the essence of the Agreement"; that "[p]ayments under the Agreement are predicated on compliance"; that "Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements"; that "this certification reflects a change in the government's position regarding the materiality of the foregoing requirements," *id.* at 4; and that "a knowing false statement" related to compliance with this requirement "may subject Recipient to liability under the False Claims Act, . . . and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001." *Id.*

58.    The CMS 2025 Standard Terms and Conditions further specify that "[b]y drawing or otherwise obtaining funds from the Department of Health and Human Services (HHS) Payment Management System (PMS), the recipient acknowledges acceptance of the terms and conditions of the award and is obligated to perform in accordance with the requirements of the award." It does not specify a time period and accordingly appears to apply to all open grant awards, including any

unspent funds from prior grant awards. For new awards, the condition requires that a grant recipient notify the Grants Management Officer within 30 days of the award notice if the recipient cannot accept the terms; "[o]nce an award is accepted by a recipient, the contents of the NOA are binding on the recipient unless and until modified by a revised NOA signed by the GMO." *Id.* at 3.

59.    On August 19, 2025, shortly before the start of the new fiscal year on October 1, 2025, HHS made the Gender Conditions certification requirement universal by adding the same terms into its new "Grants Policy Statement," the HHS GPS, which generally "provides information on HHS agencies that make awards, the award process, and where to find and apply for awards."  Exh. A at 5 (Dep't of Health and Human Servs., *HHS Grants Policy Statement* at 5, *available at* https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-oct-2025.pdf, *preserved at* https://perma.cc/S88F-RE2W). "The [HHS] GPS also provides information about the legal and regulatory rules that apply to [a grantee's] award and will be used for enforcement purposes." *Id.* The Gender Condition language is identical to that of the CMS Grants Policy Statement.

60.    The HHS GPS applies to all discretionary awards issued by HHS (with the exception of NIH grants) effective October 1, 2025, including any "award modifications that add funding . . . supplements to award, [and] competing and non-competing continuations." It further specifies that "the requirements flow down to sub-recipients." In addition, "HHS agencies have the discretion to apply certain parts of the GPS to non-discretionary awards." HHS GPS § 1.2. The recipient's certification of compliance with the terms, including the Gender Conditions, "is effective upon acceptance of the award, including "the obligation, expenditure, or drawdown of award funds." *Id.*

61.     Like the CMS Standard Terms and Conditions, the HHS GPS explicitly threatens FCA and criminal fraud liability for any noncompliance. *See id.* at 22 ("Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."). And the GPS "acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement." *Id.*

62.     Likewise, on or around November 18, 2025, SAMHSA added the Gender Conditions to the new Standard Terms and Conditions applicable to all SAMHSA discretionary grants and cooperative agreements received on or after October 1, 2025, requiring recipients to certify their compliance "with Title IX . . . including the requirements" of the Gender Ideology EO. Substance Abuse and Mental Health Services Administration Fiscal Year (FY) 2025 Standard Terms and Conditions, at 8 (SAMHSA 2025 Terms and Conditions), *available at* https://www.samhsa.gov/sites/default/files/fy25-award-standard-terms-conditions.pdf, *preserved at* https://perma.cc/2S54-MV49 (attached as Exhibit H).

63.     As in other HHS grant documents, the SAMHSA Terms and Conditions incorporate the Gender Conditions' requirement of certification of compliance with Title IX "including the requirements set forth" in the Gender Ideology EO; deem certification to take effect "by drawing or otherwise obtaining funds from" the HHS Payment Management System, *id*. at 2; explicitly threaten FCA and criminal fraud liability for any noncompliance, *id.* at 2-3; and require recipients to "acknowledge[] that this certification reflects a change in the government's position regarding

the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement." *Id.*

64. The SAMHSA 2025 Terms and Conditions replaced the previous SAMHSA Terms and Conditions, which contained a term stating: "You must administer your project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age and, in some circumstances, religion, conscience, and sex (*including gender identity, sexual orientation, and pregnancy*)," *available at* https://www.samhsa.gov/sites/default/files/fy24-award-standard-terms-conditions.pdf, *preserved at* https://perma.cc/R7TG-JLXR.

65. HHS has also included the Gender Conditions in new funding applications. Grant applicants must certify their compliance with the Gender Conditions, in addition to a litany of other grant conditions, to submit applications to and receive new grant funding from HHS.

66. As just one example, HHS recently incorporated the Gender Conditions in the Notice of Funding Opportunity ("NOFO") for the newly established Rural Health Transformation Program, established in HR1, Section 71401 of Public Law 119-21. This program aims to "help[] State governments to support rural communities across America in improving healthcare access, quality, and outcomes by transforming the healthcare delivery ecosystem." CMS, *Rural Health Transformation Program,* NOFO at 5, *available at* https://grants.gov/search-results-detail/360442, *preserved at* https://perma.cc/586R-5CUM (attached as Exhibit I). This program offers $50 billion to states over five budget periods, with $25 billion in baseline funding designated to be distributed equally among all approved states, and the other half to be awarded based on "the content and quality of [the] application and rural factors" for each applicant state. *Id.* at 13. The program identifies "permissible uses" for the funds, including, *inter alia,* "training and technical assistance"

and "recruiting and retaining clinical workforce talent to rural areas." *Id.* at 10-11. All of Plaintiff

States applied for those funds.

67.    The Rural Health Transformation Grant NOFO states that award recipients are

bound to the terms of the HHS GPS, which includes the Gender Conditions. *Id.* at 54, 59. The

NOFO further requires applicant "to designate an authorized organizational representative"

("AOR") with authority to act and enter contracts on behalf of the state. *Id.* at 7. The NOFO states

that the AOR's signature "means the State will assume the obligations imposed by the terms and

conditions of the award, including federal statutes and regulations and other terms and conditions

of the award, if the State and CMS enter into a cooperative agreement." *Id.* The NOFO further

states that the Notice of Award (NOA) "is the only official award document," that "[t]he NOA

incorporates the requirements of the program and funding authorities, the grant regulations, the

HHS Grants Policy Statement (GPS), and the NOFO," and that "[b]y drawing down funds, [the

recipient] accept[s] the terms and conditions of the award." *Id.* at 54.

### E. Plaintiff States Receive HHS Grants that Include the Gender Conditions.

68.    As noted in paragraph 9, *supra*, three courts, including this Court, have held the

Gender Conditions to be unlawful in recent months. *See Rhode Island Coalition Against Domestic

Violence v. Kennedy*, 25-cv-00342 (D.R.I. Oct. 25, 2025) (DuBose, Dist. Judge); *City of Fresno v.

Turner*, 25-cv-07070 (N.D. Cal. Sept. 23, 2025); *King County v. Turner*, Case No. 25-cv-00814

(W.D. Wash. Aug. 12, 2025). But HHS has not withdrawn the Gender Conditions from its Terms

and Conditions or Grants Policy Statements, or informed State Recipients that the Gender

Conditions will not be enforced. HHS has, instead, continued to add the Gender Conditions to

various NOFOs and NOAs.

69.    As a result of Defendants' agency-wide adoption of the Gender Conditions,

numerous open grants to State Recipients include the Gender Conditions, either through (a) the

specific Notice of Award for the grant in question, (b) the standard terms and conditions of an HHS sub-agency that applies to those awards, or (c) the HHS GPS, which took effect agency-wide and applies to all new, supplemental, modification, or continuation awards issued after October 1, 2025.

70. In many cases, expenses on awards subject to the Gender Conditions are incurred by sub-grantees and invoiced on a periodic basis, followed by drawdown of federal funds. Other funds are used to support State Recipients' staff, incurring nearly immediate and ongoing payroll obligations. Many State Recipients either have therefore already drawn down funds from these awards or will need to do so imminently because the funds have already been expended or obligated.

71. On or about December 29, 2025, most Plaintiff States received NOAs for the Rural Health Transformation Program grants, discussed *supra,* ¶¶ 66-67. Notwithstanding the injunctions in place against the Gender Conditions, the NOAs incorporated the Gender Conditions by reference as contained in the HHS Grants Policy Statement and incorporated the Gender Conditions directly by including them in revised CMS Standard Terms and Conditions applicable to all funded award actions issued on or after December 14, 2025. *See supra*, ¶¶ 56-57; Ex. G. Taken together, the Rural Health Transformation Program NOFO and NOA's terms appear to require the State's designated AOR, and thus the state as a whole, to certify compliance with the Gender Conditions as a condition of drawing down the funds. States have 30 days to accept or reject the awards.

72. As discussed above, three courts have preliminarily set aside the Gender Conditions and enjoined Defendants from enforcing them. Tacitly acknowledging this fact, the CMS Standard

Terms and Conditions incorporated into the NOA contain the additional vague language, immediately following the Gender Conditions:

> **Court Orders**. Any term or condition in this NOA, including those incorporated by reference, that HHS is enjoined by court order from imposing or enforcing shall not apply or be enforced as to any recipient or subrecipient to which that court order applies and while that court order is in effect.

Ex. G at 3.

73.    The court orders setting aside the Gender Conditions remain in effect, and those terms are consequently unenforceable at present. Yet Defendants included them in the Rural Health Transformation NOFOs and NOAs. In light of the ambiguities of the Conditions discussed below, Plaintiff States accordingly fear that agreeing to the Gender Conditions, even with reservations, will expose them to heightened legal risks and place billions of dollars of funding provided by Congress for the Rural Health Transformation program at risk.

## F.    The Gender Conditions' Terms Are Contradictory, Ambiguous, and Impermissibly Retroactive.

74.    The Gender Conditions are impermissibly vague and ambiguous. First, the Gender Conditions require certification of compliance with Title IX, "including the requirements of" the Gender Ideology EO. But the Gender Ideology EO is addressed to federal agencies and directs them to take certain actions. It contains no directives to States or other grant recipients—nor could it, as Presidential executive orders cannot direct States or other non-federal grant recipients. It is therefore unclear what certifying compliance with requirements of the Gender Ideology EO requires of State Recipients, or what HHS contends it requires.

75.    Second, while HHS purports to incorporate the Gender Ideology EO into Title IX, an executive order cannot amend statutory law. The EO itself specifies that it must be applied "consistent with applicable law," EO 14168 § 8(b), which would include Title IX. But the EO

directs federal agencies to ignore and adopt interpretations inconsistent with existing applicable law interpreting Title IX.

76.    The Gender Ideology EO further directs that the definitions it contains "shall govern all Executive interpretation of and application of Federal law and administration policy," and orders federal agencies to use the definitions "when interpreting or applying statutes, regulations, or guidance . . . ." EO 14168 § 2, 3(b). But the definitions in the EO are unscientific, unworkable, and inconsistent with other "official" HHS guidance purporting to define the same terms, including HHS's February 19 announcement. It is unclear how these definitions relate to—and whether they are the same as or materially different from—the definitions contained in the EO referencing the "large/small reproductive cell," and if they are different, which definition takes priority.

77.    Given these ambiguities and internal inconsistencies, among many others, Plaintiff States are unable to determine what the Gender Conditions require of them as grant recipients that is distinct from pre-existing requirements under Title IX. This uncertainty puts Plaintiff States at risk of—unintentionally—violating the Gender Conditions and being subject to loss of funding and threats of federal enforcement actions.

78.    The threat presented by this ambiguity is exacerbated by the fact that the Gender Conditions specify that they "are conditions of payment that go to the essence of the Agreement" and are therefore "material terms of the Agreement," violation of which could potentially subject the recipient to FCA liability and claw back of funding.

79.    The Gender Conditions are also impermissibly retroactive because they alter conditions attached to the funds Congress duly appropriated to HHS by imposing new conditions on existing appropriations of federal funds to the States.

24

**G. The Gender Conditions Are Inconsistent with Existing Interpretations of Title IX by Courts, Other Federal Agencies, and HHS Itself.**

80.     Whatever the vague Gender Conditions mean, the Gender Ideology EO's purpose—and thus the Agency's purpose in referencing it in the Gender Conditions—is to exclude transgender, intersex, non-binary, and gender-diverse individuals and make denial of their existence official policy. This discriminatory purpose is contrary to existing interpretations of Title IX by courts and other federal agencies, including HHS. Over the past several years, Plaintiff States and State Recipients have structured their programs consistent those interpretations of Title IX and the requirements of past assurances of compliance they have signed.

81.     Title IX of the Education Amendments of 1972, Pub. L. No. 92-318, provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a).

82.     In June 2020, in *Bostock v. Clayton County*, *Georgia*, the Supreme Court recognized that Title VII of the Civil Rights Act of 1964 protects individuals from discrimination on the basis of sexual orientation and gender identity. 590 U.S. 644 (2020). In particular, the Court held that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id*. at 660.

83.     In March 2021, the Department of Justice confirmed that Title IX protects against discrimination based on gender identity. U.S. Dep't of Justice, *Application of* Bostock *to Title IX of the Education Amendment of 1972*, Memorandum (March 2021).[1]

---

[1] *Available                                                                                                                     at* https://web.archive.org/web/20250124074730/https://www.justice.gov/crt/page/file/1383026/dl?i

84. In May 2021, HHS issued a "Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972," stating:

> Consistent with the Supreme Court's decision in *Bostock* and Title IX, beginning May 10, 2021, the Department of Health and Human Services (HHS) will interpret and enforce Section 1557 of the Affordable Care Act prohibition on discrimination on the basis of sex to include: discrimination on the basis of sexual orientation; and discrimination on the basis of gender identity.

Fed. Reg. 27,984, 27,984.

85. Statements and materials on the HHS website, even those active today, reflect the understanding that Title IX prohibits discrimination on the basis of gender identity. For example, HHS's web page, entitled *Protecting the Rights of Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex (LGBTQI+) People* describes HHS's Office for Civil Rights (OCR) as "the law enforcement agency within HHS that is responsible for guaranteeing that people are free from discrimination based on race, color, national origin (including primary language), disability, age, religion, and sex (*including pregnancy, sexual orientation, and gender identity*)," *available at* https://www.hhs.gov/ocr/lgbtqi/index.html, *preserved at* https://perma.cc/439V-XHDG (emphasis added) (last visited Jan. 12, 2026) (attached as Exhibit J); *see also* U.S. Dep't of Health and Human Servs., Nat'l Institutes of Health, *NIH Grants Policy Statement* IIA-14 Apr. 2024, *available at* https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf, *preserved at* https://perma.cc/U38D-EV2N

---

nline, *preserved at* https://perma.cc/T58P-G66T. On February 12, 2025, pursuant to the EO, DOJ withdrew the March 2021 memorandum. *See* Memorandum to DOJ Civil Rights Div. from Acting Associate Attorney General (Feb. 12, 2025), *available at* https://www.justice.gov/crt/media/1389946/dl?inline, *preserved at* https://perma.cc/NW52-7PWW.

("Recipients are required to administer NIH-funded projects in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and sex, *which includes discrimination on the basis of gender identity*, sexual orientation, and pregnancy" (emphasis added)).

86.    Similarly, HHS's current Assurance of Compliance, which all recipients have signed and remains in effect, states that under Title IX, sex includes "pregnancy, sexual orientation, and gender identity." HHS Assurance of Compliance, *available at* https://www.hhs.gov/sites/default/files/form-hhs690.pdf, *preserved at* https://perma.cc/9K8D-M6ND (last visited Jan. 2, 2026) (attached as Exhibit K).

**H. Plaintiff States Are Harmed by the Gender Conditions.**

87.    Plaintiff States will suffer immediate and irreparable injuries to their proprietary and sovereign interests as a result of HHS's adoption of the Gender Conditions and their attempted application to Plaintiff States. The Gender Conditions force Plaintiff States and State Recipients to choose between certifying to a vague, ambiguous, and retroactive term, or refusing to certify and risking the loss of hundreds of billions of dollars in federal grants, resulting in harm to all of their residents—not just transgender individuals. They further subject states to increased administrative burdens and a heightened threat of investigation and legal risk under the FCA (even if any such suit would be baseless). And they conflict with state laws intended to protect the rights and dignity of transgender residents in Plaintiff States, in violation of Plaintiffs' sovereign authority.

**i.    Application of the Gender Conditions to State Recipients Jeopardizes Federal Funding Critical to Plaintiff States.**

88.    In light of the EO's discriminatory terms and Defendants' continued requirement that Plaintiff States certify compliance with them, the States fear that HHS will deem various

aspects of their education-related programming and activities out of compliance. A finding of non-compliance with the Gender Conditions' vague terms, sweeping prohibitions, and nonscientific definitions could result in the loss of crucial federal funding, including the claw back of funds already obligated or expended.

89.    Loss of these funds would be devastating to State Recipients, with potentially crushing impacts on Plaintiff States' public education systems, universities, medical training programs and premier research institutions. States would bear the cost of triaging any such losses. But state budgets could not come close to replacing the vast amount of federal funding at stake through state coffers.

90.    With respect to the funds provided to health agencies and programs, HHS guidance states that Title IX applies to funds used for educational purposes and educational programming. U.S. Dep't of Health and Human Servs., *Title IX of the Education Amendments of 1972*, *available at* https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/title-ix-education-amendments/index.html, *preserved at* https://perma.cc/75TV-HAZE. Plaintiff States rely on such funding to support critical public health and education initiatives, including programs intended to improve immunization rates, childhood wellness, adolescent pregnancy prevention, family planning, STI prevention and treatment, and maternal and child health.

91.    Many HHS grant funds are not used for educational purposes or in education institutions, but rather, advance vital public health, research, and equity initiatives. The inclusion of the Gender Conditions in NOAs and Terms and Conditions applicable to such grants compounds grantees' confusion about certification to their terms, when in their good faith belief, Title IX does not apply to the funded programs at all.

92.    With respect to funds provided for state education institutions and agencies in Plaintiff States, such as state education agencies, public universities, and state hospitals, HHS Guidance makes clear that Title IX applies to "Colleges and universities, including all of the programs they operate, regardless of which program receives federal financial assistance from HHS." *Id*.

93.    Public education institutions and agencies in Plaintiff States, including state education agencies and numerous top-tier public research universities, receive hundreds of billions of dollars in federal funds from HHS to support a vast array of programs. These funds are used to support core health provision and education and public health surveillance in K-12 schools, groundbreaking scientific research in areas as diverse as the treatment of traumatic brain injuries, developmental disabilities, the long-term effects of COVID-19 infection, aging, epidemic and pandemic preparedness, and the training and development of medical professionals in fields like HIV/AIDS treatment, addiction medicine, advanced nursing, psychology, public health, geriatrics, rural health, and dentistry.

94.    Because Title IX applies to all activities of education institutions, regardless of the nature or purpose of the specific stream of grant funding, and in view of the extent of the funds at stake, HHS's potential application and enforcement of the Gender Conditions to such institutions could jeopardize federal funding essential to their operations as a whole.

95.    The States reasonably fear that, due to the ambiguity regarding whether and how the Gender Conditions affect their obligations under Title IX, HHS could deem some of their activities, curricula and materials, or policies noncompliant simply for referring to transgender and gender diverse populations, identifying those groups as at-risk populations for services or outreach, recognizing or requiring use of transgender individuals' names and pronouns, or incorporating

record-keeping or data collection practices that account for the existence of transgender and gender diverse individuals.

96.    HHS agencies have already undertaken similar enforcement efforts in furtherance of the administration's policy against "promoting gender ideology," and in some instances, State Recipients have already been informed by HHS grant officers that they need to change specific aspects of their programs and materials, oftentimes in conflict with state laws and guidance.

97.    For example, the Administration for Children and Families, in a public announcement, declared specific health curricula used in a sexuality education program known as the Personal Responsibility Education Program ("PREP"), as noncompliant for purportedly promoting "gender ideology." *See* Letters from Andrew Gradison, Acting Assistant Secretary for the Administration for Children and Families (ACF), to health agency administrators for 46 states and territories (Aug. 26, 2025), *available at* https://acf.gov/sites/default/files/documents/main/08.26.25-Combined-PREP-Letters.pdf, *preserved at* https://perma.cc/KE6Y-BCZR. The portions of the curricula were designated as noncompliant for attempting to create an inclusive environment for LGBTQIA students, or for merely recognizing or acknowledging their existence.

98.    In the context of higher education specifically, because the Administration has repeatedly stripped or threatened to strip institutions of higher education of vital federal funds in order to compel compliance with its policy priorities, the threat of enforcement is not an idle one. Similar investigations and enforcement efforts have already been commenced against education institutions by federal agencies, including HHS, in numerous states, including in Plaintiff States, pursuant to the EO's directives that federal agencies enforce Title IX consistent with its definitions and interpretations of federal law.

99.    For example, on February 21, 2025, HHS's Offices for Civil Rights (OCR) initiated an investigation to examine whether the Maine Department of Education "subjected female students in the State of Maine to discrimination on the basis of sex" in violation of Title IX by allowing "transgender athletes to compete in women's sports." On February 25, 2025, HHS OCR found the Maine Department of Education to be in violation of Title IX. On March 17, 2025, HHS OCR issued a press release regarding its finding that described its action as "part of a larger initiative to defend women and children and restore biological truth to the Federal government," with a link to its February 19 announcement that it was taking action on the Gender Ideology EO, *available at* https://www.hhs.gov/press-room/hhs-civil-rights-office-determines-maine-violates-title-ix-allowing-males-womens-sports.html, *preserved at* https://perma.cc/EX3E-H3UK (attached as Exhibit L). HHS described its action as "part of a larger initiative to defend women and children and restore biological truth to the Federal government," with a link to its February 19 announcement that it was taking action on the Gender Ideology EO.

100.    Similarly, on September 30, 2025, the U.S. Department of Education and HHS OCR jointly issued findings that Minnesota was in violation of Title IX because the state has adopted laws and policies that allow students to participate on athletics teams or access restrooms and locker rooms consistent with their gender identity. *Letter of Findings (Notice of Violation)* 1, U.S. Dep'ts of Educ. & Health & Hum. Servs. (Sept. 30, 2025), *preserved at* https://perma.cc/S6TX-9H77 (attached as Exhibit M). The Findings also asserted that the Minnesota Department of Education and other recipients of federal funding are "required to comply with all applicable federal laws, including Title IX in this instance, and all related Executive Orders," including the Gender Ideology EO. *Id.* at 21.

**ii.    Application of the Gender Conditions to State Recipients Increases Administrative Burdens and Legal Liability for Plaintiff States.**

101.    HHS's retroactive application of the Gender Conditions will further burden Plaintiff States, which have structured their programs and sub-awards in reliance on the terms that were in effect at the time the funds were accepted and would be harmed by having to ensure compliance with new conditions, including by having to expend resources to survey compliance by sub-grantees and contractors, respond to inquiries from sub-grantees and advise them on any necessary changes, and ensure any required changes are made to curricula, materials, and facilities.

102.    Because the actions triggering certification (obligation, expenditure or drawdown) are in many cases ongoing and/or imminent, State Recipients would not have sufficient time to take the steps necessary to confirm compliance. What is more, Plaintiff States' agencies are being asked to ensure their subgrantees' compliance with ambiguous terms in all of their programming, including programming that is not covered by Title IX, or programming that may be covered by Title IX but that is not funded by or related to the state agency's grant. Even if Plaintiff States engage in these tasks in an attempt to confirm compliance, they risk enforcement by HHS if the agency deems their interpretation incorrect.

103.    Many State Recipients have in good faith accepted funds subject to the Gender Conditions for a variety of reasons, including their belief that Title IX does not apply to the funding in question; that the Gender Conditions do not impose additional obligations on them outside of Title IX; that they are compliant with Title IX under applicable, established law; that they could comply with any obligations imposed on them by the Gender Conditions; or that the Gender Conditions have been set aside and Defendants enjoined from enforcing them. But the ambiguities detailed in this Complaint, along with HHS's continuing insistence that State Recipients certify to

32

the Gender Conditions even following the courts' stays and injunctions, expose Plaintiff States to heightened legal risks, as specified in the Conditions themselves.

104.    The risk to State Recipients is magnified by DOJ's formation of the "Civil Rights Fraud Initiative," and plans for "vigorous enforcement" of the FCA against recipients of federal funds in coordination with "federal agencies that enforce civil rights requirements for federal funding recipients, including . . . [HHS]," Exh. C (Blanche FCA Memo) at 2, and the corresponding formation of the DOJ-HHS FCA Working Group. Both of these initiatives further encourage whistleblowers and private enforcement of the FCA. *Id.*; Exh. F at 2. While Plaintiff States are immune from private FCA suits, and do not concede that they are subject to liability under the FCA at all, there can be no question that the Blanche FCA Memo places Plaintiff States under increased threat of investigation and legal risk under the FCA.

### iii.    Application of the Gender Conditions Conflicts with Laws of Plaintiff States that Safeguard the Rights of Transgender People.

105.    Should HHS contend that the Gender Conditions impose new requirements on Plaintiff States as grant recipients, given the content of the EO, Plaintiff States are stuck between a rock and a hard place: comply with HHS's unlawful Gender Conditions and violate their own State's laws and policies intended to honor the dignity and safeguard the rights of transgender people within their borders, or risk losing billions in federal funding for essential programs. This renders the Gender Conditions impermissibly coercive. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).

106.    In Plaintiff States' sovereign judgment, protecting the rights and ability of transgender individuals to participate in all aspects of society consistent with their gender identity, and free from discrimination or harassment, is central to ensuring members of the transgender community can survive and thrive. Plaintiff States have particularly strong interests in promoting

the health of underserved populations, including transgender individuals, and in safeguarding young people's ability to participate in education programming in an environment that is safe, affirming, and free from discrimination.

107.    To protect these interests, in the exercise of their sovereign authority, Plaintiff States have enacted a variety of measures that recognize and protect the transgender members of their communities. These measures include state constitutional protections against discrimination on the basis of sex and gender identity; laws and policies designed to protect against discrimination, bullying, and harassment, in employment, education, and public accommodations; laws and policies guaranteeing the right to use facilities consistent with gender identity; and laws and policies ensuring students can participate in athletic activities consistent with their gender identity to the greatest degree possible. The States have further taken steps to ensure transgender individuals have equal access to health care, and that populations that are frequently overlooked are included in health research and programming.

108.    By contrast, policies and practices that exclude, stigmatize, or fail to recognize transgender individuals, and in particular transgender young people, are associated with a raft of harmful physical and mental health outcomes, including increased rates of depression, PTSD, substance abuse disorder, and suicidality.

109.    If HHS asserts that the Gender Conditions impose obligations on Plaintiff States beyond Title IX, then given the content of the EO, their application to Plaintiff States is all but certain to interfere with Plaintiff States' ability to effectuate their respective states' laws and policies protecting and advancing the rights of transgender individuals, harming Plaintiff States' sovereign interests, on pain of losing their federal funding.

110.    For example, the New York State Constitution was recently amended to include protections against discrimination on the basis of sex, including, *inter alia*, sexual orientation and gender identity. N.Y. Const. Art. 1 § 11. The New York State Human Rights Law prohibits discrimination on the basis of gender identity or expression in employment, housing, schools, and public accommodations. N.Y. Exec. Law §§ 290-301. It further states that all protections are a floor—not a ceiling—and are to be liberally construed, without reference to any federal law that may lead to a more restrictive result. *Id.* § 300. New York Civil Rights Law Section 40-c also bans discrimination by any person, corporation, institution, firm, or the state, on the basis of sex, gender identity or expression. New York has enacted numerous regulations pursuant to these laws to carry out their mandates.[2]

111.    In addition, New York State Education Law expressly prohibits gender identity-based discrimination and harassment of students on school property and at school functions. N.Y. Educ. Law §§ 11(6), 12(1), 313(3)(a); 8 NYCRR § 100.2(l)(2). The New York State Education

---

[2] *See, e.g.*, 9 NYCRR § 466.13 (defining gender identity or expression as a protected class and discrimination based on gender identity or expression as a form of prohibited sex discrimination, and defining discrimination on the basis of gender dysphoria as disability discrimination); 14 NYCRR §§ 584.8(f), 599.6, 815, 830.6, 853.19 (prohibiting discrimination by the New York State Office of Mental Health and requiring providers to offer culturally competent services on the basis of gender identity and expression); 9 NYCRR § 6654.16(ai) (banning discrimination by the New York State Office of the Aging); 14 NYCRR § 633.3 (banning discrimination by the New York State Office of People with Developmental Disabilities and facilities it certifies); 9 NYCRR §§ 180-1.5, 180-3.10, 180-3.27, (banning discrimination in certain youth services and secure detention facilities); 18 NYCRR §§ 440.4, 441.4(a), 423.4(m), 441.22(a), 441.24, 443.3 (banning discrimination in programs for foster children and family members served by the agency; 14 NYCRR §§ 584.6(e), 584.7(c) (banning discrimination in residential treatment services for children); 14 NYCRR § 505.2(l) (banning discrimination in Medicaid related to gender dysphoria); 10 NYCRR §§ 405.7(b), 751.9 and 14 NYCRR §§ 580.5, 582.5(a)(3), 590.6(c)(2) (banning discrimination at hospitals and psychiatric centers on the basis of gender identity and expression); 11 NYCRR §§ 52.72, 52.75 (banning discrimination on the basis of sexual orientation and gender identity or expression in insurance).

Department has made it clear that under state law, transgender students in K-12 schools have the right to access school facilities and participate in activities consistent with their gender identity. *See* N.Y.S. Educ. Dep't, *Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* (June 12, 2023) at 22-23, *available at* https://www.nysed.gov/sites/default/files/programs/student-support-services/creating-a-safe-supportive-and-affirming-school-environment-for-transgender-and-gender-expansive-students.pdf, *preserved at* https://perma.cc/PBC9-F8PA.

112.    New York Executive Law Section 170-G requires state agencies to capture sexual orientation and gender identity (SOGI) data whenever the agency collects ancestry and ethnic origin data from customers interacting with the agency; *see also* N.Y. Public Health Law §§ 2803-C-2 (patient bill of rights for LGBTQ communities); 240(6) (requiring NYSDOH to use health disparities data, including on the basis of sexual orientation and gender identity to promote health equity); 244(g) (providing specific attention for transgender and non-binary wellness and equity to increase cultural competence and address inequities in health care and funding); N.Y. Mental Hyg. Law §§ 19.45 (to have a council develop and implement health strategies to reduce disparities for vulnerable populations, including the transgender community); 19.07(c) (requiring the Office of Addiction Services to provide care regardless of gender identity or expression); 9 NYCRR § 52.52 (requiring insurers to request information related to gender identity or expression but prohibiting discrimination related to that collection).

113.    Oregon's Constitution guarantees legal equality to all people, regardless of sex. Or. Const. Art. I, § 46. And the word "sex" in Oregon law has been interpreted to include gender identity. *Matter of Hollister*, 305 Or. App. 368, 377 (2020).

114.    It is Oregon's public policy that unlawful discrimination on the basis of gender identity is a matter of state concern, a threat to the rights and privileges of Oregon's inhabitants, and a danger to "the institutions and foundation of a free democratic state." Or. Rev. Stat. § 659A.006(1). As part of that policy, Oregon prohibits discrimination on the basis of gender identity in employment, education, medical treatment, housing, real estate transactions, and public accommodations, among other areas. Or. Rev. Stat. § 659A.030 (a)–(b), (d)–(e); Or. Rev. Stat. § 659.850(1)–(2); Or. Rev. Stat. § 659A.142(6); Or. Rev. Stat. § 659A.421; Or. Rev. Stat. § 659A.403(1), (3); Or. Rev. Stat. § 659A.406; Or. Rev. Stat. § 659A.409. In the educational environment specifically, all students, employees, and visitors are entitled to be free from discrimination or harassment on the basis of gender identity. Or. Rev. Stat. § 339.347(3).

115.    Oregon law also allows individuals to amend their vital records and change their legal sex to affirm their gender identity, including their nonbinary gender identity. Or. Rev. Stat. § 33.460(1); Or. Rev. Stat. § 432.235(3); *Hollister*, 305 Or. App. at 370. And Oregon state institutions—ranging from universities to child protective services to law enforcement agencies—are often required to collect demographic information on the people they serve that includes information about the gender identity of those constituents. *E.g.*, Or. Rev. Stat. § 352.274(1); Or. Rev. Stat. § 419B.335(1); Or. Rev. Stat. § 131.925; Or. Rev. Stat. § 147.380.

116.    California law prohibits discrimination on the basis of gender identity, gender expression, transgender status, gender dysphoria diagnosis, or intersex status in the provision of healthcare services. Cal. Civ. Code § 51; Cal. Gov't Code §§ 11135, 12926; Cal. Code Regs. Tit. 2, §§ 14000 *et seq*. In California, healthcare for transgender residents is "medically necessary health care that respects the gender identity of the patient, as experienced and defined by the patient." Cal. Welf. & Inst. Code § 16010.2(b)(3); Cal. Civ. Code § 1798.300(c).

117.    It has been the law and policy of the State of California that all persons, regardless of their gender, gender identity, or gender expression, should enjoy equal rights and opportunities, and freedom from discrimination of any kind, in the educational institutions of the state. *See* Cal. Educ. Code §§ 200, 220.

118.    California prohibits discrimination and harassment in the workplace based on actual or perceived sex, gender identity, gender expression, transgender or transitioning status, or sexual orientation. Employers must honor transgender workers' lived names and pronouns and allow them to use gender-appropriate restrooms. Cal. Gov't Code § 12940(a); 2 Cal. Code Reg. § 11034(e)(2), (h), (i)(4).

119.    California prohibits discrimination in housing based on actual or perceived sex, gender identity, gender expression, or sexual orientation. This includes emergency shelter settings. Cal. Gov't Code § 12955.

120.    California allows individuals to self-attest to their gender marker when applying for a driver's license or state identification card, updating a California birth certificate, or petitioning a court for a gender marker change order. Cal. Health & Safety Code §§ 103426, 103430; Cal. Vehicle Code § 12800. California allows individuals to legally change their names to conform to their gender identity, by filing a petition in state court and obtaining a name change court order. Cal. Code Civ. Proc. § 1279.5.

121.    Rhode Island law prohibits discrimination on the basis of gender identity or expression in places of public accommodation, including health care settings including "clinics" and "hospitals." R.I. Gen. Laws § 11-24-2, 3. Rhode Island law establishes a right to equal employment opportunities "regardless of . . . gender identity or expression." R.I. Gen. Laws § 28-5-5. Further, Rhode Island prohibits wage discrimination on the basis of gender identity or

expression. R.I. Gen. Laws § 28-6-18. Similarly, in housing, Rhode Island law establishes a right to equal housing opportunities "regardless of . . . gender identity or expression" and prohibits all manner of discriminatory housing practices. R.I. Gen. Laws §§ 34-17-1 *et seq*. All Rhode Island state agencies must "render service to the citizens of this state without discrimination based on . . . gender identity or expression" and "[n]o state facility shall be used in furtherance of any discriminatory practice nor shall any state agency become a party to any agreement, arrangement, or plan that has the effect of sanctioning those patterns or practices." R.I. Gen. Laws § 28-5.1-7.

122.    Rhode Island prohibits discrimination on the basis of sex, gender identity, or gender expression in the provision of health care. State-licensed health care facilities are prohibited from denying care on the basis of sex, gender identity, or gender expression. R.I. Gen. Laws § 23-17-19.1; *see also* R.I. Gen. Laws § 28-5.1-12 (requiring state-licensed or chartered health care facilities to comply with the state policy of equal opportunity and nondiscrimination in-patient admissions and health care service); 220-RICR-80-05-1 (regulations further detailing these obligations of health care facilities, including obligations to admit patients without discriminating on the basis of "gender identity or expression" and implement employment policies that prohibit discrimination on the basis of "sex" or "gender identity or expression"). Rhode Island further prohibits discrimination on the basis of gender identity, expression, or gender dysphoria diagnosis in the provision of health insurance regulated by the state. Health Insurance Bulletin 2015-3, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Expression (November 23, 2015).

123.    Rhode Island students are protected from discrimination on the basis of gender identity at school. R.I. Gen. Laws § 16-21-34 (requiring a statewide policy prohibiting bullying, including on the basis of gender identity or expression); 200-RICR-30-10-2 (regulations

promulgating the statewide policy prohibiting bullying, including on the basis of gender identity or expression).

124.    The Colorado Anti-Discrimination Act (CADA) prohibits discrimination in public accommodations, employment, and housing on the basis of, *inter alia*, gender identity and gender expression. *See* Colo. Rev. Stat. § 24-34-300.7; § 24-34-301(9)-(10). Colorado also designates "gender affirming health-care services" as "legally protected health-care activity" and prohibits regulatory or professional disciplinary action for providing such health care so long as it is consistent with generally accepted standards of practice under Colorado law. Colo. Rev. Stat. § 12-30-121. Colorado law also allows individuals to change the sex designation to male (M), female (F), or neither male nor female (X) on their birth certificate and state identity documents such as driver's licenses to align with their gender identity. Colo. Rev. Stat. § 25-2-113.8; §42-2-107(2)(a)(II); § 42-3-302(2.5)(a). Additionally, Colorado law requires that school district boards adopt written policies specifying that schools in the district are subject to state and federal laws and constitutional provisions prohibiting discrimination on various bases including gender identity and gender expression. Colo. Rev. Stat. § 22-32-109(1)(ll)(I).

125.    The Delaware Equal Accommodations Law bars, "in places of public accommodations, practices of discrimination against any person because of . . . gender identity," which means "gender-related identity, appearance, expression or behavior of a person, regardless of the person's assigned sex at birth." 6 Del. C. §§ 4500 *et seq*. Delaware employers may not discriminate against an individual on the basis of gender identity, and must allow an employee to "appear, groom and dress consistent with the employee's gender identity." 19 Del. C. § 711. Similarly, Delaware's Fair Housing Act and Landlord Tenant Code prohibit discrimination against individuals on the basis of gender identity when selling, renting, or making available housing. 6

Del. C. §§ 4600 *et seq.*; 25 Del. C. § 5116. Contracts for public works in Delaware also require equality of opportunity and equal pay for all individuals without regard to their gender identity. 29 Del. C. § 6962. Further, the Delaware Insurance Code makes it an unfair practice to discriminate against an individual on the basis of the person's gender identity in any way when conducting insurance business. 18 Del. C. §§ 2304(22), 8304.

126.    Students in Delaware schools are also protected from discrimination on the basis of gender identity at school. 14 Del. C. § 4164 ("School bullying awareness and prevention," requiring, for example, schools to make a determination as to whether a student was bullied on the basis of "gender identity or expression.").

127.    The Delaware Personal Data Privacy Act protects data revealing an individual's status as transgender or nonbinary as "Sensitive Data" that is worthy of protection and may not be processed without the individual's consent. 6 Del. C. §§ 12D-101 *et seq*.

128.    Neither mental health professionals in Delaware nor Delaware's Department of Services for Children, Youth, and their Families may practice conversion therapy aimed at changing a child's gender identity and may not refer a child to a provider in another jurisdiction to receive conversion therapy. 24 Del. C. § 3009; 29 Del. C. § 9003.

129.    In Delaware, a person who commits a crime motivated in whole or in part by the victim's gender identity is guilty of a hate crime, while a public servant who discriminates against a person on the basis of an individual's gender identity is guilty of official misconduct. 11 Del. C. §§ 1304, 1211.

130.    The Illinois Human Rights Act provides broad civil rights protections for transgender, nonbinary, and gender nonconforming individuals in employment, housing, and places of public accommodation, such as healthcare and schools. 775 Ill. Comp. Stat. 5/1-102(A);

775 Ill. Comp. Stat. 5/1-103(O-1). It is a violation of the Act to deny or refuse to provide the full and equal enjoyment of the facilities, goods, and services of any public accommodation on the basis of sexual orientation or gender identity. 775 Ill. Comp. Stat. 5/5-102(A); 775 Ill. Comp. Stat. 5/1-103(O-1).

131.    The Human Rights Act protects against discrimination based on sexual orientation and gender identity in the provision of healthcare services and health insurance. 775 Ill. Comp. Stat. 5/5-102(A); 775 Ill. Comp. Stat. 5/5-101(A)(6). It is illegal for medical providers in Illinois to refuse to treat a person or to provide unequal treatment on the basis of their gender identity. 775 Ill. Comp. Stat. 5/1-103(O-1) and (Q). Health insurance issuers licensed in Illinois are also prohibited from refusing to issue or renew insurance based on an insured or prospective insured's sexual orientation or gender identity. 775 Ill. Comp. Stat. 5/5-102(A); 775 Ill. Comp. Stat. 5/5-101(A)(6); 50 Ill. Adm. Code 2603.30. The Illinois Administrative Code further prohibits group health insurance plans that provide comprehensive insurance coverage from discriminating based on an insured's or prospective insured's actual or perceived gender identity or because the insured or prospective insured is transgender. 50 Ill. Adm. Code 2603.35.

132.    Students in Illinois are also protected from discrimination at school on the basis of gender identity. 775 Ill. Comp. Stat. 5/5-101(11) (public accommodation includes a "non-sectarian nursery, day care center, elementary, secondary, undergraduate, or postgraduate school, or other place of education"); 775 Ill. Comp. Stat. 5/1-102(A); 775 Ill. Comp. Stat. 5/1-103(O-1). To ensure schools afford a welcoming, safe, and inclusive environment for transgender, nonbinary, and gender nonconforming students, Illinois established the Affirming and Inclusive Schools Task Force in June 2019, which issued a report regarding the legal rights of transgender, nonbinary, and gender nonconforming students in Illinois, as well as recommended procedures and best practices

for schools to protect students' rights. *See* IL Exec. Order 2019-11, *Executive Order Strengthening Our Commitment to Affirming and Inclusive Schools*, (June 30, 2019), *available at* https://www.illinois.gov/content/dam/soi/en/web/illinois/documents/government/executive-orders/2019/executiveorder-2019-11.pdf, *preserved at* https://perma.cc/DUM6-XMKA. The Illinois State Board of Education (ISBE), and the Illinois Department of Human Rights (IDHR), which enforces the Human Rights Act, separately issued non-regulatory guidance to implement the Task Force's recommendations and ensure that students, parents, and schools across Illinois understand their rights and obligations. *See* Illinois State Board of Education, *Non-Regulatory Guidance Supporting Transgender, Nonbinary, and Gender Nonconforming Students* (Mar. 1, 2020) (ISBE Guidance), *available at* https://www.isbe.net/Documents/ISBE-Guidance-Supporting-Transgender-Nonbinary-Gender-Nonconforming-Students.pdf, and Illinois Department of Human Rights, *Non-Regulatory Guidance Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students Under the Illinois Human Rights Act* (Dec. 2021), *available at* https://dhr.illinois.gov/content/dam/soi/en/web/dhr/publications/documents/idhr-guidance-relating-toprotection-of-transgender-nonbinary-and-gender-nonconforming-students-eng-web.pdf, *preserved at* https://perma.cc/6ALL-PL8S. The ISBE guidance stresses that transgender, nonbinary, and gender nonconforming students have a right under state and federal law to an educational environment free from discrimination, harassment, and bullying on the basis of gender identity. ISBE Guidance at 5 ("The Illinois Human Rights Commission has repeatedly ruled that the [Illinois Human Rights Act] protects the rights of people who are transgender in both employment and public accommodations, including schools."). It also encourages schools to

provide regular training to all staff in an effort to prevent discrimination and harassment and promote inclusive schools.

133.    Illinois law also authorizes individuals to change the gender marker on their birth certificate, *see* 410 ILCS 535/17 (1)(e); 77 Ill. Adm. Code 500.43, and similarly permits changes to the gender marker on an individual's driver's license. Illinois Office of the Secretary of State Driver Services Department, *Gender Designation Change Form*, *available at* https://www.ilsos.gov/content/dam/publications/pdf_publications/dsd_a329.pdf, *preserved at* https://perma.cc/VR97-96P8, so that transgender Illinoisians can obtain official records and identification documents that are consistent with their lived experiences.

134.    In Michigan, the Elliot-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101, *et seq.*, prohibits discrimination on the basis of sex, sexual orientation, and gender identity or expression in obtaining employment, obtaining housing and other real estate, and in the "utilization of public accommodations, public service, and educational facilities." Mich. Comp. Laws § 37.2102(1). Michigan also allows individuals to change the sex designation listed on their birth certificate to align with their gender identity, Mich. Comp. Laws § 333.2831(c), and to change the sex designation listed on their driver's license or state identification card to male (M), female (F), or non-binary (X). *See License or ID sex designation correction*, Michigan Department of State, *available at* https://www.michigan.gov/sos/all-services/license-or-id-sex-designation-correction, *preserved at* https://perma.cc/XH8D-HBFR (last accessed: December 18, 2025).

135.    The Minnesota Human Rights Act (MHRA), Minnesota's principal anti-discrimination law, prohibits discrimination on the basis of sexual orientation and gender identity in employment, housing, public accommodations, public services, education, credit, and business. Minn. Stat. §§ 363A.02, 363A.16, 363A.17. In 1993, Minnesota first amended the MHRA to add

sexual orientation as a prohibited basis for discrimination, and that term was defined to include "having or being perceived as having a self-image or identity not traditionally associated with one's biological maleness or femaleness." 1993 Minn. Laws ch. 22, §§ 2, 10, 15 (amending Minn. Stat. §§ 363.01 and 363.03, subds. 3, 8a (1992)). This amendment made Minnesota the first state to protect transgender individuals from discrimination. *See* The Governor's Task Force on Gay and Lesbian Minnesotans, *Report* 51 (Aug. 1995), *available at* https://perma.cc/DXA2-YM6N (last accessed Jan. 12, 2025). In 2023, the Minnesota Legislature amended the MHRA to separate gender identity and sexual orientation into two different protected classes with updated definitions. 2023 Minn. Laws ch. 52, Art. 19, §§ 45-61, 63-71 (codified at Minn. Stat. §§ 363A.02-.11, 363A.12-.17); Minn. Stat. § 363A.03, subds. 44, 50. These amendments cement Minnesota's longstanding commitment to protecting its LGBTQ+ citizens.

136.    The Nevada State Constitution prohibits discrimination on the basis of sex, gender identity, and gender expression. Nev. Const. art. 1, § 24. Nevada law also prohibits employers, employment agencies, and labor organizations from discriminating against "any person" or "employee[s]" on the basis of, among other things, the individual's "sex," "sexual orientation," or "gender identity or expression." Nev. Rev. Stat. § 613.330. Nevada further prohibits discrimination based on "sex," "sexual orientation," or "gender identity or expression" in housing, *id.* § 118.100, and education, *id.* §§ 388.135, 388.122(1)(c). Similarly, Nevada law allows a person to change the sex designation on their Nevada State issued driver's license or ID card. Nev. Admin. Code § 483.075. And under Nevada law, insurers and carriers cannot discriminate against any person "on the basis of actual or perceived gender identity or expression," Nev. Rev. Stat. §§ 689A.033, 689B.0675, 689C.1975, 695A.198, 695B.3167, 695C.204, 695G.415, and Nevada law guarantees coverage for all medically necessary gender-affirming care services in commercial insurance,

Nevada Medicaid, and public employee health plans, *id.* §§ 422.272362, 689A.0432, 689B.0334, 689C.1652, 695A.1867, 695B.1915, 695C.16934, 695G.1718. In addition, an individual who commits a crime motivated in whole or in part by the victim's "sexual orientation or gender identity or expression" may face a sentence enhancement. *Id.* § 193.1675(1).

137.    Vermont law protects the civil rights of transgender people. Vermont prohibits discrimination based on gender identity in places of public accommodation, Vt. Stat. Ann. tit. 9, § 4502(a), including in educational institutions, *see id.* § 4501(1). Vermont likewise prohibits housing discrimination based on gender identity, *id.* § 4503(a), and employment discrimination based on gender identity, Vt. Stat. Ann. tit. 21, § 495.

138.    Vermont requires higher education institutions to report to the state on the scope and availability of gender affirming care and reproductive health care services that they offer. Vt. Stat. Ann. tit. 16, § 2502(a).

139.    "It is the policy of the State of Vermont to honor and acknowledge all gender identities and protect public health and dignity of all individuals in Vermont, irrespective of their gender." Vt. Stat. Ann. tit. 18, § 5112. Accordingly, Vermont permits individuals to change the gender markers on their identity documents, including by changing to a gender-neutral marker. *See id.*

140.    Washington State law has long enshrined the equal rights and equal dignity of all people, regardless of sex. The Washington State Constitution unequivocally provides that "[e]quality of rights and responsibility under the law shall not be denied or abridged on account of sex." Wash. Const. Art. XXXI, § 1.

141.    Washington's Law Against Discrimination (WLAD) likewise provides for "[t]he right to be free from discrimination because of . . . [s]exual orientation," Wash. Rev. Code

49.60.030(1), which includes gender expression or identity, *id.* at .040(29), in places of employment, public accommodation, and real estate, credit, and insurance transactions, *id.* at .030(1). The WLAD also prohibits discrimination in the provision of health-related services on the basis of gender identity or expression. Wash. Rev. Code 49.60.030(1), .040(2), .040(29), .215.

142.     Washington law also protects public school students and employees from discrimination based on sex, Wash. Rev. Code 28A.640, or gender identity, *id.* at 642. Washington law also requires school districts to adopt policies that prohibit harassment, intimidation, and bullying of any student based on protected characteristics, including sex, sexual orientation, and gender expression or identity, Wash. Rev. Code 28A.600.477(1), (5)(b)(i), including adopting policies that specifically address the unique challenges and needs faced by transgender students in public schools (Gender Inclusive Schools Policy and Procedure). *Id.* at 642.080.

143.     In enacting the legislation for the Gender Inclusive Schools Policy and Procedure, the prime sponsor explained: "[N]ational studies show that 82% of transgender youth report feeling unsafe at school, 44%—almost half—report being physically abused while in public schools, 67% have been bullied online, and 64% report having property stolen or destroyed. So, the experiences of our transgender youth are very different than the experiences of many of us in our public schools . . . And so, we are not asking for special protections or unique protections, but we are asking that we ensure through our policy framework that our most vulnerable students are safe in our public schools so they can focus on the important work we have for them."[3]

_____

3 Hr'g Before H. Comm. on Education (Wash. Mar. 14, 2019), at 00:29:54.79-00:31:27.45, video recording by TVW, *available at* https://tvw.org/video/house-education-committee-2019031123/?eventID=2019031123, *preserved at* https://perma.cc/QP3U-WQ3A (House Hr'g).

144.    Washington law also recognizes the existence of transgender Washingtonians in state issued documents and identification. For example, Washington law permits the amendment of birth certificates to change a person's sex designation or to use the non-binary X sex designation. Wash. Rev. Code 70.58A.500(4); Wash. Admin. Code 246-490-075. Likewise, a person may change the sex designation on their Washington State issued driver's license or ID to male, female, or the non-binary sex designation X. Wash. Admin. Code 308-104-0150.

145.    The Gender Conditions fly in the face of these important, well-reasoned protections for transgender people and in doing so, force Plaintiff States into the untenable position of choosing whether to risk losing funding to valuable programs, face heightened risk of FCA liability, or abandon some of its most vulnerable residents.

## CAUSES OF ACTION

### COUNT I

### Violation of the Administrative Procedure Act § 706(2)(A)
### Arbitrary & Capricious

146.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs. Defendants HHS and its sub-Agencies, including CMS, HRSA, and SAMHSA, are "agenc[ies]" under the APA, 5 U.S.C. § 551(1). HHS's decision to adopt the Gender Conditions and implement them agency-wide is a final agency action subject to review under the APA.

147.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

148.    An agency action is arbitrary or capricious where it is not "supported by the record and reasonably explained." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 52 (1983). An agency must "explain the evidence which is available, and must offer a rational connection between the facts found and the choice made." *Id*. (internal quotation marks omitted).

149.    An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem before" it. *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020) (citation omitted); *see also State Farm*, 463 U.S. at 43.

150.    In addition, when an agency rescinds or reverses a prior policy, the agency must provide an explanation for the change and must "consider the 'alternative[s]' that are 'within the ambit of the existing policy,'" *Regents*, 591 U.S. at 30 (quoting *State Farm*, 463 U.S. at 51), "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns," *id*. at 33.

151.    The Gender Conditions acknowledge, and require recipients to acknowledge, "that [the Title IX] certification reflects a change in the government's position." Defendants have provided no explanation to support this significant change. The sole explanation for the adoption of the Gender Conditions is found in the EO itself. But an executive order alone is insufficient to justify an agency's adoption of a new legislative rule. Further, an EO cannot amend statutory law, much less in a manner that is inconsistent with HHS's own prior and present interpretations of Title IX.

152.    In adopting the Gender Conditions, HHS also failed to consider numerous important aspects of the problem. These include (a) the reliance interests of State Recipients and other recipients that have structured their programs based on the agency's prior interpretation of Title IX and on the past and existing interpretations of federal civil rights law by courts and agencies; (b) the harmful impacts on the intended beneficiaries of the relevant grant programs, including the multitude of harms to transgender, nonbinary, intersex, and gender diverse

individuals of being erased from recognition; and (c) the harmful impact to State Recipients, Plaintiff States, and their residents, who rely on this federal funding. Defendants provided no indication that they considered these reliance interests, or that they considered any potential alternatives to achieving their ostensible goal of protecting women's dignity, safety and well-being.

153.    HHS's adoption of the Gender Conditions is further arbitrary and capricious because it breaks with established precedent and would lead to absurd results. Interpreting Title IX—"a broadly written general prohibition on discrimination," *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175, (2005)—as requiring discrimination against and exclusion of transgender individuals is arbitrary, and, at a minimum, marks a policy change on the part of the federal government that is inconsistent with existing applicable law. *See also* 20 U.S.C. § 1689(a)(6) (recognizing transgender individuals as a vulnerable population and requiring formation of a task force on sexual violence in education responsive to their needs).

154.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a finding that the Gender Conditions violate the APA because they are arbitrary and capricious.

155.    Plaintiffs are also entitled to vacatur of the Gender Conditions pursuant to 5 U.S.C. § 706, and all appropriate relief under 5 U.S.C. § 705.

156.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing Defendants from implementing or enforcing the Gender Conditions.

## COUNT II

### Violation of the Administrative Procedure Act § 706(2)(D)
### Without Observance of Procedure Required by Law

157.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

158.    Defendants HHS and its sub-agencies, including CMS, HRSA, and SAMHSA, are "agenc[ies]" under the APA, 5 U.S.C. § 551(1). HHS's decision to adopt the Gender Conditions and implement them agency-wide is a final agency action subject to review under the APA.

159.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

160.    When issuing legislative rules, federal agencies are required to follow the notice-and-comment process set forth in the APA. These require the agency to publish a "[g]eneral notice of proposed rule making" in the Federal Register. 5 U.S.C. § 553(b). That notice must describe "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id*. § 553(b)(3). The agency must further provide "interested persons" an "opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. § 553(c).

161.    In promulgating the Gender Conditions and applying them agency-wide, HHS adopted a new policy interpretation of Title IX.

162.    Additionally, in adopting the Gender Conditions as purporting to "include" the EO's "requirements" into Title IX and apply them to recipients, HHS attempted to alter the substantive requirements of Title IX. HHS acknowledged that the change constitutes a new certification requirement with "updated non-discrimination language." HHS GPS at 4. It specifies that compliance with "all federal antidiscrimination laws *and these requirements* . . . is a material condition of receiving federal funding streams" that "go[es] to the essence of the Agreement." (emphasis added). It states that in accepting the award, "[r]ecipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the

foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement" and "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001." *Id.*

163.    Because HHS has attempted to impose a new basis for Title IX enforcement and withholding of HHS education-related funding on recipients, as well as liability under the FCA, the adoption and promulgation of the Gender Conditions constitutes a legislative rule, rather than an interpretive rule or a general statement of policy.

164.    Setting aside whether HHS could legally and constitutionally promulgate a rule imposing the Gender Conditions in the first instance, there are no circumstances that would create good cause for HHS to forgo notice and comment in adopting the policy underlying the GPS. *See* 5 U.S.C. § 553(b)(B). Nor does HHS invoke the good cause exception for promulgating the Gender Conditions in this manner by "incorporat[ing] the finding [of good cause] and a brief statement of reasons therefor," as required by § 553(b)(B).

165.    In adopting and promulgating the Gender Conditions to issue an agency-wide legislative rule interpreting Title IX, Defendants have failed to follow the procedural requirements of the APA. The Gender Conditions must therefore be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(D).

166.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing Defendants from implementing or enforcing the Gender Conditions.

## COUNT III

**Violation of the Administrative Procedure Act §§ 706(2)(A), 706(2)(B), 706(2)(C)
Not in Accordance with Law; In Excess of Statutory Authority;
Contrary to Constitutional Power**

167.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

168.    Defendants HHS and its sub-agencies, including CMS, HRSA, and SAMHSA, are "agenc[ies]" under the APA, 5 U.S.C. § 551(1). HHS's decision to adopt the Gender Conditions and implement them agency-wide is a final agency action subject to review under the APA.

169.    The APA requires courts to "hold unlawful and set aside" agency actions that are "not in accordance with law," *id.* § 706(2)(A); "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B); or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

170.    The Gender Conditions exceed the agency's statutory authority to impose conditions on funds appropriated by Congress, and are contrary to various laws and constitutional protections, including separation of powers and the Spending Clause of the U.S. Constitution. They are further not in accordance with numerous federal and State constitutional and statutory protections guaranteeing equal rights and dignity to transgender individuals. Because these infirmities render them in excess of HHS's authority and contrary to law and the Constitution, this Court should hold them unlawful and set them aside under the APA.

171.    First, to the extent HHS's Gender Conditions are an attempt to bind Plaintiff States to the Gender Ideology EO and its definitions, such attempt finds no support in any Congressional condition placed on grants administered or disbursed by HHS. Congress has not authorized HHS to impose such terms as a condition of the receipt of federal funds.

172.    HHS lacks authority to reinterpret Title IX's requirements via a funding condition or graft the EO's definitions onto Title IX's substantive prohibitions on sex discrimination. Title IX does not include any such definitions, nor does any other statute contain a definition of sex, "gender ideology," or any related term that requires recipients of federal funds to exclude or deny the existence of transgender individuals. And the terms of the EO are inconsistent with HHS's prior and still current interpretations of Title IX, as well as with prior interpretations of Title IX and related civil rights laws by courts.

173.    Second, for similar reasons, the Gender Conditions violate separation of powers. Article II of the Constitution entrusts the President to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Article I of the U.S. Constitution vests Congress with the power to make appropriations and control the public finances. The Presentment Clause requires that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States." U.S. Const. art. I, § 7, cl. 2. The Appropriations Clause provides that no "[m]oney shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

174.    Congress distributes hundreds of billions of dollars every year to the States in the form of healthcare, research, and educational grants distributed by HHS, some of which are subject to Title IX.

175.    The Gender Conditions violate separation of powers because the executive branch, through HHS, has overridden the careful judgments of Congress by conditioning receipt of funds from innumerable federal grant programs based on certification of compliance with conditions not clearly authorized by Congress. HHS has no statutory authority to do this.

176.    HHS's attempt to incorporate the Gender Conditions into Title IX violates the President's Article II obligation to take care that the laws be faithfully executed and usurps the legislative authority conferred by the Constitution exclusively on Congress.

177.    Third, even if Congress had granted HHS such authority—which it has not—the Gender Conditions would violate the Spending Clause.

178.    The Constitution specifically grants Congress the power "to pay the Debts and provide for the common Defense and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

179.    While Congress can attach conditions to the receipt of federal funds, its authority is not unlimited. Conditions must be lawful, and states must be given clear and unambiguous notice of any conditions on federal funds. Congress also cannot surprise participating states with retroactive conditions. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012). And Congress may not commandeer state power by attaching terms that are "so coercive as to pass the point at which 'pressure turns into compulsion.'" *Id*. at 580 (quoting *South Dakota v. Dole,* 483 U.S. 203, 211 (1987)). The Gender Conditions violate the Spending Clause on each of the above grounds.

180.    To the extent the Gender Conditions apply to open or continuing grant awards, the Gender Conditions retroactively alter the conditions attached to those funds by imposing new conditions on existing appropriations of federal funds to the States, altering the terms upon which Congress obligated and disbursed the funds and on which the States relied in applying for and accepting the funds. This violates the Spending Clause.

181.    The Gender Conditions lack the clear and unambiguous language required by the Spending Clause because they (a) fail to specify what types of conduct or programming are

permitted or prohibited under the Administration's purported redefinition of the scope of Title IX; (b) command federal agencies to interpret and enforce federal statutes, including Title IX, in accordance with the EO's terms, while failing to specify what, if anything the EO requires of State Recipients; (c) purport to incorporate definitions that conflict with HHS's prior and existing definitions; and (d) require State Recipients to make a certification that appears to conflict with existing certifications to which they are still subject. The Gender Conditions therefore fail to provide States with the type of "unambiguously" clear notice about the terms and conditions attached to the funding that the Spending Clause requires.

182.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are thus entitled to a finding that the Gender Conditions violate the APA because they are not in accordance with law and exceed the agency's authority, and an injunction that they must be set aside.

183.    Plaintiffs are also entitled to vacatur of the Gender Conditions pursuant to 5 U.S.C. § 706, and all appropriate relief under 5 U.S.C. § 705.

184.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing Defendants from implementing or enforcing the Gender Conditions.

### COUNT IV

### Violation of the Separation of Powers

185.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

186.    As set forth in Count III, which is fully incorporated herein, the Gender Conditions violate separation of powers. Pursuant to 28 U.S.C. § 2201, Plaintiffs are thus entitled to a declaration that the attempt to incorporate the Gender Conditions into Title IX violates separation of powers.

187.    Plaintiffs are also entitled to a preliminary and permanent injunction barring the Defendants from implementing or enforcing the Gender Conditions.

**COUNT V**

**Violation of the Spending Clause**

188.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

189.    As detailed in Count III, which is fully incorporated herein, the Gender Conditions violate the Spending Clause. Pursuant to 28 U.S.C. § 2201, Plaintiffs are thus entitled to a declaration that HHS's imposition of the Gender Conditions violates the Spending Clause.

190.    Plaintiffs are also entitled to a preliminary and permanent injunction barring Defendants from implementing or enforcing the Gender Conditions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States respectfully request that this Court enter judgment in their favor and grant the following relief:

A.  Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, hold unlawful and set aside the Gender Conditions as contained in:

    i.    The HHS Grants Policy Statement;

    ii.    The standard terms and conditions of SAMHSA, CMS, HRSA, or any future standard terms and conditions of any other sub-Agency of HHS;

    iii.    Any existing or future notices of funding opportunity or notices of award issued by any HHS sub-Agency to Plaintiff States, including State Recipients and sub-grantees, including for the Rural Health Transformation Program;

        iv.     Any similar documents, notices, or other action by Defendant Agencies by any other name, against Plaintiff States, including State Recipients and sub-grantees.

B. Issue a judicial declaration that the Gender Conditions, and any actions taken by Defendants to enforce them against Plaintiff States or State Recipients violate the guarantee of separation of powers and the Spending Clause of the U.S. Constitution;

C. Permanently enjoin Defendants from implementing or enforcing the Gender Conditions as contained in:

        i.     The HHS Grants Policy Statement;

        ii.     The standard terms and conditions of SAMHSA, CMS, HRSA, or any future standard terms and conditions of any other sub-Agency of HHS;

        iii.     Any existing or future notices of funding opportunity or notices of award issued by any HHS sub-Agency to Plaintiff States, including State Recipients and sub-grantees, including for the Rural Health Transformation Program;

        iv.     Any similar documents, notices, or other actions by Defendant agencies by any other name, against Plaintiff States, including State Recipients and sub-grantees.

D. Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

E. Grant other such relief as this Court may deem proper.

Dated this 13th day of January 2026.

Respectfully submitted,

**DAN RAYFIELD**
Attorney General of Oregon

By: */s/ Leanne Hartmann*
LEANNE HARTMANN OSB # 257503*
*Senior Assistant Attorney General*
CARTER BRACE OSB #243828*
*Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Leanne.Hartmann@doj.oregon.gov
Carter.Brace@doj.oregon.gov

*Counsel for Plaintiff State of Oregon*


**ROB BONTA**
Attorney General for the State of California

By: */s/ Crystal Adams*
CRYSTAL ADAMS*
*Deputy Attorney General*
MICHAEL L. NEWMAN*
NELI PALMA*
*Senior Assistant Attorneys General*
KATHLEEN BOERGERS*
JOEL MARRERO*
*Supervising Deputy Attorneys General*
KATHERINE MILTON*
BRIAN BILFORD*
*Deputy Attorneys General*
1515 Clay Street
Oakland, CA 94612-1499
(408) 679-7010
Crystal.Adams@doj.ca.gov
Michael.Newman@doj.ca.gov
Neli.Palma@doj.ca.gov
Kathleen.Boergers@doj.ca.gov
Joel.Marrero@doj.ca.gov
Katherine.Milton@doj.ca.gov
Brian.Bilford@doj.ca.gov

*Counsel for Plaintiff State of California*

**LETITIA JAMES**
Attorney General of New York

By: */s/ Galen Leigh Sherwin*
GALEN LEIGH SHERWIN*
*Special Counsel for Reproductive Justice*
RABIA MUQADDAM*
*Chief Counsel for Federal Initiatives*
ANNE CHAMPION*
*Special Counsel for Federal Initiatives*
COLLEEN K. FAHERTY*
*Special Trial Counsel*
MATTHEW FAIELLA*
*Special Counsel for LGBTQIA Rights*
RACHEL HANNAFORD*
*Senior Enforcement Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-6183
Galen.Sherwin@ag.ny.gov
Rabia.Muqaddam@ag.ny.gov
Anne.Champion@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Matthew.Faiella@ag.ny.gov
Rachel.Hannaford@ag.ny.gov

*Counsel for Plaintiff State of New York*

***Cont'd on next page***

**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ David Moskowitz*
DAVID MOSKOWITZ*
*Deputy Solicitor General*
SAM WOLTER*
*Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
720-508-6000
david.moskowitz@coag.gov
samuel.wolter@coag.gov

*Counsel for Plaintiff State of Colorado*


**KWAME RAOUL**
Attorney General State of Illinois

By: */s/ Caitlyn G. McEllis*
CAITLYN G. MCELLIS*
*Senior Policy Counsel*
ALEEZA STRUBEL*
*Complex Litigation Counsel*
ELENA METH*
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. Lasalle Street
Chicago, IL 60603
312-814-3000
Caitlyn.McEllis@ilag.gov
Aleeza.Strubel@ilag.gov
Elena.Meth@ilag.gov

*Counsel for Plaintiff State of Illinois*


**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Ian R. Liston*
IAN R. LISTON*
*Director of Impact Litigation*
VANESSA L. KASSAB*
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8875
Ian.Liston@delaware.gov
Vanessa.Kassab@delaware.gov

*Counsel for Plaintiff State of Delaware*


**DANA NESSEL**
Attorney General of Michigan

By: */s/ Daniel J. Ping*
DANIEL J. PING*
NEIL GIOVANATTI*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
PingD@michigan.gov
GiovanattiN@michigan.gov

*Counsel for Plaintiff State of Michigan*

***Cont'd on next page***

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/Katherine Bies*
KATHERINE BIES*
*Assistant Attorney General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*


**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Sarah W. Rice*
SARAH W. RICE (Bar No. 10465)
*Deputy Chief, Public Protection Bureau*
*Assistant Attorney General*
JULIA C. HARVEY (Bar No. 10529)
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2054
srice@riag.ri.gov
jharvey@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*


**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ Sarah E. Smith-Levy*
SARAH E. SMITH-LEVY, WSBA #55770*
LUCY WOLF, WSBA #59028*
KELSEY ENDRES, WSBA #39409*
*Assistant Attorneys General*
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104
(206) 464-7744
sarah.e.smith-levy@atg.wa.gov
lucy.wolf@atg.wa.gov
kelsey.endres@atg.wa.gov

*Counsel for Plaintiff State of Washington*


**AARON D. FORD**
Attorney General of Nevada

By: */s/ K. Brunetti Ireland*
K. BRUNETTI IRELAND*
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for Plaintiff State of Nevada*


**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Jonathan T. Rose*
JONATHAN T. ROSE*
*Solicitor General*
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.Rose@vermont.gov

*Counsel for Plaintiff State of Vermont*


*\* Applications for admission pro hac vice forthcoming*