# EXHIBIT M



OFFICE FOR CIVIL RIGHTS

September 30, 2025

Commissioner Willie Jett
Minnesota Department of Education



Don Peschel, Board President
Erich Martens, Executive Director
Minnesota State High School League

Keith Ellison

Re:    ED OCR Case Numbers 05254060 and 05258901 – Letter of Findings (Notice of Violation)
       HHS OCR Transaction No. 25-626-433-RV-CRR (Notice of Violation)

Dear Messrs. Jett, Peschel, Martens, and Ellison:

This letter is to inform you of the outcome of the investigations conducted by the U.S. Department of Education (Department), Office for Civil Rights (ED OCR), and the U.S. Department of Health and Human Services (HHS), Office for Civil Rights (HHS OCR) into the Minnesota Department of Education (MDE) and the Minnesota State High School League (MSHSL).[1] For the reasons set forth below, ED OCR and HHS OCR find that the MDE and the MSHSL are in violation of Title IX.

---

[1] On April 4, 2025, the U.S. Department of Education and the U.S. Department of Justice announced the creation of the Title IX Special Investigations Team (SIT) to ensure timely, consistent resolutions that protect students, especially female athletes, from the pernicious and generally unlawful conduct performed in school programs and activities in the service of radical gender ideology. This investigation was conducted by the SIT.

*Page 2* –05254060, 05258901, and 25-626-433-RV-CRR – *Letter of Findings (violation)*

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq*., and its implementing regulation, 34 C.F.R. Part 106 (ED)[2] and 45 C.F.R. Part 86 (HHS), prohibit discrimination on the basis of sex in any education program or activity receiving federal financial assistance. Recipients of federal financial assistance from the Department and HHS are subject to these laws and regulations and to the enforcement jurisdiction of the Department's and HHS's OCR. Additional information about the laws OCR enforces is available on the Department's website and HHS's website.

## SECTION 1: THE DEPARTMENT OF EDUCATION

OCR examined whether the MDE and the MSHSL violate Title IX by discriminating on the basis of sex in athletics, including by denying equal education benefits or opportunities to female student athletes through general or athletics-specific participation policies that permit males to participate in interscholastic athletic programs designated for girls and women, which deprives girls and women of equal athletic opportunities. OCR also examined whether the MDE and the MSHSL violate Title IX through its sensitive-spaces policies or practices, including whether the MDE and the MSHSL denies female students the equal benefits of any education program or activity by denying females access to female-only sensitive spaces, such as sex-separated locker rooms and bathrooms.[3]

In accordance with OCR's Case Processing Manual (February 19, 2025), OCR has reached its determination by using a preponderance-of-the-evidence standard and finds that the evidence supports a conclusion of noncompliance with Title IX. As further explained below, Title IX is not a statute about "gender identity" or "gender-identity discrimination" but one about sex discrimination. "Sex" does not mean, and has never meant, "gender identity." Title IX and its implementing regulations have never used the term "gender identity," let alone defined this seemingly undefinable term. When recipients of federal funding treat "trans-identifying" males as if they were somehow females, they defeat the very purpose of Title IX: to ensure equal opportunities for women and girls without jeopardizing their privacy, safety, or other rights. Allowing men and boys to compete in women's and girls' sports is demeaning, unfair, and dangerous to women and girls and denies females the same equal opportunity to participate and excel in competitive sports afforded to males. And allowing males to invade sensitive female-only spaces like locker rooms or bathrooms endangers women's and girls' safety, privacy, and dignity, while denying them equal access to educational activities or programs. The MDE, Minnesota school districts, and the MSHSL intentionally, or with deliberate indifference, allow males to participate in women's and girls' sports and to use women's and girls' locker rooms and bathrooms. They have done so despite seeing women and girls harmed during sporting events, displaced from podiums in athletic competitions, lose opportunities for advancement in competitions, miss out on critical visibility and recognition, and denied access to previously available athletic competition in programs designed for and dedicated to female-only student athletes. And they have done so despite seeing women and girls suffer privacy and safety harms from their locker-room and bathroom policies—harms that common sense would reveal to be the

---

[2] This matter cites to the Title IX regulations that are currently in force and that took effect August 14, 2020 (85 Fed. Reg. 30,026-30,579 (May 19, 2020)). *See Tennessee v. Cardona*, 762 F. Supp. 3d 615, 626-28 (E.D. Ky. 2025).

[3] The terms bathrooms and restrooms throughout this letter are used interchangeably. Additionally, although these investigations focused on the Minnesota Department of Education and the Minnesota State High School League, OCR found similar violations by various Minnesota school districts who are also recipients of federal funding through the Minnesota Department of Education and who utilize the services of the Minnesota State High School League.

*Page 3 –05254060, 05258901, and 25-626-433-RV-CRR – Letter of Findings (violation)*

obvious result of such policies. Thus, they are in clear violation of Title IX.

## I.    Legal Standards

### A.    Statutory and Regulatory Background

Title IX states a general prohibition on "sex" discrimination in education programs or activities receiving federal funding: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a).[4]

After that general ban on sex discrimination, Title IX lists various sex-based practices that the statute does not forbid. Recipients of federal funding, for example, may have traditionally sex-separated schools (*id.* § 1681(a)(5)), fraternities and sororities (*id.* § 1681(a)(6)), Boys and Girls State conferences (*id.* § 1681(a)(7)), and scholarships for "beauty" pageants (*id.* § 1681(a)(9)). Schools may also have father-daughter dances if they provide "reasonably comparable activities" for "the other sex." *Id.* § 1681(a)(8). And Title IX's ban on sex discrimination cannot be "construed" to prohibit "separate living facilities for the different sexes." *Id.* § 1686.

Title IX empowers and directs Federal departments and agencies to issue and enforce regulations to effectuate the provisions of Title IX. *See id.* § 1682. The Department has exercised this authority from the beginning, issuing regulations making clear that schools may have sex-separate bathrooms, athletic programs, among other things. *See* 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).

One Title IX regulation states the general prohibition on sex discrimination:

> (a) General. Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives federal financial assistance. . . .
>
> (b) Specific prohibitions. Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:
>
> > (1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the

---

[4] Title IX defines "Educational institution" as "any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department." 20 U.S.C. § 1681(c). And 34 C.F.R. § 106.2(k) defines "educational institution" to include "a local educational agency (LEA)." And Title IX defines "program or activity" to include: "a department, agency, special purpose district, or other instrumentality of a State or of a local government"; "the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government"; "a college, university, or other postsecondary institution, or a public system of higher education; a local educational agency . . . , system of vocational education, or other school system; an entire corporation, partnership, or other private organization . . . if assistance is extended to such corporation, partnership, private organization; or which is principally engaged in the business of providing education, . . .; or any other entity which is established by two or more of the entities described [herein]; any part of which is extended Federal financial assistance. . . ." 20 U.S.C. § 1687; *see* 34 C.F.R. § 106.2(h).

provision of such aid, benefit, or service;

(2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

(3) Deny any person any such aid, benefit, or service;

(4) Subject any person to separate or different rules of behavior, sanctions, or other treatment;

. . .

(6) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees;

(7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

. . .

(d) Aid, benefits or services not provided by recipient.

(1) This paragraph applies to any recipient which requires participation by any applicant, student, or employee in any education program or activity not operated wholly by such recipient, or which facilitates, permits, or considers such participation as part of or equivalent to an education program or activity operated by such recipient, including participation in educational consortia and cooperative employment and student-teaching assignments.

(2) Such recipient:

(i) Shall develop and implement a procedure designed to assure itself that the operator or sponsor of such other education program or activity takes no action affecting any applicant, student, or employee of such recipient which this part would prohibit such recipient from taking; and

(ii) Shall not facilitate, require, permit, or consider such participation if such action occurs.

34 C.F.R. § 106.31.

Other regulations touch on sensitive facilities (*e.g.*, bathrooms and locker rooms) and athletics specifically. As to sensitive facilities, Title IX's regulations require "[c]omparable facilities," stating that "[a] recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

As to athletics, Title IX's implementing regulations require that:

*Page 5 –05254060, 05258901, and 25-626-433-RV-CRR – Letter of Findings (violation)*

(a) General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

(b) Separate teams. Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

(c) Equal Opportunity. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:

> (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
>
> (2) The provision of equipment and supplies;
>
> (3) Scheduling of games and practice time;
>
> (4) Travel and per diem allowance;
>
> (5) Opportunity to receive coaching and academic tutoring;
>
> (6) Assignment and compensation of coaches and tutors;
>
> (7) Provision of locker rooms, practice and competitive facilities;
>
> (8) Provision of medical and training facilities and services;
>
> (9) Provision of housing and dining facilities and services;
>
> (10) Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

34 C.F.R. § 106.41.

Specifically, Title IX's athletics regulation declares a general prohibition against sex discrimination, providing that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." *Id.* § 106.41(a). But because of the physical advantages males have over females, the regulation provides a basis for recipients to separate athletic teams by sex under certain circumstances: "a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 106.41(b). Because separation cannot disadvantage either sex, when a recipient provides sex-separated athletic teams, the teams must remain separated by sex with only a clearly defined limited exception: "where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport." *Id.*

The athletics regulation also provides that "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics *shall provide equal athletic opportunity for members of both sexes.*" *Id.* § 106.41(c) (emphasis added). In determining whether an equal opportunity for members of both sexes is provided, the Department will consider: "whether the selection of sports and levels of competition *effectively accommodate the interests and abilities of the members of both sexes.*" *Id.* § 106.41(c)(1) (emphasis added).

To explain the meaning of "equal athletic opportunity" and "effective accommodation" under 34 C.F.R. § 106.41(c), the Department issued a Policy Interpretation, entitled *Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics*, 44 Fed. Reg. 71,413 (1979) ("Policy Interpretation"). An important factor regarding the Policy Interpretation is that it only applies if a recipient is providing athletic programs actually separated by sex, and only by sex. In other words, the Policy Interpretation only addresses potential inequalities in properly sex-separated athletics programs. Under the Policy Interpretation, compliance determinations regarding equal opportunity in athletics are based on three considerations: (a) "[w]hether the policies of an institution are discriminatory in language or effect"; (b) "[w]hether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the institution's program as a whole"; or (c) "[w]hether disparities in benefits, treatment, services, or opportunities in individual segments of the program are substantial enough in and of themselves to deny equality of athletic opportunity." *Id.* at 71,417.

Under the Policy Interpretation, the Department has stated it will base compliance determinations regarding "Effective Accommodation of Student Interests and Abilities," on "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." *Id*. The Department will assess this using three factors: (a) "[t]he determination of athletic interests and abilities of students"; (b) "[t]he selection of sports offered"; and (c) "[t]he levels of competition available including the opportunity for team competition." *Id*.

The Policy Interpretation explains under "Application of the Policy – Selection of Sports":

In the selection of sports, the regulation does not require institutions to integrate their teams nor to provide exactly the same choice of sports to men and women.

*Page 7 –05254060, 05258901, and 25-626-433-RV-CRR – Letter of Findings (violation)*

> However, where an institution sponsors a team in a particular sport for members of one sex, it may be required to permit the excluded sex to try out for the team or to sponsor a separate team for the previously excluded sex.

*Id.* at 71,417-18; *see* 34 C.F.R. § 106.41(b).

The Department also made clear in the Policy Interpretation that for a recipient to effectively accommodate the interests and abilities of the members of both sexes, a recipient must provide separate teams based on sex under the following circumstances:

> a. Contact Sports – Effective accommodation means that if an institution sponsors a team for members of one sex in a contact sport, it *must* do so for members of the other sex under the following circumstances:
>
> > (1) The opportunities for members of the excluded sex have historically been limited; and
> >
> > (2) There is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team.[5]
>
> b. Non-Contact Sports – Effective accommodation means that if an institution sponsors a team for members of one sex in a non-contact sport, it *must* do so for members of the other sex under the following circumstances:
>
> > (1) The opportunities for members of the excluded sex have historically been limited;
> >
> > (2) There is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team; and
> >
> > (3) Members of the excluded sex do not possess sufficient skill to be selected for a single integrated team, or to compete actively on such a team if selected.

*Id.* at 71,418 (emphases added); *see* 34 C.F.R. § 106.41(c).

The Policy Interpretation provides a "three-part test" to assess participation-opportunity compliance. *See Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782, 786 (8th Cir. 2021); 34 C.F.R. § 106.41(c)(1). The "three-part test" can be, and has been, used by courts and the Department to analyze challenges regarding "Levels of Competition," but the three-part test does not apply to all situations. As the Policy Interpretation explains, the "three-part test" analysis is only applicable to a "Levels of Competition" analysis, but it does not apply to a "Determination of Athletic Interests and Abilities" analysis or a "Selection of Sports" analysis. 44 Fed. Reg. at 71,417-18. In that circumstance, the Department "considers the effective accommodation of interests and abilities in conjunction with equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes to determine whether an institution provides equal athletic opportunity as required by Title IX." *Berndsen*, 7 F.4th at 788 (citation omitted). Where a

---

[5] The Policy Interpretation applies to both intercollegiate and interscholastic athletics. 44 Fed. Reg. at 71,413.

*Page 8 –05254060, 05258901, and 25-626-433-RV-CRR – Letter of Findings (violation)*

recipient does not provide athletic programs separated by sex, the Policy Interpretation and associated "tests" do not apply.

> **B.      Title IX prohibits recipients from creating special exemptions allowing trans-identifying students to compete on opposite-sex teams or use opposite-sex sensitive spaces.**

> **1.      Making distinctions based on relevant biological differences between the sexes is not prohibited sex discrimination under Title IX.**

> ### a.      *Title IX prohibits discrimination based on sex, not "gender identity."*

Title IX states a general prohibition on "sex" discrimination in education programs or activities receiving federal funding: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). The term "sex" is an objective factor, including in the context of Title IX. Title IX and its implementing regulations use the term "sex" to mean biological sex. "Sex" does not mean, and has never meant, "gender identity."

When Congress passed Title IX in 1972, contemporaneous dictionaries defined "sex" as what the term has always meant: biological sex. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F. 4th 791, 812-13 (11th Cir. 2022) (en banc) (consulting nine contemporary dictionaries for definitions); *see id.* at 812-15 (finding Title IX refers to biological sex). What dictionaries establish, Title IX's context confirms. "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current [and longstanding] regulations . . . reflect this presupposition." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal financial Assistance*, 85 Fed. Reg. 30,026, 30,178 (May 19, 2020). Section 1681(a)(2), for example, distinguishes between "institution[s] which admi[t] only students of one sex" and "institution[s] which admi[t] students of *both sexes*." 20 U.S.C. §1681(a)(2) (emphasis added). Section 1681(a)(8) similarly refers to sex in binary terms: If father-son or mother-daughter activities are provided for "one sex," then "reasonably comparable activities" must be provided for "the other sex." *Id.* § 1681(a)(8). And Title IX's implementing regulation on bathrooms, like other regulations, use the term "sex" in binary and biological terms. *See, e.g.*, 34 C.F.R. § 106.33 (authorizing "separate toilet, locker room, and shower facilities on the basis of sex" and making clear that "such facilities provided for students of one sex shall be comparable to such facilities provided to students of the other sex"); 85 Fed. Reg. at 30,178 ("In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes."). Thus, all indicators of ordinary meaning show that "sex" in Title IX means biological sex and does not include "gender identity." *See, e.g.*, *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) ("the term 'sex' in Title IX 'unambiguously' referred to 'biological sex' and not 'gender identity'").

Consistent with "sex" meaning biological sex in Title IX, on January 20, 2025, and February 5, 2025, the President of the United States issued two Executive Orders that reaffirm the meaning of the term "sex" in Title IX:

> (a) "Sex" shall refer to an individual's immutable biological classification as either male or female.  "Sex" is not a synonym for and does not include the

concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell. . . .

Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615-16 (Jan. 30, 2025); *see* Executive Order 14,201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9,279 (Feb. 11, 2025) (incorporating Executive Order 14168's definitions). And under Executive Order 14,168, the U.S. Department of Health and Human Services published definitions of "sex" and related words (such as "female," "male," "girl," "woman," "boy," and "man"), stating that "sex" means "a person's immutable biological classification as either male or female."[6]

Title IX and its implementing regulations never use the term "gender identity," let alone define this seemingly undefinable term. The term "gender identity" is, at best, a subjective factor, "reflect[ing] a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." Executive Order 14,168, 90 Fed. Reg. at 8,616. Indeed, as some courts have explained, "gender identity" is not a "'discrete'" category but "can describe 'a huge variety of gender identities and expressions.'" *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 487 (6th Cir.), *aff'd sub nom.*, 145 S. Ct. 1816 (2025).[7] According to some, "gender identity" is "a three-dimensional 'galaxy.'" *United States v. Varner*, 948 F.3d 250, 257 (5th Cir. 2020); *see Skrmetti*, 145 S. Ct. at 1852 (Barrett, J., concurring). And according to a once blindly followed but now discredited partisan organization, World Professional Association for Transgender Health (WPATH), someone can be "more than one gender identity simultaneously or at different times (*e.g.*, bigender)," "not have a gender identity or have a neutral gender identity (*e.g.*, agender or neutrois)," "have gender identities that encompass or blend elements of other genders (*e.g.*, polygender, demiboy, demigirl)," or "have a gender that changes over time (*e.g.*, genderfluid)." *Standards of Care for the Health of Transgender and Gender Diverse People*, World Prof. Ass'n Transgender Health, S80 (8th ed. 2022); *see, e.g.*, Executive Order 14,187, *Protecting Children From Chemical and Surgical Mutilation*, 90 Fed. Reg. 8,771, (Jan. 28, 2025) (noting that WPATH "lacks scientific integrity"); *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1261 (11th Cir. 2024) (Lagoa, J., concurring) ("But recent revelations

---

[6] https://womenshealth.gov/article/sex-based-definitions (U.S. Department of Health and Human Services).

[7] In a recent seminal decision, the Supreme Court rejected an equal-protection challenge to a State's child-protection law that prohibited providing controversial medical interventions to minors to address "gender dysphoria." *United States v. Skrmetti*, 145 S. Ct. 1816 (2025). While acknowledging that trans-identification does not (indeed, cannot) change one's sex, *id.* at 1830 n.2, the Court concluded that the challenged law was subject to rational-basis review because it did not classify based on sex or "transgender status," *id.* at 1829-35. The law, the Court explained, easily passed the rational-basis standard because of the "'medical and scientific uncertainty'" surrounding interventions for "gender dysphoria." *Id.* at 1835-37.

indicate that WPATH's lodestar is ideology, not science. For example, in one communication, a contributor to WPATH's most recent Standards of Care frankly stated, 'our concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits.'" (alteration omitted)); *Skrmetti*, 145 S. Ct. at 1848 (Thomas, J., concurring) ("WPATH appears to rest [its conclusions] on self-referencing consensus rather than evidence-based research."); *id.* at 1849 (WPATH and other "prominent medical professionals . . . have built their medical determinations on concededly weak evidence" and "have surreptitiously compromised their medical recommendations to achieve political ends."). The ACLU even contends that "trans-identifying" individuals include anyone not matching their sex-stereotype. *See* ACLU, *Transgender People and the Law*, at 19-20 ("transgender" means "a broad range of identities and experiences that fall outside of the traditional understanding of gender").[8]

Simply put, "gender identity" is not "ascertainable at the moment of birth" or really at any period of time. *L.W.*, 83 F.4th at 487; *see Skrmetti*, 145 S. Ct. at 1851-52 (Barrett, J., concurring) (explaining that trans-identification is not "definitively ascertainable at the moment of birth," that "transgender status does not turn on an immutable characteristic," that "the transgender population [is not] a discrete group," and that the group's "boundaries . . . are not defined by an easily ascertainable characteristic that is fixed and consistent across the group" (cleaned up)); *id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Transgender status is not 'immutable,' and as a result, persons can and do move into and out of the class. Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."); *id.* at 1866-67 (similar). Or as the Department of Health and Human Services has explained, "[i]t may be true that a person's gender identity is subjective[,] . . . but the more critical point is that no tolerably clear definition of 'gender identity' has been offered in the first place."[9]

In short, Title IX is not a statute about "gender identity" but only about sex discrimination. As many courts have rightly concluded, "the term 'sex' in Title IX 'unambiguously' refer[s] to 'biological sex' and not 'gender identity.'" *Alabama*, 2024 WL 3981994, at *4; *accord, e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2 (6th Cir. July 17, 2024); *Adams*, 57 F.4th at 814-15; *Kansas v. United States Dep't of Educ.*, 739 F. Supp. 3d 902, 920 (D. Kan. 2024); *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 530-36 (E.D. Ky. 2024); *Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 399-400 & nn.48-49 (W.D. La. 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, 741 F. Supp. 3d 515, 520-25 (N.D. Tex. 2024).

Contemporaneous post-enactment history confirms Title IX does not include discrimination based on "gender identity." Shortly after Title IX was enacted in 1972, Congress passed the Javits Amendment, which directed the Department of Education's predecessor to create regulations "implementing . . . [T]itle IX," which "shall include" regulations on "intercollegiate athletic activities." 88 Stat. 484, 612 (1974). The agency then issued regulations that allow sex separation in many contexts—including sports. 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).[10]

---

[8] https://www.aclu.org/sites/default/files/field_pdf_file/lgbttransbrochurelaw2015electronic.pdf.

[9] *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Department of Health and Human Services, 34 (May 1, 2025), https://opa.hhs.gov/gender-dysphoria-report.

[10] *E.g.*, 40 Fed. Reg. 24,137, 24,142-43 (July 4, 1975) (presently at 34 C.F.R. §106.41(b) ("a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.43 ("If use of a single standard of measuring skill or progress in physical education classes has an adverse effect on members of one sex, the

Those contemporaneous regulations, nearly all of which still exist today, are strong evidence of Title IX's original public meaning. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); *id.* at 370 ("Such respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time."). In fact, that evidence is even stronger here because Congress got the chance to disapprove these regulations before they went into effect and chose not to. *See Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530-35 (1982). Reading Title IX's bar on sex discrimination to wholesale include "gender-identity discrimination," as some wrongly claim, would eviscerate these accurate regulatory interpretations of Title IX, including the regulation on athletics. That "highly counterintuitive result" cannot be right. *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 360 (2021).

Congress's actions for more than 50 years following Title IX's enactment further confirm that Title IX's bar on sex discrimination does not include "gender-identity discrimination." In other statutory contexts, Congress has acted affirmatively to address gender-identity discrimination as a distinct category separate from sex discrimination. For example, when Congress enacted the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, Pub. L. No. 111-84, Div. E., 123 Stat. 2190 (2009), Congress found that the "incidence of violence motivated by the actual or perceived race, color, religion, national origin, *gender*, sexual orientation, *gender identity*, or disability of the victim poses a serious national problem." 34 U.S.C. § 30501(1) (emphases added). Similarly in 2013, Congress amended the Violence Against Women Act to create a federal government enforcement action that protected the separate bases of sex and gender identity. *See* 34 U.S.C. § 12291(b)(13)(A) (2013), as amended by Pub. L. No. 113-4, § 3, 127 Stat. 56 (2013) (prohibiting discrimination in certain federally funded programs "on the basis of actual or perceived race, color, religion, national origin, *sex, gender identity* (as defined in [18 U.S.C. § 249(c)(4)]), sexual orientation, or disability" (emphasis added)). These post-Title IX enactments show that Congress knows how to prohibit discrimination based on "gender identity" when it wants to but did not do so in Title IX. *DHS v. MacLean*, 574 U.S. 383, 394 (2015).

### b.    *Sex discrimination includes treating one sex less favorably than similarly situated members of the other sex but does not include distinctions grounded in relevant biological differences between the sexes.*

Title IX states a general prohibition on "sex" discrimination in education programs or activities receiving federal funding: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). Title IX carries "the 'normal definition of discrimination.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005). The "ordinary meaning of the word discrimination" is treating individuals or groups that "are similarly situated differently without sufficient justification for the

---

recipient shall use appropriate standards that do not have that effect.")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.32(b) (A recipient "may provide separate housing on the basis of sex" provided the housing provided "to students of one sex, when compared to that provided to students of the other sex, shall be" proportionate and comparable.); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.").

difference in treatment." *Alabama Dep't of Revenue v. CSX Transp., Inc.*, 575 U.S. 21, 26 (2015) (quotation marks omitted); *see, e.g.*, *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 19 (1980) ("An employer 'discriminates' against an employee only when he treats that employee less favorably than he treats others similarly situated."). Title IX thus prohibits practices that subject members of one biological sex to "'less favorable' treatment" than similarly situated members of the other sex. *Jackson*, 544 U.S. at 174.

Because the two sexes are usually similarly situated when it comes to educational programs, Title IX usually prohibits sex separation. For example, Title IX prohibits separate male and female math classes because for such classes the sexes are similarly situated.

But importantly, this does not mean that *all* sex-based classifications are prohibited discrimination. Given that the difference between males and females is grounded in biology, there are of course some physiological ways in which "the sexes are not similarly situated." *Bauer v. Lynch*, 812 F.3d 340, 351 (4th Cir. 2016) (quoting *Michael M. v. Superior Court*, 450 U.S. 464, 469 (1981) (plurality opinion)), *cert. denied*, 580 U.S. 959 (2016).

In fact, Title IX itself recognizes that it is not discrimination to separate based on sex when biology is relevant. Indeed, Congress clarified that Title IX's general bar on sex discrimination must not "be *construed* to prohibit any" federal-funding recipient "from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686 (emphasis added). This "[i]nterpretation," *id.*, of Title IX's general sex-discrimination bar confirms that Title IX does not prohibit sex separation when based on real differences that are rooted in biology. It also shows that Congress understood that such sex separation is not only beneficial but also sometimes necessary to ensure equal opportunities for women.[11]

### 2.   Title IX permits sex separation in athletics and sensitive spaces because such separation is based on real biological differences between the sexes.

#### a.   *Athletics*

Title IX permits separating athletics based on sex because the distinction is based on relevant biological differences between the sexes. "It is beyond dispute that, barring rare genetic mutations not at issue here, a person either has male sex chromosomes or female sex chromosomes," and this biological trait "determines many of the physical characteristics relevant to athletic performance." *B.P.J. v. W. Virginia State Bd. of Educ.*, 98 F.4th 542, 567 (4th Cir. 2024) (Agee, J., dissenting in relevant part), *cert. granted*, No. 24-43, 2025 WL 1829164 (U.S. July 3, 2025). On average, males differ from females with respect to attributes like height, weight, bone structure, muscle mass, and heart and lung capacity. *See, e.g.*, *id.* at 567-68; *Adams*, 57 F.4th at 819-20 (Lagoa, J., concurring) (discussing scientific literature regarding biological advantages of males over females in sports). This results in males being stronger and faster than females, all else being equal—*i.e.*, if they have had similar environmental experiences and possess similar genetic traits other than the different sex chromosome.

For example, the Supreme Court has particularly recognized the inherent physical

---

[11] That is reinforced by the fact that after that general ban on sex discrimination, Title IX lists various sex-based practices that the statute does not forbid. Recipients of federal funding, for example, may have traditionally sex-separated schools (*id.* § 1681(a)(5)), fraternities and sororities (*id.* § 1681(a)(6)), Boys and Girls State conferences (*id.* § 1681(a)(7)), and scholarships for "beauty" pageants (*id.* § 1681(a)(9)). Schools may also have father-daughter dances if they provide "reasonably comparable activities" for "the other sex." *Id.* § 1681(a)(8).

differences between the sexes in physical fitness and athletics. In *United States v. Virginia*, the Court recognized an inherent male advantage when it found that admitting women to a previously all-male military academy "would undoubtedly require" that institution "to adjust aspects of the physical training programs." *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996). Similarly, in *Bauer*, the Fourth Circuit recognized that "[m]en and women simply are not physiologically the same for the purposes of physical fitness programs." 812 F.3d at 350. "[T]o account for the[se] innate physiological differences," the FBI has adopted sex-normed physical-fitness standards for special agents: *e.g.*, men must do 30 push-ups and run 1.5 miles in 12 minutes and 24 seconds, whereas women need only do 14 push-ups and run 1.5 miles in 13 minutes and 59 seconds. *See id.* at 343-344; U.S. Fed. Bureau of Investigation, U.S. Dep't of Justice, Special Agent Physical Requirements, https://fbijobs.gov/special-agents/physical-requirements. The Fourth Circuit held that those sex-based standards are not discrimination because of sex under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). *Bauer*, 812 F.3d at 351.

Congress itself has also recognized that "physiological differences between male and female individuals" warrant sex-based differences in physical-fitness admissions standards at military academies. Pub. L. No. 94-106, Tit. VIII, § 803(a), Oct. 7, 1975, 89 Stat. 537-538 (10 U.S.C. § 7442 note).

Accordingly, "it is generally accepted" that "males outperform females athletically because of inherent physical differences between the sexes." *B.P.J. v. W. Virginia State Bd. of Educ.*, 649 F. Supp. 3d 220, 231 (S.D.W. Va. 2023); *see B.P.J.*, 98 F.4th at 560 ("strength and speed" are "attributes relevant to most competitive sports"). To be sure, the physical differences between the sexes do not always lead to a competitive advantage for males. They sometimes may benefit females, as in sports that favor light weight or flexibility, *see* Sex Segregation in Youth Rodeo Events Under Title IX Regulations, __ O.L.C. __, 2021 WL 222745, at *5 (2021), and there may be other sports where the differences are not sufficiently material to affect competitive outcomes. But no matter the sport, the physical differences between the sexes persist, and thus, it is not discrimination to separate males and females to ensure a fair and safe competitive playing field.

Though the sexes' divergence in athletic performance grows in adulthood, it rests on innate biological differences that exist at birth and manifest during childhood. Sex chromosomes give rise to "pre-puberty physical differences that affect athletic performance." *Adams*, 57 F.4th at 819 (Lagoa, J., specially concurring); *see B.P.J.*, 98 F.4th at 568 (Agee, J., dissenting in relevant part) ("there is evidence that biological boys have a competitive advantage over biological girls even before puberty"). The undeniable physiological differences between males and females provide boys and men with inherent advantages in strength, speed, and physicality that pre-determine the outcome of athletic contests. "Males and females are materially different with respect to the main physical attributes that contribute to athletic performance." Doriane Lambelet Coleman et. al., *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 Duke J. Gender L. & Pol'y 69, 92 (2020) (citing *The Role of Testosterone in Athletic Performance*, Duke Ctr. for Sports Law & Policy (Jan. 2019)).[12]

In certain sports separated into male and female divisions, males who compete against females "enter the female division with an inherent advantage because of their male physiology." Alison K. Heather, *Transwoman Elite Athletes: Their Extra Percentage Relative to Female Physiology*, Int'l Journal Envtl. Research and Pub. Health, 8 (2022);[13] *see Adams*, 57 F.4th at 819-

---

[12] https://law.duke.edu/sites/default/files/centers/sportslaw/Experts_T_Statement_2019.pdf
[13] https://www.mdpi.com/1660-4601/19/15/9103

21 (Lagoa, J., concurring). Allowing males to participate in women's sports thus is fundamentally "unfair to female athletes," "do[es] not protect female safety," and "denies women and girls the equal opportunity to participate and excel in competitive sports." Executive Order 14,201, 90 Fed. Reg. at 9,279-80; *see, e.g.*, *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, J., in chambers) ("Without a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events."); *Neal v. Bd. of Trs.*, 198 F.3d 763, 767 (9th Cir. 1999) ("Male athletes had been given an enormous head start in the race against their female counterparts for athletic resources, and Title IX would prompt universities to level the proverbial playing field."); *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993) ("If, to satisfy [T]itle IX, all that the School District were required to do was to allow girls to try out for the boys' teams, then it need not have made efforts . . . to equalize the numbers of sports teams offered for boys and girls."); *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) ("It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement.").

In sum, because males and females are not similarly situated physically with respect to athletic competition, separating sports teams by sex is not "discrimination" prohibited under Title IX when such separation does not treat members of either sex worse than the other. Consistent with this straightforward interpretation, courts have recognized for decades that "the Title IX regime permits institutions to maintain gender-segregated teams." *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996) (emphasis omitted), *cert. denied*, 520 U.S. 1186 (1997); *see, e.g.*, *Kelley v. Board of Trs.*, 35 F.3d 265, 270-71 (7th Cir. 1994), *cert. denied*, 513 U.S. 1128 (1995); *Williams v. School Dist. of Bethlehem*, 998 F.2d 168, 172 (3d Cir. 1993), *cert. denied*, 510 U.S. 1043 (1994). And the same goes for young students. For example, in *O'Connor v. Board of Education of School District Number 23*, Justice Stevens and the Seventh Circuit both denied relief to an 11-year-old challenging exclusion from opposite-sex middle-school basketball teams. 449 U.S. 1301, 1307 (1980) (declining to vacate stay of injunction); 645 F.2d 578, 582 (1981) (reversing injunction), *cert. denied*, 454 U.S. 1084 (1981). And the Ninth Circuit long ago saw "no question" that sex-separated athletics permissibly accommodate "real differences between the sexes." *Clark v. Arizona Interscholastic Ass'n* (*Clark I*), 695 F.2d 1126, 1131 (1982) (citing, *e.g.*, *Michael M.*, 450 U.S. at 469).

One of Title IX's implementing regulations confirms that separating athletics based on sex is permissible under Title IX. Shortly after Title IX's enactment, Congress in 1974 directed the Department of Health, Education, and Welfare (HEW) to promulgate regulations "implementing the provisions of Title IX," including "reasonable provisions considering" how Title IX applies to athletics given "the nature of particular sports." Pub. L. No. 93-380, § 844, 88 Stat. 612. HEW implemented Congress's directive by adopting regulations permitting certain forms of sex separation, including in athletics. 40 Fed. Reg. 24,128 (June 4, 1975). These regulations "permit[] separate teams for members of each sex where selection for the team is based on competitive skill or the activity involved is a contact sport." *Id.* at 24,134. They thus contemplate that schools may "operate[] or sponsor[] separate teams" for "members of each sex," so long as they provide "equality of opportunity for members of each sex." *Id.* at 24,143.

Congress declined to disapprove these regulations, *see North Haven*, 456 U.S. at 531-35, and the original provision permitting sex-separated athletics has remained in effect for 50 years, 34 C.F.R. § 106.41(b)-(c). Because these agency "interpretations issued contemporaneously with

the statute" and "have remained consistent over time," they are "especially useful in determining the statute's meaning." *Loper Bright*, 603 U.S. at 394. Indeed, the Supreme Court has repeatedly "recognized the probative value of Title IX's unique postenactment history" in construing the statute. *Grove City*, 465 U.S. at 567-68. That history strongly supports interpreting Title IX to permit sex-separated athletics.

**b.    Sensitive Spaces: Living Facilities, Bathrooms, Locker Rooms, and Shower Facilities**

Similarly, Title IX permits separating living facilities, bathrooms, locker rooms, and shower facilities based on sex because the distinction is based on relevant biological differences between the sexes. "[T]he physical differences between males and females" lead to a particularly acute "need for privacy" in sensitive spaces like school bathrooms and locker rooms. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 634 (4th Cir. 2020) (Niemeyer, J., dissenting). "To state the obvious, what bathroom, locker room, shower, and living facilities all have in common is that they are places where people are, at some point, in a state of partial or complete undress to engage in matters of highly personal hygiene. An individual has a legitimate and important interest in bodily privacy that is implicated when his or her nude or partially nude body is exposed to others. And this privacy interest is significantly heightened when persons of the opposite biological sex are present." *Id.* at 633-34 (collecting cases). That "privacy interest is heightened yet further when children use communal restrooms and similar spaces, because children . . . 'are still developing, both emotionally and physically.'" *Id.* at 636; *accord Adams*, 57 F.4th at 804.

"In light of the privacy interests that arise from the physical differences between the sexes, it has been commonplace and universally accepted—across societies and throughout history—to separate on the basis of sex those public restrooms, locker rooms, and shower facilities that are designed to be used by multiple people at a time." *Grimm*, 972 F.3d at 634 (Niemeyer, J., dissenting). "[T]he privacy afforded by sex-separated bathrooms has been widely recognized throughout American history and jurisprudence. In fact, 'sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding.'" *Adams*, 57 F.4th at 805.

Unsurprisingly, "courts have long found a privacy interest in shielding one's body from the opposite sex in a variety of legal contexts," which is why "[t]he protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective." *Id.* at 804-05. Including the Supreme Court: In *Virginia*, the Court acknowledged this when it stated that admitting women to the Virginia Military Institute for the first time "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." 518 U.S. at 550 n.19. Indeed, "as then-Professor Ruth Bader Ginsburg noted, 'separate places to disrobe, sleep, and perform personal bodily functions are permitted, *in some situations required*, by regard for individual privacy." *Adams*, 57 F.4th at 804 (emphasis in original) (alterations omitted) (quoting Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21).

Title IX itself also recognizes as much. Indeed, Title IX itself clarifies that its general sex-discrimination bar does not "prohibit any educational institution . . . from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. This "[i]nterpretation," *id.*, of Title IX's general sex-discrimination bar confirms that Title IX does not prohibit sex separation when based on privacy concerns associated with real differences that are rooted in biology; it also shows that

Congress understood that such sex separation in sensitive spaces is not only beneficial but also sometimes necessary to ensure equal opportunities for women.

One of Title IX's implementation regulations—which has existed since Title IX's enactment and thus "accurately reflect congressional intent," *Grove City*, 465 U.S. at 568, and Title IX's original public meaning, *see Loper Bright*, 603 U.S. at 394—also confirms that Title IX allows sex separation in sensitive spaces. The regulation expressly permits a recipient to provide "separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33. The separate-living-facilities clarification (20 U.S.C. § 1686) and the separate-sensitive-facilities regulation (34 C.F.R. § 106.33) are grounded in students' privacy, safety, and dignity interest in using the bathroom away from students of the opposite sex and in shielding their bodies from students of the opposite sex while changing in the locker room. This confirms that Title IX allows sex separation in sensitive spaces like living facilities, bathrooms, locker rooms, and shower facilities.

Thus, when schools "separate restrooms for its male and female students in order to protect bodily privacy concerns that arise from the anatomical differences between the two sexes," *Grimm*, 972 F.3d at 636 (Niemeyer, J., dissenting), the schools are not treating one sex less favorably than similarly situated members of the other sex but permissibly distinguishing based on concerns associated with relevant biological differences between the sexes. Title IX thus allows sex-separate living facilities, bathrooms, locker rooms, and shower facilities.

> **3.    Recipients that create special exemptions allowing trans-identifying students to compete on opposite-sex teams or use opposite-sex sensitive spaces violate Title IX.**

> ### a.    *Recipients that create special exemptions allowing trans-identifying students to compete on opposite-sex teams violate Title IX.*

As explained, sex discrimination is treating individuals or groups that "are similarly situated differently without sufficient justification for the difference in treatment," *Alabama Dep't of Revenue*, 575 U.S. at 26 (quotation marks omitted), *i.e.*, subjecting members of one biological sex to "'less favorable' treatment" than similarly situated members of the other sex, *Jackson*, 544 U.S. at 174. When a federal-funding recipient separates sports based on sex, the recipient is not discriminating based on sex because the recipient is treating the sexes differently with a sufficient justification: the real biological differences between men and women. But when the recipient separates sports based on sex and also creates a special exemption to that general distinction for "gender identity," the recipient is no longer treating the sexes differently based on a sufficient justification. Because these recipients have thrown out the biological justification for sex separation, they are discriminating on the basis of sex by separating the sexes without a valid basis under Title IX.

Title IX's athletics regulation—which is an accurate interpretation of Title IX, *see Loper Bright*, 603 U.S. at 394; *Grove City*, 465 U.S. at 568—confirms this conclusion. That regulation first sets out a "[g]eneral" rule prohibiting sex-separated teams: "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a). It then lays out the only circumstance where recipients may have "[s]eparate teams": "Notwithstanding the requirements of paragraph (a) of

this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 106.41(b). Still, "where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport." *Id.* And when a recipient sex-separates teams, Title IX requires the recipient to "provide equal athletic opportunity for both sexes." *Id.* § 106.41(c).

When a recipient separates sports teams based on sex and then creates a special exemption for trans-identifying individuals, the recipient is violating Title IX. That is because the recipient's practice destroys the justification for segregating the teams at all—if the only basis for segregating is the biological difference, yet the recipient is nevertheless letting some men play on women's teams, they can no longer justify the segregation under Title IX, so they are discriminating on the basis of sex by having sex-segregated teams without an adequate justification. Indeed, these recipients are not following the only circumstance where sex-separate teams are permissible under Title IX: "where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). In other words, when a recipient disregards the real biological differences between boys and girls, it is now discriminating by separating the sexes without any valid basis. Having thrown out the biological justification for sex-separate sports teams, a recipient is akin to separated math classes where there are no relevant biological differences between the sexes.

These recipients also violate Title IX in another respect: They are treating women worse than men. While men get sex-separated teams where they are competing against their physical equals, women get teams where they are facing unfair and unsafe competition from men with a physical advantage. Put differently, while male sports maintain fair and safe competition, females are forced to participate in unfair and unsafe competition, where female athletes risk injuries, are displaced from podiums in athletic competitions, lose opportunities for advancement to regional and national competitions, and miss out on critical visibility for college scholarships and recognition. That unequal treatment is the denial of "equal athletic opportunity" in violation of Title IX. 34 C.F.R. § 106.41(c); *see* Executive Order 14,201, 90 Fed. Reg. at 9279 ("In recent years, many educational institutions and athletic associations have allowed men to compete in women's sports. This is demeaning, unfair, and dangerous to women and girls, and denies women and girls the equal opportunity to participate and excel in competitive sports."); *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 294-95 (2d Cir. 2004) ("Treating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal opportunity for both sexes."); *Soule v. Conn. Ass'n of Schs.*, 90 F.4th 34, 63 (2d Cir. 2023) (en banc) (Menashi, J., concurring) ("an education program risks Title IX liability when it *fails* to distinguish between student athletes based on sex"). Just as it is impermissible to give women's teams fewer options or worse funding, it is impermissible to subject them alone to competition with physically unequal people with a competitive advantage. Thus, recipients that have chosen to disregard the real biological differences between boys and girls, thereby failing to "provide equal athletic opportunity for members of both sexes" in violation of Title IX. 34 C.F.R. § 106.41(c).

Title IX's purpose confirms as much. *See Abramski v. United States*, 573 U.S. 169, 179 (2014) ("[The Court] must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." (quotation marks omitted)).

Title IX was manifestly passed to promote "girls' and women's rights." *Adams*, 57 F.4th at 817 (Lagoa, J., concurring); *see McCormick*, 370 F.3d at 286 ("Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities."). And Title IX has achieved substantial success in that regard, especially in the realm of sports. "[O]ne need not look further than the neighborhood park or local college campus to see the remarkable impact Title IX has had on girls and women in sports." *Adams*, 57 F.4th at 818 (Lagoa, J., concurring). "In 1971, before Congress enacted the statute, approximately 300,000 girls and 3.67 million boys played competitive high school sports nationwide." *McCormick*, 370 F.3d at 286. Today, Title IX "has had stellar results." *Louisiana*, 737 F. Supp. 3d at 390.

Policies or practices that "comingl[e] both biological sexes in the realm of female athletics" have "vast societal consequences" and "threaten to undermine one of Title IX's major achievements, giving young women an equal opportunity to participate in sports." *Adams*, 57 F.4th at 818, 821 (Lagoa, J., concurring) (brackets omitted); *see Clark v. Arizona Interscholastic Ass'n* (*Clark II*), 886 F.2d 1191, 1193 (9th Cir. 1989) ("If males are permitted to displace females on the school volleyball team even to the extent of one player . . . , the goal of equal participation by females in interscholastic athletics is set back, not advanced."). This confirms that allowing special exemptions based on "gender identity" for otherwise sex-separate sports violates Title IX.

### b. Recipients that create special exemptions allowing trans-identifying students to invade opposite-sex sensitive spaces such as bathrooms and locker rooms violate Title IX.

The same is true for sensitive spaces like bathrooms and locker rooms. When a federal-funding recipient separates bathrooms based on sex, the recipient is not discriminating based on sex because the recipient is treating the sexes differently with a sufficient justification. But when the recipient separates bathrooms based on sex and also creates a special exemption to that general distinction for trans-identifying individuals, the recipient is no longer treating the sexes differently based on a sufficient justification. Because these recipients have thrown out the biological justification for sex separation, they are discriminating on the basis of sex by separating the sexes without a valid basis under Title IX in violation of Title IX.

Allowing boys to invade sensitive female-only spaces also endangers girls' privacy, dignity, and safety, causing a hostile and unsafe educational environment that denies girls educational opportunities. It is a "generally acceptable notion that the protection of individual privacy will occasionally require some segregation between the sexes is beyond doubt—as then-Professor Ruth Bader Ginsburg noted, 'separate places to disrobe, sleep, and perform personal bodily functions are permitted, *in some situations required*, by regard for individual privacy." *Adams*, 57 F.4th at 804 (emphasis in original) (alterations omitted) (quoting Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21). So unsurprisingly, eliminating sex-separate bathrooms "render[s] the purpose of [Title IX] obsolete in terms of the privacy interests Congress sought to protect by permitting sex-based segregation in sensitive areas where separation has been traditional." *Tennessee*, 737 F. Supp. 3d at 559.

By denying female students sex-separated intimate facilities, recipients violate students' privacy and substantially increase the risk of sexual harassment and assault in these sensitive spaces. *See Tennessee*, 737 F. Supp. 3d at 562 ("the risk of 'inappropriate sexual behavior' toward other students would certainly be heightened too"). Although self-evident, a recently released report finds that requiring women to undress or use the bathroom in the presence of men causes distress in women, violates their right to privacy, and can deny women equal access to benefits of

education programs and activities. *See* Reem Alsalem, *Special Rapporteur on Violence Against Women and Girls, Its Causes and Consequences*, U.N. Doc. A/79/325 at 5/24 (August 27, 2024), https://docs.un.org/en/A/79/325. The report indicates that policies denying female students sex-separated sensitive spaces increases the risk of sexual harassment, assault, voyeurism, and physical and sexual attacks in unisex locker rooms and toilets. *Id*. Thus, "ignoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities." *Tennessee*, 737 F. Supp. 3d at 561.

At bottom, recipients have an obligation under Title IX to all students in the provision of sensitive spaces like restrooms and locker rooms, not just students who identify as "transgender." Separating sensitive facilities based on sex protects the sexes' privacy, dignity, and safety. When recipients of federal funding, like K-12 schools, colleges, and universities, do not maintain sex-separate sensitive spaces but instead let males invade female-only spaces, these recipients discriminate based on sex, create hostile and unsafe educational environments, and deny women and girls equal access to educational benefits in violation of Title IX.

> **C.** **The Department of Education has authority to enforce Title IX and its implementing regulations against noncompliant recipients of Federal funding.**

> **1.** **Recipients of federal funding are required to comply with all applicable federal laws, including Title IX and all related Executive Orders.**

Title IX's regulation states that if the Department "finds that a recipient has discriminated against persons on the basis of sex in an education program or activity under this part, or otherwise violated this part," then the noncompliant "recipient must take such remedial action" as the Department "deems necessary to remedy the violation, consistent with 20 U.S.C. § 1682." 34 C.F.R. § 106.3.

As a condition of receiving federal financial assistance from the Department, a recipient must make an assurance that the education program or activity will be operated in compliance with Title IX:

> Every application for federal financial assistance shall as condition of its approval contain or be accompanied by an assurance from the applicant or recipient, satisfactory to the Assistant Secretary, that the education program or activity operated by the applicant or recipient and to which this part applies will be operated in compliance with this part. An assurance of compliance with this part shall not be satisfactory to the Assistant Secretary if the applicant or recipient to whom such assurance applies fails to commit itself to take whatever remedial action is necessary in accordance with § 106.3(a) to eliminate existing discrimination on the basis of sex or to eliminate the effects of past discrimination whether occurring prior or subsequent to the submission to the Assistant Secretary of such assurance.

> . . .

> (b) Duration of obligation . . . such assurance shall obligate the recipient for the period during which federal financial assistance is extended.

34 C.F.R. § 106.4(a).

34 C.F.R. § 106.6(b)-(c) also states:

(b) Effect of State or local law or other requirements. The obligation to comply with this part is not obviated or alleviated by any State or local law or other requirement which would render any applicant or student ineligible, or limit the eligibility of any applicant or student, on the basis of sex, to practice any occupation or profession.

(c) Effect of rules or regulations of private organizations. The obligation to comply with this part is not obviated or alleviated by any rule or regulation of any organization, club, athletic or other league, or association which would render any applicant or student ineligible to participate or limit the eligibility or participation of any applicant or student, on the basis of sex, in any education program or activity operated by a recipient and which receives federal financial assistance.

34 C.F.R. § 106.81 further states:

The procedural provisions applicable to Title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein by reference. These procedures may be found at 34 CFR §§ 100.6-100.11 and 34 CFR part 101. The definitions in § 106.30 do not apply to 34 CFR §§ 100.6-100.11 and 34 CFR part 101.

34 C.F.R. § 100.7 also states in relevant part:

(c) Investigations. The responsible Department official or his designee will make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part. The investigation should include, where appropriate, a review of the pertinent practices and policies of the recipient, the circumstances under which the possible noncompliance with this part occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with this part.

. . .

(d) Resolution of matters. (1) If an investigation . . . indicates a failure to comply . . . , the responsible Department official or his designee will so inform the recipient and the matter will be resolved by informal means whenever possible. If it has been determined that the matter cannot be resolved by informal means, action will be taken as provided for in § 100.8.

And 34 C.F.R. § 100.8(d) states in relevant part:

If there appears to be a failure or threatened failure to comply with this regulation, and if the noncompliance or threatened noncompliance cannot be corrected by informal means, compliance with this part may be effected by the suspension or termination of or refusal to grant or to continue federal financial assistance or by any other means authorized by law. Such other means may include, but are not limited to, (1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States (including other titles of

the Act), or any assurance or other contractual undertaking . . . .

Moreover, all federal grant recipients from the Department are required to comply with all applicable federal laws, including Title IX in this instance, and all related Executive Orders. Specifically, 34 C.F.R. § 75.500 states in relevant part: "Each grantee must comply with the following statutes and regulations: . . . Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*), 34 CFR part 106. . . ." And 34 C.F.R. § 75.700 states:

> A grantee must comply with § 75.500, applicable statutes, regulations, *Executive orders*, stated institutional policies, and applications, and must use Federal funds in accordance with the U.S. Constitution and those statutes, regulations, Executive orders, stated institutional policies, and applications.

34 C.F.R. § 75.700 (emphasis added).

## II.      Findings of Fact

### A.      The Minnesota Department of Education is a recipient of Federal funding and subject to Title IX and to OCR's enforcement authority.

The Minnesota Department of Education (MDE) is currently, and has been, for many years, a recipient of federal financial assistance from the Department of Education. The funding the Department of Education currently has allocated to MDE totals approximately $2.96 billion, of which approximately $551 million remains available for drawdown by MDE, including both discretionary grants and formula grants.

Moreover, federal funding applies directly and indirectly to educational opportunities for students in Minnesota, including student athletic programs and activities. As a condition of receiving federal financial assistance from the Department of Education, MDE has submitted to the Department a Grant Certification dated April 25, 2025, applicable to *all* federal funding stating in part:

> [The] Minnesota Department of Education: . . .Will comply with all applicable requirements of all other Federal *laws*, *executive orders*, *regulations*, and public policies governing financial assistance awards and any Federal financial assistance project covered by this certification document, including but not limited to: . . . *Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 et seq. . . .*

Minnesota Department of Education Grants Certifications Report, SAM.gov (April 25, 2025) (emphasis added).

The MDE is also a signatory to an "Assurance of Compliance with Title IX of the Education Amendments of 1972 and the Regulation Issued by the Department" from 1977, that remains in force. In that Assurance of Compliance, the MDOE agrees they will comply "with Title IX and all applicable requirements imposed by or pursuant to the Department's regulation issued pursuant to Title IX." Additionally, the MDE agrees they will:

> Require any person, organization, group or other entity to which it subgrants or with which it contracts, subcontracts or otherwise arranges to provide services or benefits or to assist it in the conduct of any program covered by this assurance,

*Page 22 –05254060, 05258901, and 25-626-433-RV-CRR – Letter of Findings (violation)*

or with which it contracts or otherwise arranges for the use of any facility covered by this assurance, to comply fully with Title IX . . . and to submit to the Department an assurance satisfactory to the Director, Office for Civil Rights, to that effect.[14]

Assurance of Compliance with Title IX of the Education Amendments of 1972 and the Regulation Issued by the Department.

All federal grant recipients from the Department, including the MDE and subrecipient Minnesota School districts, are required to comply with all applicable federal laws, including Title IX in this instance, and all related Executive Orders. Specifically, 34 C.F.R. § 75.500, states in relevant part: "Each grantee must comply with the following statutes and regulations: . . . Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*), 34 CFR part 106. . . ."

Further, 34 C.F.R. § 75.700 states:

A grantee must comply with § 75.500, applicable statutes, regulations, *Executive orders*, stated institutional policies, and applications, and must use Federal funds in accordance with the U.S. Constitution and those statutes, regulations, Executive orders, stated institutional policies, and applications.

34 C.F.R. § 75.700 (emphasis added).

As a recipient of federal financial assistance from the U.S. Department of Education, the MDE and subrecipient Minnesota school districts are subject to Title IX, its implementing regulations, Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615-16 (Jan. 30, 2025), Executive Order 14,201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9,279 (Feb. 11, 2025) (incorporating Executive Order 14,168's definitions), and OCR's enforcement jurisdiction.

## B.    Athletic Programs in Minnesota

Historically, interscholastic athletic opportunities for women and girls in the United States have been limited, but the same cannot be said for men. For example:

Participation in intercollegiate sports has historically been emphasized for men but not women. Partially as a consequence of this, participation rates of women are far below those of men. During the 1977-78 academic year women students accounted for 48 percent of the national undergraduate enrollment (5,496,000 of 11,267,000 students). Yet only 30 percent of the intercollegiate athletes are women. The historic emphasis on men's intercollegiate athletic programs has also contributed to existing differences in the number of sports and scope of competition offered men and women.

*Policy Interpretation*, 44 Fed. Reg. at 71,419[15]; *see* Women's Sports Foundation, 50 Years of Title

---

[14] Minnesota Administrative Rule 3535.9910 requires local school districts to make similar assurances to the Minnesota Department of Education, and indicates "federal and state financial assistance will be extended in reliance on the representations."

[15] The Policy Interpretation applies to both intercollegiate and interscholastic athletics. 44 Fed. Reg. at 71,413.

IX infographic (2022).[16]

An example of the historically limited interscholastic athletic opportunities for girls in Minnesota is demonstrated by the disparities in athletic opportunities shown in data provided to OCR by the MSHSL:

Boys' Alpine Skiing was first sanctioned by the MSHSL in 1932
Girls' Alpine Skiing was first sanctioned by the MSHSL in 1976

Boys' basketball was first sanctioned by the MSHSL in 1913
Girls' basketball was first sanctioned by the MSHSL in 1974

Boys' Cross Country was first sanctioned by the MSHSL in 1943
Girls' Cross Country was first sanctioned by the MSHSL in 1975

Boys' Golf was first sanctioned by the MSHSL in 1943
Girls' Golf was first sanctioned by the MSHSL in 1977

Boys' Hockey was first sanctioned by the MSHSL in 1945
Girls' Hockey was first sanctioned by the MSHSL in 1995

Boys' Nordic Skiing was first sanctioned by the MSHSL in 1932
Girls' Nordic Skiing was first sanctioned by the MSHSL in 1976

Boys' Tennis was first sanctioned by the MSHSL in 1950
Girls' Tennis was first sanctioned by the MSHSL in 1974

Boys' Wrestling was first sanctioned by the MSHSL in 1938
Girls' Wrestling was first sanctioned by the MSHSL in 2022

Because of the obvious physical advantages men and boys have over women and girls in athletics, the MDE, Minnesota school districts, and the MSHSL, have, for many years, offered sex-separated athletics programs in order to fulfill the equal opportunity and effective accommodation obligations under Title IX, which has been, and continues to be, permitted and required by 34 C.F.R. § 106.41. And because there is sufficient interest and ability among female students in Minnesota schools to sustain viable female-only interscholastic athletic teams, and there is a reasonable expectation of interscholastic competition for girls' teams, the MDE, Minnesota school districts, and the MSHSL have provided a variety of sex-separated athletic programs for boys and girls.[17] A variety of sex-separated athletic programs is a proven way to provide equal athletic opportunities for girls and women. *See, e.g.*, *Clark I*, 695 F.2d at 1131 ("[T]he governmental interest claimed is redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes. There is no question that this is

---

[16] https://www.womenssportsfoundation.org/wp-content/uploads/2022/04/FINAL6_WSF-Title-IX-Infographic-2022.pdf.

[17] The actual separation by sex, however, is now illusory because of the existing policy allowing males to compete on teams designated for girls. Furthermore, MSHSL has informed OCR that all boys sports are open to girls, including when a girls' team in that sport is available. As further explained below, such policy constitutes a facial violation of 34 C.F.R. 106.41(b).

a legitimate and important governmental interest.").

Because of the need for sex-separated interscholastic athletic programs for Minnesota students, and the actual past provision of sex-separated athletic programs, the MDE promulgated Administrative Rules regarding teams separated by sex:

> SEPARATION BY TEAMS.
>
> Subpart 1. Programs for students in the seventh grade and above. Athletic programs for students in the seventh grade or above may include one or more teams limited to participants of one sex whose overall athletic opportunities have previously been limited.
>
> Subp. 2. Programs for students in the sixth grade and below. Athletic programs for students in the sixth grade or below shall be operated without restrictions on the basis of sex, except that when overall athletic opportunities for one sex have previously been limited and there is demonstrated interest by members of that sex to participate on a team restricted to members of that sex, the educational institution may provide a team restricted to members of that sex. The educational institution shall make a biennial determination of students' demonstrated interest. The method used shall be reported to the Department of Education in conjunction with the report required by part 3535.3600.
>
> Subp. 3. Provision of separate teams. Any public or private elementary or secondary school may provide in the same sport two teams which are separated according to sex when overall athletic opportunities for one sex have previously been limited, but the team for the other sex may only be substantially separated by sex. When an equal opportunity to participate is not provided to members of a sex whose overall athletic opportunities to participate have previously been limited, the school, where there is a demonstrated interest, shall provide separate teams in sports which it determines will provide members of the excluded sex with an equal opportunity and which will attempt to accommodate their demonstrated interest.
>
> Subp. 4. Try outs for opposite team. When overall athletic opportunities for one sex have previously been limited, members of that sex shall be permitted to try out and, if successful, to participate on any team in any sport. This part does not prohibit any elementary or secondary school from making participation on a team in a sport dependent upon a demonstrated level of skill and ability. When an educational institution has established a team exclusively for members of the sex whose overall athletic opportunities have previously been limited, members of the other sex may not try out for or participate on that team.

M.A.R. § 3535.3200.

Consistent with the requirements of Title IX, when sex-separated teams are provided, the MDE Administrative Rule states they must be treated equally:

> CREATING EQUAL OPPORTUNITY FOR TWO TEAMS.
>
> When two teams in the same sport are provided pursuant to part 3535.3200, subpart 1, the two teams shall be treated in a substantially equal manner. Public and private elementary and secondary schools shall accomplish this to the extent

that they are applicable in a given situation by providing that:

> A. equipment, supplies, and uniforms for each team are comparable;
>
> B. the games and competitive events for each team are scheduled so that the number of opportunities to perform before an audience are comparable;
>
> C. the practice sessions and competitive events scheduled for each team are at equally desirable time periods;
>
> D. the travel and per diem allowances per participant are comparable;
>
> E. the amount of coaching provided for members of each team is comparable;
>
> F. the locker rooms, practice, and competitive facilities for each team are comparable;
>
> G. the medical services for each team are comparable;
>
> H. the publicity produced by the school for each team is comparable; and
>
> I. the expenditure, excluding salary of the coach, per participant on each team is substantially equal. Per participant expenditure excludes gate receipts and other revenues generated by that sport. When an item or items of expense are not separated, the expense shall be prorated to the teams according to the number of participants.

M.A.R. § 3535.3400.

MDE defines the following terms in its Athletic Rule:

> DEFINITIONS.
>
> Subpart 1. Scope. All the words listed shall have the meaning herein ascribed to them.
>
> Subp. 2. Athletic program. "Athletic program" means all interscholastic and intramural sports offered to students by public and private elementary and secondary educational institutions.
>
> Subp. 3. Interscholastic athletic program. "Interscholastic athletic program" means all athletic activities offered within a school the purpose of which is to provide opportunities for students to compete with other students on like teams in other schools within an organized conference under the auspices of the Minnesota State High School League or with other like teams in other schools operating under separate jurisdictions.
>
> Subp. 4. Intramural athletic program. "Intramural athletic program" means all noninterscholastic athletic activities offered within a school, which are not a part of the regular physical education curriculum, designed to provide students athletic opportunities, experiences, and the development of competencies in a variety of sports.

*Page 26 –05254060, 05258901, and 25-626-433-RV-CRR – Letter of Findings (violation)*

> Subp. 5. Participate. "Participate" means for interscholastic sports, a student has been selected by the coach to be a member of a particular athletic team, inclusive of varsity, junior varsity, and sophomore teams, after the tryout period has ended.
>
> Subp. 6. Participation rate for a particular sex in the interscholastic athletic program. "Participation rate for a particular sex in the interscholastic athletic program" means the ratio of the number of participants of that sex in the athletic program to the number of students of that sex in the student body.
>
> Subp. 7. Participation rate for a particular sex in the intramural athletic program. "Participation rate for a particular sex in the intramural athletic program" means the ratio of the number of participants of that sex in the athletic program to the number of students of that sex in the student body.

M.A.R. § 3535.3000.

The MDE requires school districts to determine student interest in athletics and to ensure equal opportunities for "female" students. MDE Administrative Rule 3535.3300 states in relevant part:

> BIENNIAL DETERMINATION OF STUDENT INTEREST.
>
> Public and private elementary and secondary schools shall make a biennial determination of student demonstrated interest. Schools shall report the method used to make the determination to the Department of Education . . . Student demonstrated interest shall be considered in the selection of those athletic activities to be provided in the athletic program for the purpose of providing separate teams or sports for members of previously excluded sex.
>
> Public and private elementary and secondary schools shall provide equal opportunity for members of each sex to participate in both their intramural and interscholastic athletic program by responding to the following considerations.
>
> The number of opportunities for females to participate on teams is to be comparable to the number of opportunities for males to participate on teams in each school year in the interscholastic athletic program and comparable, as well as in the intramural athletic program. The equipment, supplies, and uniforms for each sport are to be comparable for both sexes. The locker rooms, practice, and competitive facilities are to be comparable for both sexes. The medical services are to be comparable for both sexes. The participation rates for members of both sexes are to be comparable while recognizing the voluntary nature of student involvement in interscholastic and intramural athletics.

M.A.R. § 3535.3300.

Examples of sex-separated athletic programs offered to students in Minnesota include:[18]

- Badminton (Girls)
- Basketball (Boys and Girls)
- Cross Country (Boys and Girls)

---

[18] MSHSL 2024-2025 Handbook, p 2. See also footnote 14.

*Page 27 –05254060, 05258901, and 25-626-433-RV-CRR – Letter of Findings (violation)*

- Golf (Boys and Girls)
- Gymnastics (Girls)
- Hockey (Boys and Girls)
- Lacrosse (Boys and Girls)
- Alpine Skiing (Boys and Girls)
- Soccer (Boys and Girls)
- Softball (Girls)
- Swimming & Diving (Boys and Girls)
- Synchronized Swimming (Girls)
- Tennis (Boys and Girls)
- Track & Field (Boys and Girls)
- Volleyball (Boys and Girls)
- Wrestling (Boys and Girls)

But once the MDE, Minnesota school Districts, and the MSHSL began permitting boys to compete in athletic programs designated for girls based on a student's "gender identity," the educational benefit of sex-separated athletic opportunities for girls has been eliminated because athletic programs are no longer sex-separated.

Then, on December 4, 2014, without any corresponding change to the Title IX athletics regulation, the MSHSL adopted a policy allowing males athlete to compete in interscholastic athletic programs designated for women and girls. OCR finds that the change in policy and practice eliminated the availability of all-female interscholastic athletic programs in Minnesota, resulting in disparities of a substantial and unjustified nature in the benefits, treatment, services, and educational opportunities afforded to female athletes with no meaningful impact on the benefits, treatment, services, and educational opportunities afforded to male student athletes.

As detailed herein, the MSHSL's change in policy and practice to allow male students to participate in interscholastic athletic programs designated for women and girls has discriminated based on sex, resulted in the denial of educational opportunities to female student athletes, including scholarship opportunities, playing time, publicity, and recognition, and denied women and girls the opportunity and benefit of playing in an all-female interscholastic athletic program. Male student participation in interscholastic athletic programs designated for women and girls has also increased danger of injury and presented unfair levels of competition for girls and women, while at the same time, male athletic programs have not been similarly impacted in such a negative way.

C.   **Minnesota's policies and guidance adopt gender ideology, eviscerate sex-separate activities, and endanger girls' safety, privacy, and mental health.**

1.   **Minnesota Department of Education**

The MDE was established under Minnesota state law and is under the administrative control of the Commissioner of Education (Commissioner), who is appointed by the Governor. Minn. Stat. § 127A.05, Subd. 1. The Commissioner exercises general supervision over public schools and public educational agencies in the state. *Id*. at Subd. 3.

The Commissioner shall recommend to the Governor and legislature such modification and unification of laws relating to the state system of education as shall make those laws more readily understood and more effective in execution. Minn. Stat. § 127A.06.

The Commissioner may accept and administer federal funding. Minn. Stat. § 127A.09, Subd. 1. If the granting federal agency requires a state plan addressing policy for expenditure, the Commissioner shall adopt a state plan in conformity with state and federal regulations and guidelines prior to commissioner acceptance. *Id*. at Subd. 2.

The Commissioner may reduce or withhold a school district's state aid for any school year whenever the board of the district authorizes or permits violations of law within the district by noncompliance with state laws prohibiting discrimination because of race, color, creed, religion, national origin, sex, age, marital status, status with regard to public assistance or disability. Minn. Stat. § 127A.42, Subd. 2. Additionally, the Commissioner shall adopt rules that must direct school districts to file with the Commissioner assurances of compliance with state and federal laws prohibiting discrimination. *Id*. at Subd. 3.

On an annual basis, the Commissioner shall obtain and review information from the Minnesota State High School League including a list of all complaints filed with the league and all lawsuits filed against the league and the disposition of those complaints and lawsuits, information about league policies and rules, and may review all league activities or league-related issues when the Commissioner believes this review is warranted. Minn. Stat. § 128C.20.

The Commissioner is authorized to conduct on-site reviews of school districts to assure the application of certain laws regarding discrimination on the basis of race, color, national origin, sex, and disability.[19] The on-site reviews include a review of Title IX compliance.[20] The Commissioner also provides training opportunities on civil rights compliance to school district staff.[21]

Pursuant to the MDE's Administrative Regulations, the Commissioner is responsible for determining whether school districts are violating federal law prohibiting discrimination and if a school district is not in compliance with federal law, take action to bring the school district into compliance or begin proceedings to suspend or terminate that school district's federal assistance. Under Minnesota Administrative Rules (M.A.R.) § 3535.2800(B), entitled "Duties of the Commissioner," the Commissioner is required to:

> In order to determine whether a violation of federal laws prohibiting discrimination has occurred: within 90 days of the receipt of the data, the commissioner of education shall review it to determine whether a school district is in compliance with federal law prohibiting discrimination; if, after reviewing the data and finding what appears to be a violation of federal law, the commissioner shall make a prompt investigation; and if the investigation indicates noncompliance with federal law, the commissioner shall inform the school district. If the noncompliance cannot be resolved by informal means, the commissioner may proceed to suspend or terminate federal assistance.

M.A.R. § 3535.2800.

The MDE has published on its website, a resource entitled: "A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students (2017)," (Toolkit) and indicates the Toolkit, "helps school districts and charter schools create school environments

---

[19] https://education.mn.gov/MDE/dse/civil/
[20] *Id*.
[21]  https://education.mn.gov/MDE/dse/civil/TrainingCivilRightsCompliance/

*Page 29 –05254060, 05258901, and 25-626-433-RV-CRR – Letter of Findings (violation)*

. . . required by federal or state law."

In the Toolkit (Revised: September 25, 2017), the MDE indicates, "During the last three years, an increasing number of school and school district administrators and staff members as well as students and families have contacted the Minnesota Department of Education seeking technical assistance on how to ensure safe, supportive and inclusive environments for all students, including transgender and gender nonconforming students." Toolkit, p.1. The Toolkit was "compiled to provide information to assist schools in establishing or amending school policies." *Id.* at p.2.

The Toolkit states: "Gender identity, assigned sex and sexual orientation are separate identity characteristics. . . . Any student, including transgender and gender nonconforming students, may be heterosexual, gay, lesbian or bisexual. Gender identity does not correlate with sexual orientation." *Id.* The Toolkit provides the following definitions for school district staff to observe:

> Gender identity – an individual's innate sense of one's own gender; a deeply held sense of psychological knowledge of one's own gender, regardless of the gender assigned at birth.

> Gender expression – the external appearance, characteristics or behaviors typically associated with a specific gender.

> Gender nonconforming – people whose gender expression differs from stereotypical expectations, such as "feminine" boys, "masculine" girls, and those who are perceived as androgynous or gender nonbinary.

> Sexual orientation – refers to the sex of those to whom one is sexually and romantically attracted. Categories of sexual orientation typically have included attraction to members of one's own sex (gay or lesbian), attraction to members of the other sex (heterosexual) and attraction to members of both sexes (bisexual).

> Transgender – an umbrella term for people whose gender identity, gender expression or behavior does not conform to that typically associated with the sex to which they were assigned at birth.

*Id.* at pp. 1-2.

The MDE Toolkit provides the following guidance to school districts regarding Athletics, Restrooms, and Locker Rooms, relating to gender identity:

> Athletics

> Sports provide youth with unique opportunities to improve their physical fitness and develop valuable life skills such as goal setting, perseverance, teamwork and a commitment to fair play. Title IX requires schools provide transgender students with the right to participate in such activities, including athletics, in a manner consistent with their gender identity. The Minnesota State High School League allows participation for all students regardless of their gender identity or expression in an environment free from discrimination with an equal opportunity for participation in athletics and fine arts. (footnote referencing 34 C.F.R. §106.41(a) omitted).

> If a school does not allow a student to participate on the team consistent with

their gender identity or gender expression, a student or the student's family can make an appeal to the Minnesota State High School League (MSHSL) (http://www.mshsl.org/mshsl/index.asp). The Eligibility Appeal Procedures for a transgender student is outlined in the 300.00 Bylaws: Administration of Student Eligibility (http://www.mshsl.org/mshsl/Publications/code/handbook/300 Bylaws.pdf?year=2016) section of MSHSL's Official Handbook For questions and assistance regarding eligibility appeal procedures, contact the MSHSL at (763) 560-2262.

. . .

Restrooms, Locker Rooms and Hotel Accommodations

Title IX and the Minnesota Human Rights Act declare that it is an unfair discriminatory to deny any student the full and equal enjoyment of any educational institution such as a public school. Schools ensure full and equal enjoyment of public accommodations for students where they are not stigmatized or segregated from the rest of the general student population when in exercising their right to the public accommodation.

"A policy that requires an individual to use a bathroom that does not conform to his or her gender identity punishes that individual for his or her gender nonconformance, which in turn violates Title IX." Whitaker v. Kenosha Unified School District, (7th U.S. Circuit Court of Appeals, May 30, 2017). (footnote omitted).

Within the school setting, school officials and leaders need to ensure that all students have access to restrooms, have access to locker rooms to fully participate in classes, sports and activities and have access to hotel accommodations when travelling with school groups for athletic, educational and/or cultural purposes.

Schools should work with transgender and gender nonconforming students to ensure that they are able to access needed facilities in a manner that is safe, consistent with their gender identity and does not stigmatize them. Privacy objections raised by a student in interacting with a transgender or gender nonconforming student may be addressed by segregating the student raising the objection provided that the action of the school officials does not result in stigmatizing the transgender and gender nonconforming student.

Restrooms

Transgender and gender nonconforming students should be afforded the opportunity to use the restroom of their choice. Some students may feel uncomfortable with using a restroom with a transgender or gender nonconforming student. Any student who wishes not to share a restroom with a transgender or gender nonconforming student can be provided a private space such as a single-user restroom. Many schools have chosen to make single-stall restrooms available to all students. For example, some schools have re-purposed a staff restroom into a single user restroom for all students to use.

Locker Rooms

*Page 31 –05254060, 05258901, and 25-626-433-RV-CRR – Letter of Findings (violation)*

> Students use locker rooms during their school day for physical education classes, sports and other activities. Some transgender and gender nonconforming students may prefer a private space while others may wish to use the locker room consistent with their gender identity. Coaches should consider how they can utilize privacy curtains, restrooms and separate changing schedules to provide for privacy for all students.

> Hotel Accommodations

> If students are to be separated based on gender when travelling for athletic, educational or cultural activities, school officials should allow a transgender or gender nonconforming student the opportunity to room with peers who match the student's gender identity unless the transgender or gender nonconforming student requests otherwise. At times, any student may have specific needs for privacy and the school can make arrangements based on that student's wishes.

Toolkit, pp. 8-10.

On February 19, 2025, the Commissioner sent a "Reminder about Student Civil Rights" to Minnesota Educators and School Leaders. The communication, in part, reminded local school officials of the MDE's Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students (2017).

The MDE has a statutory procedure in place that empowers the Commissioner to ensure school districts comply with Title IX, but the MDE has failed to exercise that authority and in fact has directed school districts and the Minnesota State High School League to take action that violates Title IX. In particular, the MDE has failed to take action to assure the Department and the MDE that the school districts which operate or sponsor education programs and activities, including interscholastic athletics that are facilitated through the Minnesota State High School League, take no action affecting a student that Title IX would prohibit the MDE from taking. To the contrary, the MDE's policies and guidance act to encourage subrecipient school districts and the Minnesota State High School League to take action that violates Title IX.

## 2.    Minnesota State High School League

The Minnesota State High School League (MSHSL) is a nonprofit corporation organized under Minnesota State law. Minn. Stat. § 128C.01, Subd. 1. The MSHSL is also a political subdivision of the State of Minnesota and is considered a state agency. Minn. Stat. §§ 128C.15, 128C.22. The MSHSL has a 22-member governing board, four of which are appointed by the Governor. Minn. Stat. § 128C.01, Subd. 4.[22]

The MSHSL provides service, leadership, and extra-curricular opportunities to more than 500 member schools.[23] The MSHSL is made up of high schools whose governing boards have delegated their control of extracurricular activities, which include interscholastic athletics, to the MSHSL. Minn. Stat. § 128C.01, at Subd. 2. To be eligible for membership in the MSHSL, "the

---

[22] Title VI of the Civil Rights Act of 1964 (Title VI) and its implementing regulation at 34 C.F.R. Part 100, prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance. Although a review of Title VI was not the focus of this investigation, OCR notes Minn. Stat. § 128C.01, Subd. 4, states in part: "At least one of [the Governor's appointments to the MSHSL Board] must be an American Indian, an Asian, a Black, or a Hispanic." This appears to be a facial violation of Title VI.

[23] https://www.mshsl.org/about

governing board of each such school must pass a resolution applying for membership for each of its high schools in which it agrees to abide by and enforce the Articles of Incorporation, Constitution, Bylaws and Regulations of the League." Constitution of the Minnesota State High School League, 204.01.[24] Member school districts are required to pay annual membership dues to the MSHSL. *Id*. at 205.00.

The MSHSL oversees contests by and between pupils of the Minnesota high schools that are delegated to it under state law. Minn. Stat. § 128C.01, at Subd. 3. The MSHSL establishes, conducts, and regulates championship high school tournament activities and determines the number of classes in all interscholastic athletic activities under its jurisdiction. Minn. Stat. § 128C.05.

The MSHSL "Founding Purposes" include:

> The Minnesota State High School League is organized for the following *educational* purposes:
>
> - To provide, promote, manage and administer a program of activities for students of the member schools on subsection, section and state levels in athletics and fine arts.
>
> - To establish uniform and equitable rules for students in extra-curricular activities.
>
> - To elevate standards of sportsmanship and to encourage the growth of responsible citizenship among students, member schools and their communities.
>
> - To protect students, member schools and their communities from exploitation by special interest groups.
>
> - To provide mutual benefit and relief plans for the assistance of students injured in extra-curricular activities in meeting medical and hospital expenses incurred by reason of such injuries.
>
> - To serve the best interests of member schools and their students by providing a medium of cooperation and coordination in educational fields of endeavor and a series of related activities on a state-wide basis, which they individually could not achieve or accomplish for their students and which aid and assist the schools in maintaining a constantly improved program.

MSHSL, About (emphasis added).[25]

The MSHSL created a "Transgender Eligibility Appeal Procedures for a Male to Female (MTF) Student" process for male students who identify as "transgender" and who want to compete against female students in athletic programs designated for girls. This policy first appeared in the 2015-2016 MSHSL Handbook in Section 300.00 Bylaws: Administration of Student Eligibility. The policy change was adopted by the MSHSL Board of Directors on December 4, 2014. MSHSL Minutes of the Board of Directors Meeting, December 4, 2014, p. 2.

---

[24] https://www.mshsl.org/sites/default/files/2024-07/mshsl-handbook-constitution.pdf
[25] https://www.mshsl.org/about

The MSHSL then amended the policy on February 4, 2016 "as recommended by the Minnesota Department of Education." See revisor's note at the conclusion of Section 300.00, Paragraph 4, p. 53 of the 2016-2017 MSHSL Handbook. The primary change to the policy appears to rename the appeals process to "Eligibility Appeal Procedures for a Transgender Student."

The appeals process published under the 2024-2025 MSHSL Handbook, Section 300.00 Bylaws: Administration of Student Eligibility, remains entitled "Eligibility Appeal Procedures for a Transgender Student." The procedure states in part:

> 3. Eligibility Appeal Procedures for a Transgender Student
>
> A. Introduction: In accordance with applicable state and federal laws, rules and regulations, the Minnesota State High School League allows participation for all students consistent with their gender identity or expression in an environment free from discrimination with an equal opportunity for participation in athletics and fine arts.
>
> B. Transgender Eligibility Appeal Procedures: The application to appeal a transgender eligibility determination is limited to the following circumstances:
>
> 1) The school must have made a determination of ineligibility based on the student's gender identity after receiving information that the student has a consistent gender identity or that the gender identity is sincerely held as part of the student's core identity and the gender identity is different from the student's sex assigned at birth and that the student wishes to participate in athletics in a manner consistent with the student's gender identity. . .
>
> 5) Following a complete review of the information, the Independent Hearing Officer's recommendation shall be effective until reviewed by the MSHSL Board of Directors at its next regularly scheduled meeting.
>
> 6) If the Independent Hearing Officer affirms the eligibility of the student, the student will be eligible to participate in MSHSL activities consistent with the student's gender identification for the balance of the student's high school eligibility.

2024-2025 MSHSL Handbook, pp. 61-62.

The MSHSL has acknowledged to OCR there are male students competing against female students in Minnesota athletic programs designated for girls and that the MSHSL has utilized the "Transgender Student" eligibility Fair Hearing appeal procedure for students who wished to appeal a school's determination of the student's eligibility to participate on a team designated for the opposite sex. The MSHSL informed OCR that the recommendation of the independent hearing officer in each of those appeals was to grant the student's eligibility.

The MSHSL has also acknowledged to OCR despite knowing that male students are participating against female students in athletic programs designated for girls, the MSHSL does not collect information related to such students' participation in MSHSL athletic competitions, and the MSHSL does not track "adverse impacts on female athletes regarding participation, competitive outcomes, potential awards or visibility to colleges."

It is noted the 2024-2025 MSHSL Handbook includes the following reference to Minnesota State law relating to Sex Discrimination in Athletic Programs, which appears to contradict the MSHSL policy that allows male athletes to compete on teams designated for female athletes:

STATE LEGISLATION

121A.04 Athletic Programs; Sex Discrimination.[26]

Subdivision 1. Purpose.

The legislature recognizes certain past inequities in access to athletic programs and in the various degrees of athletic opportunity previously afforded members of each sex, race, and ethnicity. The purpose of this section is to provide an equal opportunity for members of each sex and members of all races and ethnicities to participate in athletic programs.

Subd. 2. Equal opportunity in athletic programs.

Each educational institution or public service shall provide equal opportunity for members of each sex and members of all races and ethnicities to participate in its athletic program. In determining whether equal opportunity to participate in athletic programs is available for the purposes of this section, at least the following factors shall be considered to the extent that they are applicable to a given situation: whether the opportunity for males and females to participate in the athletic program reflects the demonstrated interest in athletics of the males and females in the student body of the educational institution or the population served by the public service; whether the opportunity for members of all races and ethnicities to participate in the athletic program reflects the demonstrated interest in athletics of members of all races and ethnicities in the student body of the educational institution or the population served by the public service; whether the variety and selection of sports and levels of competition effectively accommodate the demonstrated interests of members of each sex; whether the variety and selection of sports and levels of competition effectively accommodate the demonstrated interests of members of all races and ethnicities; the provision of equipment and supplies; scheduling of games and practice times; assignment of coaches; provision of locker rooms; practice and competitive facilities; and the provision of necessary funds for teams of one sex.

Subd. 3. Exceptions.

(a) Notwithstanding any other state law to the contrary, in athletic programs operated by educational institutions or public services and designed for participants 12 years old or older or in the 7th grade or above, it is not an unfair discriminatory practice to restrict membership on an athletic team to participants of one sex whose overall athletic opportunities have previously been limited.

(b) When an educational institution or a public service provides athletic teams for children 11 years old or younger or in the 6th grade or below, those teams shall be operated without restrictions on the basis of sex, except that when overall athletic opportunities for one sex have previously been limited and there

---

[26] It is noted the Minnesota Legislature amended the Athletic Programs; Sex Discrimination statute, M.S. § 121A.04, in 2023, to internationally eliminate the term "both sexes" from the athletics statute, with Minnesota bill number HF2497. The Governor signed the measure into law on May 24, 2023.

is a demonstrated interest by members of that sex to participate on a team restricted to members of that sex, the educational institution or public service may provide a team restricted to members of that sex.

(c) When two teams in the same sport are in fact separated or substantially separated according to sex, the two teams shall be provided with substantially equal budgets per participant, exclusive of gate receipts and other revenues generated by that sport, and in all other respects shall be treated in a substantially equal manner. However, nothing in this section shall be construed to require the two teams to conduct combined practice sessions or any other combined activities related to athletics.

*(d) If two teams are provided in the same sport, one of these teams may be restricted to members of a sex whose overall athletic opportunities have previously been limited, and members of either sex shall be permitted to try out for the other team.*

(e) Notwithstanding the provisions of paragraphs (a), (b), and (d), any wrestling team may be restricted to members of one sex whether or not the overall athletic opportunities of that sex have previously been limited, provided that programs or events are provided for each sex to the extent the educational institution or public service determines that these programs or events are necessary to accommodate the demonstrated interest of each sex to participate in wrestling.

Subd. 4. Provision of separate teams.

When an equal opportunity to participate in the elementary or secondary school level athletic program of an educational institution or public service is not provided to members of a sex whose overall athletic opportunities have previously been limited, that educational institution or public service shall, where there is demonstrated interest, provide separate teams for members of the excluded sex in sports which it determines will provide members of that excluded sex with an equal opportunity to participate in its athletic program and which will attempt to accommodate their demonstrated interests.

Subd. 5. Rules.

The commissioner of education, after consultation with the commissioner of human rights must promulgate rules in accordance with chapter 14 to implement this section to prevent discrimination in elementary and secondary school athletic programs operated by educational institutions. The rules promulgated by the commissioner pursuant to this section shall not require athletic competition or tournaments for teams whose membership may be restricted to members of a sex whose overall athletic opportunities have previously been limited to be scheduled in conjunction with the scheduling of athletic competition or tournaments for teams whose membership is not so restricted by this section. Any organization, association or league entered into by elementary or secondary schools or public services for the purpose of promoting sports or adopting rules and regulations for the conduct of athletic contests between members shall provide rules and regulations and conduct its activities so as to

permit its members to comply fully with this section. The rules of that organization, association or league may provide separate seasons for athletic competition or tournaments in a sport for teams whose membership may be restricted to members of a sex whose overall athletic opportunities have previously been limited from athletic competition or tournaments established for teams in that same sport whose membership is not so restricted by this section, and its rules may prohibit a participating student from competing on more than one school team in a given sport during a single school year.

2024-2025 MSHSL Handbook, p. 126 (emphasis added).

The MSHSL and various school districts who use the MSHSL are members of the National Federation of State High School Associations (NFHS). The NFHS implicitly recognizes there are physical differences between boys and girls that are so significant, such that the differences between the sexes not only justify, but require, high school athletic programs to provide sex-separated athletics in many sports. This is evidenced by the different standards in boys' and girls' athletic competitions for equipment in several sports that would constitute impermissible sex discrimination unless supported by the fact that boys and men have physical advantages over girls and women in many sports, including the following sample of examples:[27]

- Basketball: boys use a ball that is 29.5in (size 7), and girls use a ball that is 28.5in (size 6);

- Shot put: the minimum weight of the shot is 12 lbs. (5.443kg) for boys and 8.818 lbs. (4.0kg) for girls; for boys, the minimum diameter shall be no less than 3.873 inches (98.4mm), while maximum diameter shall not exceed 4.625 inches (117.5mm) and for girls, the minimum diameter shall be no less than 3.740 inches (95mm), while maximum diameter shall be no more than 4.331 inches (110mm);

- Discus: the minimum weight of the discus is 3.527 lbs. (1.6kg) for boys and 2.205 lbs. (1.0kg) for girls; the diameter of the boys' discus must be at least 8.228 inches (209mm), but not more than 8.307 inches (211mm), the diameter of the girls' discus must be at least 7.087 inches (180mm), but not more than 7.165 inches (182mm);

- Hurdles: boys use hurdles that are 39 inches high, girls use hurdles that are 33 inches high;

- Lacrosse: boys' lacrosse is a full-contact sport, requiring protective gear like helmets, shoulder pads, and gloves, while girls' lacrosse is non-contact and typically only requires eyewear and a mouthguard;

- Long jump: Recommended distances from the foul line or take off board for boys is 12 feet, for girls 8 feet; and

- Triple jump: Recommended distances from the foul line or take off board for boys is 32 feet, for girls 24 feet.

---

[27] https://www.nfhs.org/media/6892897/nfhs-track-and-field-pre-meet-notes_2023_final.pdf;
https://www.nfhs.org/media/7213496/rule-comparison-document-24-25-final-v2.pdf;
https://www.osaa.org/docs/btf/2023_Shot_Put_and_Discus_Implement_Specifications.pdf;
https://www.nfhs.org/media/5989329/2023-nfhs-track-and-field-field-events-diagrams-final.pdf

[2023 NFHS Track and Field Pre-Meet Notes, p. 12](#).

The physiological differences between males and females exist regardless of how a person claims to identify and regardless of what medical interventions the person has undergone. *See, e.g.*, *Adams*, 57 F.4th at 819-21 (Lagoa, J., concurring). That is why "the Title IX framework effectively requires a recipient to maintain separate sports teams." *Soule*, 90 F.4th at 63 & n.8 (Menashi, J., concurring) (collecting cases). "Without a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events." *O'Connor*, 449 U.S. at 1307 (Stevens, J., in chambers). Separating competitive-skill and contact-sport athletic programs by sex promotes equal athletic opportunity, as Title IX and longstanding regulations require. *See Clark I*, 695 F.2d at 1131 ("[T]he governmental interest claimed is redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes. There is no question that this is a legitimate and important governmental interest.").

### 3.    Minnesota School District Policies

Several Minnesota school districts have policies that permit male students to participate in student athletic programs designated for girls and to use restrooms and locker rooms designated for girls. The Anoka-Hennepin School District engages in this conduct. The district is a member of the MSHSL and receives federal funding from the MDE.[28]

Anoka-Hennepin School District policy 102.0 states in part:

> [A]ll students, including transgender and gender non-conforming students, shall be permitted to use any and all facilities consistent with their gender identity. Transgender and gender non-conforming students will only be required to use individual and/or otherwise separate facilities if every student is required to do so.
>
> . . .
>
> This policy applies to all of the academic and nonacademic programs of the district, including, for example, coursework, co-curricular and extracurricular activities, and other rights or privileges of enrollment. This policy will be enforced before, during, or after school hours on all school property, including the school bus, school functions, or events held at other locations.

Anoka-Hennepin School District policy 102.0.

Anoka-Hennepin School District policy 102.0G further states in part:

> The District will provide all students with access to use all facilities consistent with the students' gender identity. . . . Transgender and gender non-conforming students may only be required to use individual-user or otherwise separate facilities if every student is required to do so.

Anoka-Hennepin School District policy 102.0G.

The Anoka-Hennepin School District 2024-25 School Handbook states in part:

---

[28] The Anoka-Hennepin School District received over $6.8 million form the U.S. Department in FY24.

> The Minnesota State High School League has also adopted a policy addressing eligibility determination for male-to-female transgender student athletes stating in general that all students, regardless of their gender identity or expression, should be allowed to participate in athletics in an "environment free from discrimination."

Anoka-Hennepin School District 2024-25 School Handbook, p 21.[29]

The Minneapolis Public Schools also engages in this conduct. The Minneapolis Public Schools is a member of the MSHSL and receives federal funding from the MDE.[30] Minneapolis Public Schools adopted Policy 5025, entitled "Gender Inclusion," that states in part:

> GENDER-SEGREGATED FACILITIES
>
> All students shall have access to gendered facilities and school-sponsored programs that are consistent with the student's gender identity. . . .
>
> *Restroom Accessibility*
>
> . . . students shall have access to the restroom that corresponds to their gender identity asserted at school . . .
>
> . . .
>
> *Locker Room Accessibility*
>
> . . . Unless the student requests otherwise, transgender and gender expansive students should have access to the locker room that corresponds to the student's gender identity asserted at school, like all other students. . .In no case shall a transgender student be required to use a locker room that conflicts with the student's gender identity.
>
> PHYSICAL EDUCATION AND HEALTH EDUCATION CLASSES AND INTRAMURALSPORTS
>
> All students shall be permitted to participate in . . . intramural sports and activities in a manner consistent with their gender identity.
>
> . . .
>
> INTERSCHOLASTIC COMPETITIVE SPORTS TEAMS/ACTIVITIES
>
> All students shall be permitted to participate in interscholastic athletics in a manner consistent with their gender identity and in compliance with the applicable regulations of the Minnesota State High School League (MSHSL).
>
> . . .

Minneapolis Public Schools Policy 5025: Gender Inclusion.[31]

---

[29]https://www.ahschools.us/domain/2216;https://drive.google.com/file/d/1PBbSGGFFlANHDibt6ECtEWC90JyB8X2v/view?usp=sharing

[30] The Minneapolis Public Schools received over $31.5 million form the U.S. Department in FY24.

[31] https://mps.municipalcodeonline.com/book?type=policies#name=Policy_5025:_Gender_Inclusion

### 4.     Invasion of Privacy

The harms caused by the MDE, school district, and MSHSL bathroom and locker room policies are not hypothetical. The policies affect real students. In [redacted content], a [redacted content] female student at [redacted content] in Minnesota ([redacted content] is a member of the MSHSL) expressed her experience having to share restroom and locker room facilities with boys at school, and the impact it had on her educational opportunities.[32] The young lady reported that she was in the locker room after gym class getting ready to change clothes, and she heard a male's voice inside the women's locker room. When she turned to look, she saw a boy in the locker room. She indicated that she talked to her school principal about feeling uncomfortable about changing in the locker room in the presence of a boy, but the principal told her that students can "be whoever they want to be." She also indicated that she was scared of boys pretending to be girls and that the boys will touch them or take cellphone photos of girls in restrooms or locker rooms. Other girls, she explained, had similar concerns. A mother of two other female students had raised similar concerns about boys invading female-intimate spaces.

Parents have also spoken out about school district policies allowing teen-age boys to share locker rooms and restrooms with teen-age girls at Rochester Public Schools. Rochester Public Schools is a member of the MSHSL. One parent indicated she had to move her daughters to another school district because of restroom and locker room policies allowing boys into restrooms and locker rooms designated for girls.[33]

Reinforcing common sense, a recent study indicates that policies requiring female student athletes to undress or use the bathroom in the presence of male student athletes causes distress in women and girls, violates their right to privacy, and can deny women equal access to benefits of educational programs and activities: Reem Alsalem, *Special Rapporteur on Violence Against Women and Girls, Its Causes and Consequences*, U.N. Doc. A/79/325 at 5/24 (August 27, 2024), https://docs.un.org/en/A/79/325. The report states that policies denying female athletes sex-separated sensitive spaces increases the risk of sexual harassment, assault, voyeurism, and physical and sexual attacks in unisex locker rooms and toilets. *Id*.

### D.     Specific Examples of Sex Discrimination in Minnesota Educational Programs or Activities

#### 1.     Student 1

Student 1 is a male student competing on the [redacted content] girls' varsity fastpitch softball team in the Anoka-Hennepin School District. He has competed since [redacted content] against all female athletes in the MSHSL Class AAAA Girls' Softball league and still does so. The [redacted content] varsity fastpitch softball team is recognized as a MSHSL sanctioned athletic program designated for girls. Class AAAA includes the largest schools in Minnesota, whereas Class A represents the smallest schools in Minnesota. The MSHSL has designated fastpitch softball as a girls' athletics program. The MSHSL offers multiple athletic programs available for boys, including baseball.

---

[32] https://www.dailysignal.com/2024/06/13/really-uncomfortable-16-year-old-girl-speaks-sharing-school-bathrooms-locker-rooms-males/

[33] https://www.dailysignal.com/2024/06/11/concerned-daughters-safety-13-minnesota-school-districts-issue-transgender-guidelines-allowing-boys-girls-spaces/; https://alphanews.org/infuriating-minnesota-mom-slams-school-districts-radical-transgender-restroom-guidelines/

The MSHSL rules, policies and bylaws allow softball pitchers to throw multiple games in a row, so Student 1 was allowed to pitch five consecutive games during the [redacted content] post season. During that five-game series, Student 1 dominated the girls, allowing only one earned run in 35 total innings and striking out 27 batters.

Three of the five consecutive games included championship tournament play. Student 1 was instrumental in leading the [redacted content] girls' softball team to win the [redacted content] MSHSL Class AAAA Girls' Softball Championship on [redacted content]. Student 1 was the starting pitcher for all three games in the tournament, competing against all-girl teams. In the championship title game, Student 1 pitched a complete game shutout, allowing only three hits in a 6-0 victory to defeat the all-girl opponent. During the championship tournament, Student 1 threw three complete games, recorded two shutouts, only gave up two runs, was credited with two wins, and struck out 13 batters during the three-game stretch. Student 1 also batted each of those three games hitting and average of .300 with two doubles and one run batted in. Student 1's performance against the all-girl teams resulted in post season honors for Student 1, including Student 1 being selected to the [redacted content] MSHSL Class AAAA Softball All-Tournament Team. The MSHSL published a news release on the MSHSL website, promoting Student 1's dominant performance stating in part: "In three state tournament games, the Rebels (24-2) outscored the opposition, 14-2, including shutouts in the quarterfinals and championship game . . . [redacted content] crowning victory came behind . . . another impressive pitching performance by junior [Student 1] . . . who gave up just three hits while striking out six."

Student 1's performance during the [redacted content] regular season was similarly influential in helping his team defeat the all-girl teams they competed against, earning [redacted content] a regular season record of 21-2. Student 1 started a total of 14 games as pitcher, resulting in a 12-win, one-loss record. Student 1 threw a complete game each time he pitched. Over the course of the season, Student 1 had 94 innings pitched with a 0.74 earned run average, including 105 strike outs. To start the [redacted content] regular season, Student 1 recorded double digit strike outs in each of his first four games pitched. Student 1 also appeared in 21 games as a batter during the regular season, hitting 20/58 (.344), including five doubles and 13 runs batted in. All against all-girl softball teams.

During the [redacted content] season, Student 1 helped [redacted content] to a 21-4 record. Student 1 appeared in 19 games as a pitcher in 2024 competing against all-girl softball teams. Over the course of the [redacted content] season, Student 1 pitched 105 1/3 innings, with a 0.40 earned run average, and 106 strike outs. This included six shutouts and three games with double digit strikeouts. Student 1 also appeared in 24 games as a batter during the [redacted content] regular season and postseason, hitting 29/73 (.397), including five doubles and 16 runs batted in.

During the [redacted content] season, Student 1 helped the [redacted content] team to a 16-8 record against all-girl softball teams. Student 1 appeared in 13 games as a pitcher in [redacted content]. Over the course of the [redacted content] season, Student 1 pitched 62 2/3 innings, with a 1.79 earned run average, and 53 strike outs. This included five complete games pitched. Student 1 also appeared in seven games as a batter during the regular and postseason hitting 5/16 (.312), with three runs batted in.

According to a female student at [redacted content] in the Independent School District No. 279, who competes on the varsity all-girls' fastpitch softball team, her team had to compete against Student 1 twice during [redacted content] MSHSL sanctioned regular season and sectional competitions. The [redacted content] team was defeated by the team Student 1 pitched for in both

games. The [redacted content] team failed to score in either game, in which Student 1 pitched seven shutout innings, allowing only one hit and striking out seven batters. By losing at sectionals, the all-girls [redacted content] team was eliminated from tournament play and was not permitted to advance to the state tournament.

### 2.      Other Examples

On [redacted content], the MSHSL received correspondence from the Director of Student Activities at [redacted content] informing the MSHSL that a male student who identifies as female would be participating on the girls' Alpine ski program. The MSHSL had an Alpine ski program available for boys.

On [redacted content], the MSHSL received correspondence from the Activities Coordinator at [redacted content] informing the MSHSL that a male student who identifies as female would be playing in the girls' lacrosse program. The MSHSL had a lacrosse program available for boys. That same male student was also competing on the [redacted content] boys' swimming team.

On [redacted content], the MSHSL received correspondence from the Activities Director at [redacted content] informing the MSHSL that a male student who identifies as female would be competing in the girls' Track & Field program. The MSHSL had a Track & Field program available for boys.

On [redacted content], the MSHSL received correspondence from the activities director at [redacted content] informing the MSHSL that a male student who identifies as female would be participating in the girls' Volleyball program. The MSHSL had a Volleyball program available for boys.

On [redacted content], the MSHSL received correspondence from a parent expressing concern with the MSHSL policy allowing male students to compete against female students in athletic programs dedicated for girls. The parent pointed out that girls' athletic programs are meant for females, that girls have a long history of being denied opportunities in high school athletics, and the MSHSL policy violating Title IX, including by denying girls equal athletic opportunities.

On [redacted content], the MSHSL received correspondence from the Activities Director at [redacted content] informing the MSHSL that a male student who identifies as female would be participating in the girls' Nordic skiing program. The MSHSL had a Nordic skiing program available for boys. The Athletics Director also forwarded an email from a concerned parent to the MSHSL about the MSHSL policy allowing boys to compete against girls in athletic programs designated for girls.

On [redacted content], the MSHSL received correspondence from the Activities Director at [redacted content] informing the MSHSL that a male who identifies as female would be participating in the girls' Track & Field program. The MSHSL had a Track & Field program available for boys.

On [redacted content], the MSHSL received correspondence from the Activities Director at [redacted content] informing the MSHSL that a male student who identifies as female would be participating in the girls' Nordic skiing program. The MSHSL had a Nordic skiing program available for boys.

On [redacted content], the MSHSL received a call from the activities director at [redacted content] informing the MSHSL that a male student who identifies as female would be participating

in the girls' Volleyball program. The MSHSL had a Volleyball program available for boys.

On [redacted content], a MSHSL independent hearing officer approved the request of an [redacted content] male student enrolled in the Morris Area School District who identifies as female to participate in MSHSL activities as a female student athlete "for the balance of the student's high school career." The MSHSL had multiple athletic programs available for boys.

On [redacted content], a MSHSL independent hearing officer approved the request of an [redacted content] male student enrolled in the [redacted content] who identifies as female to participate in MSHSL activities as a female student athlete "for the balance of the student's high school career." The MSHSL had multiple athletic programs available for boys.

On March 6, 2020, the MSHSL provided a letter to the Minnesota legislature indicating there were five "transgender appeals" since the 2015-2016 school year, all of which were granted by a MSHSL independent hearing officer. The letter provided details regarding four of those five appeals and indicated all four appeals involved male students identifying as females and being ruled eligible to participate in MSHSL athletics programs designated for girls. The MSHSL had multiple athletic programs available for boys at that time.

E.      **Intentional Violations of Title IX**

On February 5, 2025, the President of the United States issued Executive Order 14,201, *Keeping Men Out of Women's Sports*. In the Executive Order, the President stated clearly:

> [I]t is the policy of the United States to rescind all funds from educational programs that deprive women and girls of fair athletic opportunities, which results in the endangerment, humiliation, and silencing of women and girls and deprives them of privacy. It shall also be the policy of the United States to oppose male competitive participation in women's sports more broadly, as a matter of safety, fairness, dignity, and truth.

90 Fed. Reg. at 9279 (Feb. 11, 2025).

The MSHSL sent a letter to MSHSL member schools in response to Executive Order 14,201 stating:

> In Minnesota, participation and eligibility of transgender student-athletes is determined by state law, through the Minnesota Human Rights Act and the Minnesota Constitution. The Minnesota State High School League, similar to other youth sports organizations, is subject to state anti-discrimination laws, which prohibit discrimination based on gender identity. League Member Schools have done excellent work in respecting students and their individual situations as they determine their participating and eligibility within interscholastic sports.
>
> The League will continue to review existing state law alongside the new Presidential Executive Order and its timeline, processes for states and requirements that are included.

MSHSL letter sent to Member Schools.

The MSHSL statement failed to address the obligation of MSHSL member school districts to comply with Title IX and its implementing regulations and all executive orders as provided in

*Page 43 –05254060, 05258901, and 25-626-433-RV-CRR – Letter of Findings (violation)*

MDE's grant assurance documents signed by the MDE in order to receive federal funding from the Department which has been allocated to local school districts.

On February 12, 2025, the Speaker of the Minnesota House of Representatives and 51 other Minnesota State Representatives sent a letter to the MSHSL expressing concern regarding the MSHSL's public comments indicating the MSHSL will continue to allow male students to compete against female students in athletic programs designated for female students. The letter expressed the legislators' concern that the MSHSL's actions are "jeopardizing equal opportunities for all athletes, particularly female athletes."

On February 14, 2025, the MSHSL sent a letter to the Minnesota Attorney General, requesting guidance on whether the MSHSL and Minnesota school districts would be in violation of Minnesota law if they prohibited students from participating in interscholastic sports based on their gender identity. The Minnesota Attorney General responded to the MSHSL's request for guidance on February 20, 2024, and stated in relevant part: "The Executive Order does not have the force of law and therefore does not preempt any aspect of Minnesota law. Complying with the Executive Order and prohibiting students from participation in extracurricular activities consistent with their gender identity would violate the MHRA." Minn. Atty. Gen. Op. 1035. The Minnesota Attorney General failed to address the assurances and obligations to comply with Title IX, its implementing regulations, and all applicable executive orders, that apply to recipients of federal funding as stated in the grant assurance documents signed by the MDE as a condition of receiving federal funding.

On February 19, 2025, the Minnesota House of Representatives Education Committee heard and received written testimony on House File 12, the "Preserving Girls' Sports Act," which would have amended Minnesota state law to prevent males from participating in athletic programs designated for girls. The committee received statements from 32 individuals including students, parents, educators, and coaches, voicing their concerns about the MSHSL policies that allow men and boys to compete against women and girls in interscholastic athletic programs designated for women and girls, and their desire for the MSHSL to change its policies.[34]

On February 25, 2025, United States Attorney General Pam Bondi sent a letter to the Minnesota Attorney General Ellison and MSHSL Executive Director Martens, stating in part: "Requiring girls to compete against boys in sports and athletic events violates Title IX of the Education Amendments Act of 1972." The Attorney General further informed the Minnesota Attorney General and the MSHSL Director:

> Minnesota should be on notice. The Department of Education's Office of Civil Rights has begun a Title IX investigation into the Minnesota State High School League. If the Department of Education's investigation shows that relevant Minnesota entities are indeed denying girls an equal opportunity to participate in sports and athletic events by requiring them to compete against boys, the Department of Justice stands ready to take all appropriate action to enforce federal law.

U.S. Atty. Gen. Letter (February 25, 2025).

---

[34] https://www.youtube.com/watch?v=4XhjxrsWJKU; https://www.house.mn.gov/comm/docs/mpLhQvbb6EaE_qC-zsvgBQ.pdf

Notwithstanding the guidance and warnings from federal officials, neither the MDE, Minnesota school districts nor the MSHSL have changed their policies to prevent male students from competing against female students in athletic programs designated for girls, or to prevent male students from using female locker rooms and restrooms.

## III.    The Department finds that the Minnesota Department of Education and the Minnesota State High School League are noncompliant with Title IX and its implementing regulations.

Despite Title IX's express provisions regarding sex-separated teams in interscholastic sports and Title IX's equal-opportunity mandate, the MDE, various Minnesota school districts, and the MSHSL adopted and implemented a practice that forces women and girls to compete against men and boys in interscholastic athletic programs designated for female students if the male student athlete asserts he is female, even though it is impossible for a man to be a woman, or for a boy to be a girl. This is to say nothing of the dramatic physiological differences between the sexes and historically limited athletic opportunities for women and girls in interscholastic athletics. The evidence is overwhelming: the MDE's, various Minnesota school districts', and the MSHSL's actions are facial violations of Title IX and Title IX's athletics regulation and violate Title IX's equal-opportunity mandate, causing disparities of a substantial and unjustified nature in the benefits, treatment, services, and educational opportunities afforded to female athletes and have no meaningful impact on the benefits, treatment, services, and educational opportunities afforded to male athletes.

The MDE's, various Minnesota school districts', and the MSHSL's discriminatory practices, intentional actions, and deliberate inaction constitutes discrimination on the basis of sex, in violation of Title IX and its implementing regulations.

### A.    The MDE's, various Minnesota school districts', and the MSHSL's policies and practices involving athletics and sensitive spaces violate Title IX.

#### 1.    The MDE's, various Minnesota school districts', and the MSHSL's policies and practices allowing trans-identifying students to participate in girls' sports violate Title IX.

The MDE's, various Minnesota school districts', and the MSHSL's actions related to athletics violate Title IX in at least two ways. Because the MDE, various Minnesota school districts, and the MSHSL have thrown out the biological justification for sex separation in athletics by allowing male trans-identifying individuals to participate in women's and girls' sports, they are discriminating on the basis of sex by separating the sexes without a valid basis under Title IX. The MDE, various Minnesota school districts, and the MSHSL are also treating women and girls worse than men and boys, denying women and girls "equal athletic opportunity" in violation of Title IX. 34 C.F.R. § 106.41(c).

**1.** As explained, sex discrimination is treating individuals or groups that "are similarly situated differently without sufficient justification for the difference in treatment," *Alabama Dep't of Revenue*, 575 U.S. at 26 (quotation marks omitted), *i.e.*, subjecting members of one biological sex to "'less favorable' treatment" than similarly situated members of the other sex, *Jackson*, 544 U.S. at 174. When a federal-funding recipient separates sports based on sex, the recipient is not discriminating based on sex because the recipient is treating the sexes differently with a sufficient justification: the real biological differences between men and women. When a recipient provides

sex-separated interscholastic athletic teams, the teams must remain separated by sex, with only a clearly defined limited exception: "where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport." 34 C.F.R. § 106.41(b). Unless both requirements in the exception are satisfied, a member of one sex cannot be permitted to participate in an athletic program designated for the opposite sex. When the recipient separates sports based on sex, creates a special exemption to that general distinction for "gender identity," and does not adhere to the limited exception in 34 C.F.R. § 106.41(b), the recipient is no longer treating the sexes differently based on a sufficient justification but are instead discriminating on the basis of sex by separating the sexes without a valid basis under Title IX.

The MDE, various Minnesota school districts, and the MSHSL are violating Title IX. The following evidence obtained during the investigation relevant to a 34 C.F.R. § 106.41(b) analysis is uncontroverted: (1) The MDE and various school districts are recipients of federal funding; (2) the MDE, various Minnesota school districts, and the MSHSL knowingly permit male students to compete in interscholastic athletic programs designated for women and girls; (3) historically, interscholastic athletic opportunities for women and girls have been limited, but the same cannot be said for men and boys; and (4) the MDE, various Minnesota school districts, and the MSHSL have a history of offering sex-separated athletic programs for both males and females, in order to comply with Title IX.

Recipients, such as the MDE and various Minnesota school districts who use the MSHSL and permit males to compete in interscholastic athletic programs designated for females, violate Title IX when the two requirements in 34 C.F.R. § 106.41(b) that would permit a male to compete in an interscholastic athletic program designated for females have not been met, such as in this case. Accordingly, the MDE, various Minnesota school districts, and the MSHSL policies and practices permitting male students to participate in interscholastic athletic programs designated for women and girls, violate Title IX and its implementing regulation, 34 C.F.R. § 106.41.

**2.** The MDE, various Minnesota school districts, and the MSHSL have also violated the equal-opportunity mandate in Title IX and its athletic regulation. Though the Title IX athletic regulation declares a general prohibition against discriminating based on sex in athletics, 34 C.F.R. § 106.41(a), it also provides a basis for recipients to separate athletic teams by sex "where selection for such teams is based upon competitive skill or the activity involved is a contact sport," *id.* § 106.41(b). When a recipient provides sex-separated athletic teams, as Minnesota does, the teams must remain separated by sex, with only a limited, well-defined exception. As described above, a recipient may provide a sex-separate team for members of one sex but not the other, and "where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport." *Id.* While allowing for, and in some cases requiring, sex-separate teams, Title IX also requires recipients to "provide equal athletic opportunities for members of both sexes." *Id.* § 106.41(c).

The MDE, various Minnesota school districts, and the MSHSL are not providing equal athletic opportunities for members of both sexes and are thus in violation of Title IX and its implementing regulation. The following evidence obtained during the investigation relevant to a 34 C.F.R. § 106.41(c) equal athletic opportunity analysis is uncontroverted: (1) The MDE and

various school districts are recipients of federal funding; (2) the MDE, various Minnesota school districts, and the MSHSL knowingly permit male students to compete in interscholastic athletic programs designated for women and girls; (3) historically, interscholastic athletic opportunities for women and girls have been limited, but the same cannot be said for men and boys; (4) the MDE, various Minnesota school districts, and the MSHSL have a history of offering sex-separated athletic programs for both males and females, in order to comply with Title IX; (5) the MDE, various Minnesota school districts, and the MSHSL are aware that the presence of male students participating in female athletic programs increases the risk of women and girls being injured, losing out on playing time and recognition, being treated differently, and losing out in educational programs and activities; (6) the MDE, various Minnesota school districts, and the MSHSL knowingly allow a male students to use locker rooms and restrooms designated for women and girls; (7) there is sufficient interest and ability among female students in Minnesota to sustain viable female-only interscholastic athletic teams, and there is a reasonable expectation of interscholastic competition for women's and girls' teams; and (8) the MDE's, various Minnesota school districts', and the MSHSL's policy and practice of allowing males to participate in interscholastic athletic teams designated for females effectively eliminates "all-girl" and "all-women" interscholastic athletic programs in Minnesota schools.

The MDE's, various Minnesota school districts', and the MSHSL's actions violate Title IX's core purpose and fail to provide women and girls equal athletic opportunities compared to men and boys. A core purpose of Title IX is to ensure that both men and women have equal educational opportunities, including an "equal athletic opportunity" to participate in athletic programs. 34 C.F.R. § 106.41(c). In determining whether a recipient is providing an equal athletic opportunity for members of both sexes, the Department will consider "whether the selection of sports and levels of competition effectively accommodate the interests and abilities of the members of both sexes." *Id.* § 106.41(c)(1). The Department "considers the effective accommodation of interests and abilities in conjunction with equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes to determine whether an institution provides equal athletic opportunity as required by Title IX." *Berndsen*, 7 F.4th at 788 (citation omitted).

The overall competitiveness of women's athletics is not equal to men's athletics, and this has been a fact embraced by the MDE, various Minnesota school districts, and the MSHSL with the various interscholastic athletic programs separated by sex they have provided for many years. While men and boys get sex-separated teams where they are competing against their physical equals, women and girls get teams where they are facing unfair and unsafe competition from men and boys with a physical advantage. Put differently, while male sports maintain fair and safe competition, females are forced to participate in unfair and unsafe competition, where female athletes risk injuries, are displaced from podiums in athletic competitions, lose opportunities for advancement to regional and national competitions, and miss out on critical visibility for college scholarships and recognition. That unequal treatment is the denial of "equal athletic opportunity" in violation of Title IX. 34 C.F.R. § 106.41(c); *see* Executive Order 14,201, 90 Fed. Reg. at 9279 ("In recent years, many educational institutions and athletic associations have allowed men to compete in women's sports. This is demeaning, unfair, and dangerous to women and girls, and denies women and girls the equal opportunity to participate and excel in competitive sports."); *McCormick*, 370 F.3d at 294-95 ("Treating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal opportunity for both sexes."); *Soule*, 90 F.4th at 63 (Menashi, J., concurring) ("an education program risks Title IX liability when it *fails* to distinguish between student athletes based on sex").

Thus, the MDE, various Minnesota school districts, and the MSHSL, by disregarding the real biological differences between boys and girls, have failed to "provide equal athletic opportunity for members of both sexes" in violation of Title IX. 34 C.F.R. § 106.41(c).

Indeed, it was not until recently that this changed, and the change occurred without a corresponding change to the Title IX athletic regulation. The inherent physiological differences between the two sexes make them generally dissimilarly situated in athletics. The MDE, various Minnesota school districts, and the MSHSL have effectively conceded that males have a physical advantage over females in sports by offering sex-separated interscholastic athletic programs. Additionally, Minnesota school districts and the MSHSL are members of the NFHS, who implicitly recognizes there are physical differences between males and females that are so significant that the differences between the sexes not only justify, but require, interscholastic athletic programs to provide sex-separated athletics in many sports. This is evidenced by the different standards in men's and women's athletic competitions for equipment in several sports that would constitute impermissible sex discrimination unless supported by the fact men have physical advantages over women in many sports, including the sample of examples listed in the Findings of Fact.

The physiological differences between males and females exist regardless of how a person claims to identify and regardless of what medical interventions the person has undergone. *See, e.g., Adams*, 57 F.4th at 819-21 (Lagoa, J., concurring). That is why "the Title IX framework effectively requires a recipient to maintain separate sports teams." *Soule*, 90 F.4th at 63 & n.8 (Menashi, J., concurring) (collecting cases). "Without a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events." *O'Connor*, 449 U.S. at 1307 (Stevens, J., in chambers). Separating competitive-skill and contact-sport athletic programs by sex promotes equal athletic opportunity, as Title IX and longstanding regulations require. *See Clark I*, 695 F.2d at 1131 ("[T]he governmental interest claimed is redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes. There is no question that this is a legitimate and important governmental interest.").

The above examples in the Findings of Fact underscore what commonsense shows: Women's and girls' athletics are no longer safe or fair when a male participates in athletic programs designated for females. Thus, the impact of the MDE's, various Minnesota school districts', and the MSHSL's policies allowing a men and boys to participate on teams designated for women and girls have displaced women and girls, have created unfair and unsafe advantages for males, and will continue to displace women and girls, harm equal educational athletic opportunities for women and girls, make it impossible for the educational athletic interests and abilities of female students to be fully and effectively accommodated, and will cause women and girls to have materially fewer athletic opportunities than they previously enjoyed, because they no longer can compete in fair, exclusively female competition.

But the same is not true for athletic programs for men, where competition remains safe and fair. Even though "[a] primary purpose of competitive athletics is to strive to be the best," the MDE's, various Minnesota school districts', and the MSHSL's actions "[t]reat[] girls differently regarding a matter so fundamental to the experience of sports" (*i.e.*, "the chance to be champions") and are thus "inconsistent with Title IX's mandate of equal opportunity for both sexes." *McCormick*, 370 F.3d at 294-95; *see Adams*, 57 F.4th at 818 (Lagoa, J., concurring) ("commingling both biological sexes in the realm of female athletics . . . would threaten to undermine one of Title IX's major achievements, giving young women an equal opportunity to

participate in sports" (cleaned up)).

The MDE, various Minnesota school districts, and the MSHSL have intentionally or through deliberate inaction allowed these violations of Title IX. Women and girls, their families, and coaches have expressed to the MDE, various Minnesota school districts, and the MSHSL, their interests in female-only athletic programs, teams, and competitions that effectively accommodate their interests and abilities and in ending the practice of allowing males to compete against females in athletic programs designated for females. Yet the MDE, various Minnesota school districts, and the MSHSL, refuse to change their policies and practices and have even asserted they will continue allowing males into athletic programs designated for females based on Minnesota state law. The MDE's, various Minnesota school districts', and the MSHSL's intentional action and deliberate inaction in the face of clear Title IX violations constitutes discrimination against female athletes on the basis of sex in violation of Title IX and its implementing regulations.

In sum, by prioritizing "gender identity" over biological reality, the MDE, various Minnesota school districts, and the MSHSL discriminating on the basis of sex, are depriving female athletes of fair competition, denying them equal athletic opportunities, and exposing them to heightened risks of physical injury and psychological harm. The results of this flouting of Title IX's core principle of equal athletic opportunities are stark: women and girls are displaced from podiums, lose opportunities for advancement in competitions, and miss out on critical visibility for scholarships and recognition. This discrimination is not only unfair but also demeaning, signaling to women and girls that their opportunities and achievements are secondary to accommodating others, especially when men's and boys' athletics do not suffer from these fairness and safety concerns. And this discrimination erodes the integrity of women's and girls' sports, diminishes their competitive experience, and undermines the very purpose of Title IX: to provide equal access to educational benefits, including athletics.

Given that MDE, various Minnesota school districts, and the MSHSL have provided and purport to currently provide sex-separated interscholastic athletic programs for males and females, intercollegiate athletic opportunities for women and girls have historically been limited, sufficient interest and ability among female students in Minnesota exists to sustain viable female-only interscholastic athletic teams, and a reasonable expectation of interscholastic competition for female-only teams remains, the Department concludes that the MDE's, various Minnesota school districts', and the MSHSL's practice of allowing men and boys to compete in interscholastic athletic programs designated for women and girls effectively eliminates all-female interscholastic athletic programs and, therefore, fails to "effectively accommodate" the interests and abilities of women and girls in the selection of sports, which denies women an equal athletic opportunity, in violation of Title IX. *See* 34 C.F.R. § 106.41(c).[35] Because of those discriminatory actions, male students are displacing female students and defeating female students in their own sports, whereas male student athletes do not face similar disadvantages. Female student athletes suffer because of those policies, experiencing fewer opportunities to play, win, advance, and receive recognition in their own athletic programs. Those actions fail to treat women equally and fail to accommodate women by denying to them competitive opportunities that account for the physiological differences between males and females. Accordingly, ED and HHS find that the MDE's, various Minnesota school districts', and the MSHSL's actions discriminate based on sex in violation of

---

[35] Since the MDE, various school districts and the MSHSL have eliminated sex-separated athletic programs for women and girls with the practice of allowing men and boys to participate in athletic programs designated for women and girls, the Policy Interpretation and associated tests are not relevant to this analysis.

*Page 49 –05254060, 05258901, and 25-626-433-RV-CRR – Letter of Findings (violation)*

Title IX and its implementing regulations.

>    **2.    Minnesota's locker room and restroom policies and practices violate Title IX.**

Minnesota's locker room and restroom policies and practices violate Title IX for at least two independent reasons.

***First,*** when a federal-funding recipient separates bathrooms based on sex, the recipient is not discriminating based on sex because the recipient is treating the sexes differently with a sufficient justification. But when the recipient separates bathrooms based on sex and also creates a special exemption to that general distinction for "trans-identifying" individuals, the recipient is no longer treating the sexes differently based on a sufficient justification. Because these recipients have thrown out the biological justification for sex separation, they are discriminating on the basis of sex by separating the sexes without a valid basis in violation of Title IX.

Yet that is exactly what Minnesota has done. The MDE, various Minnesota school districts, and the MSHSL, purport to create sex-separate facilities but they have abandoned the valid basis for sex-separate facilities by creating a special exemption for "trans-identifying" individuals. Because they have thrown out the biological justification for sex-separate sensitive spaces, they are discriminating on the basis of sex by separating the sexes without a valid basis in violation of Title IX.

***Second,*** the Minnesota's policies and practices have caused a hostile educational environment that denies women educational opportunities in violation of Title IX. Women and teenaged girls have a privacy interest in using the bathroom away from men and teenaged boys, and in shielding their bodies from men and teenaged boys while changing in the locker room and on overnight stays for school activities. "[T]he privacy afforded by sex-separated bathrooms has been widely recognized throughout American history and jurisprudence. In fact, 'sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding.'" *Adams*, 57 F.4th at 805. Unsurprisingly, "courts have long found a privacy interest in shielding one's body from the opposite sex in a variety of legal contexts," which is why "[t]he protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective." *Id.* at 804-05. Eliminating sex-separate bathrooms "render[s] the purpose of [Title IX] obsolete in terms of the privacy interests Congress sought to protect by permitting sex-based segregation in sensitive areas where separation has been traditional." *Tennessee*, 737 F. Supp. 3d at 559.

Common sense alone, which government officials may rely on, shows as much. *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009) (reviewing court to draw on its judicial experience and common sense); *United States v. Cortez*, 449 U.S. 411, 418 (1981) (practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers); *see also Illinois v. Gates*, 462 U.S. 213, 274 (1983) (White, J., concurring) (the only profitable instruction we can provide to magistrates is to rely on common sense); *Trump v. Mazars USA, LLP*, 591 U.S. 848, 867 (2020) (explaining that courts need not "blind" themselves to "what all others can see and understand" (cleaned up)).

But there is more than common sense here: A recently released report found policies that require female athletes to undress or use the bathroom in the presence of males, causes distress and violates their right to privacy. *See* Reem Alsalem, *Special Rapporteur on Violence Against*

*Women and Girls, Its Causes and Consequences*, U.N. Doc. A/79/325 at 5/24 (Aug. 27, 2024), https://docs.un.org/en/A/79/325. The report indicates that policies denying female athletes sex-separated sensitive spaces increases the risk of sexual harassment, assault, voyeurism and physical and sexual attacks in unisex locker rooms and toilets. *Id.*

Examples of the distress caused by allowing men and boys into sensitive spaces designated for women and girls are provided in the Findings of Fact above. These concerns are reflected nationwide, from high school students to college students.

Recipients have an obligation under Title IX to all students in the provision of restrooms, locker rooms, and student housing. Students at school have enough to worry about; worrying about whether it is safe to use the bathroom, change in a locker room, or sleep in campus housing, cannot be one of them. *See, e.g.*, *Women's Sports Pol'y Working Grp., Access to Female Athletes' Locker Rooms Should Be Restricted to Female Athletes,* https://womenssportspolicy.org/access-to-female-athletes-locker-rooms-should-be-restricted-to-female-athletes-january-28-2023/ ("Women's locker rooms are designed to provide female athletes with a separate, safe, private place to shower, change clothes, and use the toilet.").

When recipients allow men to use locker room, restroom, and student housing facilities designated for women based on "gender identity," they are facilitating the significant deleterious effects—including discomfort, embarrassment, psychological harm, and potential physical injury—that Title IX seeks to prevent, and heighten the risk and likelihood of sexual harassment which results in a denial of the overall benefits of an education program or activity based on sex, in violation of Title IX, including 20 U.S.C. § 1681(a), and 34 C.F.R. § 106.31. In other words, the MDE, various Minnesota school districts, and the MSHSL have created a hostile educational environment that denies women and girls educational opportunities in violation of Title IX.

**B.     Minnesota's reliance on *Bostock v. Clayton County*, 590 U.S. 644 (2020), is misguided.**

*Bostock v. Clayton County*'s interpretation of Title VII does not defeat this straightforward reading of Title IX's text, context, and history. 590 U.S. 644 (2020). Minnesota officials misunderstand *Bostock*, which is entirely consistent with the Department's interpretation of Title IX. In any event, *Bostock* does not extend to Title IX. At bottom, Minnesota is providing a special exemption to biologically justified sex separation with no support in Title IX or *Bostock*.

**1.** Even if *Bostock* were somehow relevant to Title IX's scope, *Bostock* is entirely consistent with the Department's understanding of Title IX and its implementing regulations here. Under *Bostock*, Title IX would still require sex separation in athletics and would not require allowing males to participate in female athletics. *See* 590 U.S. at 681 (declining to "address bathrooms, locker rooms, or anything else of the kind"). Indeed, *Bostock* makes clear that it requires a similarly situated analysis: "[D]iscrimination" means "treating [an] individual worse than others who are similarly situated." *Id.* at 657. In other words, *Bostock* stressed that to determine whether a policy "discriminate[s]," a court must use a comparator—*i.e.*, compare the plaintiff to "others who are similarly situated." In *Bostock*, male and female employees were similarly situated because "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 660. That is not true here. Unlike in *Bostock*, males and females are not similarly situated when it comes to athletics, locker rooms, or bathrooms; given their real biological differences, sex is relevant to such decisions. *See, e.g.*, *Virginia*, 518 U.S. at 533-34 ("Physical differences between men and women, however, are enduring: '[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed

of both.'"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 468-69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part); *Adams*, 57 F.4th at 814-17. Otherwise, recipients would have no non-discriminatory basis to separate by athletic teams or sensitive spaces in the first place.

The Supreme Court's recent decision in *Skrmetti* confirms that separating based on sex because of relevant biological differences does not violate *Bostock*. In *Skrmetti*, the challenged state law, "[o]n its face," classified "based on age" and "based on medical use," not "on the basis of transgender status." 145 S. Ct. at 1829-33. Even when applying *Bostock*, the Court found facially neutral laws do not discriminate based on "gender identity" even if they disproportionately burden trans-identifying individuals, such as by banning the use of a medical treatment for a condition that "only transgender individuals" would seek to remedy through the treatment. *Id.* at 1833. Similarly here, correctly interpreting Title IX as requiring that athletics (or sensitive spaces) be separated by sex "does not classify [or otherwise discriminate] on the basis of transgender status," as one cannot "automatically switch" male to female in the sports (or the sensitive-spaces) context. *Id.*

If *Bostock* applied as Minnesota claims, then it would turn Title IX on its head. For example, Title IX makes clear that recipients can "maintain separate living facilities for the different sexes." 20 U.S.C. § 1686. If *Bostock* applied how Minnesota claims, then it "would be rendered meaningless" § 1686 (and the other Title IX carveouts) and bizarrely provide double protection for trans-identifying individuals. *Adams*, 57 F.4th at 813-14 & n.7. A person "would be able to live in both living facilities associated with their biological sex and living facilities associated with their gender identity or transgender status." *Id.*

**2.** Regardless, *Bostock* is a case about Title VII and does not extend to Title IX. *Bostock* itself made clear that it did not "prejudge" the interpretation of other statutes like Title IX. 590 U.S. at 681. And for good reason: *Bostock*'s "text-driven reasoning applies only to Title VII," as "many subsequent cases make clear." *L.W.*, 83 F.4th at 484; *accord Tennessee*, 2024 WL 3453880, at *2 ("*Bostock* is a Title VII case."). "As many jurists have explained, Title VII's definition of discrimination, together with the employment-specific defenses that come with it, do not neatly map onto other areas of discrimination" like Title IX. *Id.* (collecting cases). *Bostock* "bears minimal relevance to cases involving a different law and a different factual context," as is the case with Title IX. *Alabama*, 2024 WL 3981994, at *5 (cleaned up). While *Bostock* "involved employment discrimination under Title VII," Title IX "is about schools and children—and the school is not the workplace." *Id.* (cleaned up); *see Jackson*, 544 U.S. at 175 ("Title VII . . . is a vastly different statute from Title IX."). And "'Title IX, unlike Title VII, includes express statutory and regulatory carveouts for differentiating between the sexes,'" so "if *Bostock* applied [the way Minnesota claims], it 'would swallow the carve-outs,'" "'render them meaningless,'" and absurdly provide more protection for "gender-identity discrimination" than sex discrimination. *Alabama*, 2024 WL 3981994, at *5 (quoting *Adams*, 57 F.4th at 811 & 814 n.7). Thus, "Title VII's definition of sex discrimination under *Bostock* simply does not mean the same thing for other anti-discrimination mandates, whether under the Equal Protection Clause, Title VI, or Title IX." *Tennessee*, 2024 WL 3453880, at *2; *see, e.g.*, *Alabama*, 2024 WL 3981994, at *4-5 (collecting cases concluding the same).

Contemporaneous post-enactment history confirms Title IX does not include discrimination based on "gender identity." Shortly after Title IX was enacted in 1972, Congress passed the Javits Amendment that directed the Department of Education's predecessor to create regulations "implementing . . . [T]itle IX," which "shall include" regulations on "intercollegiate

athletic activities." 88 Stat. 484, 612 (1974). The agency then issued regulations that allow sex separation in many contexts—including sports. 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).[36] Those contemporaneous regulations, nearly all of which still exist today, are strong evidence of Title IX's original public meaning. *See Loper Bright*, 603 U.S. at 394 ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); *id.* at 370 ("Such respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time."). In fact, that evidence is even stronger here because Congress had the chance to disapprove these regulations before they went into effect and chose not to. *See Grove City*, 465 U.S. at 568; *N. Haven*, 456 U.S. at 530-35. Reading Title IX's bar on sex discrimination to wholesale include "gender-identity discrimination," as some wrongly claim, would eviscerate these accurate regulatory interpretations of Title IX, including the regulation on athletics. That "highly counterintuitive result" cannot be right. *Yellen*, 594 U.S. at 360.

Congress's actions for more than 50 years following Title IX's enactment further confirm that Title IX's bar on sex discrimination does not include "gender-identity discrimination." In other statutory contexts, Congress has acted affirmatively to address gender-identity discrimination as a distinct category separate from sex discrimination. For example, when Congress enacted the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, Pub. L. No. 111-84, Div. E., 123 Stat. 2190 (2009), Congress found that the "incidence of violence motivated by the actual or perceived race, color, religion, national origin, *gender*, sexual orientation, *gender identity*, or disability of the victim poses a serious national problem." 34 U.S.C. § 30501(1) (emphases added). Similarly in 2013, Congress amended the Violence Against Women Act to create a federal government enforcement action that protected the separate bases of sex and gender identity. *See* 34 U.S.C. § 12291(b)(13)(A) (2013), as amended by Pub. L. No. 113-4, § 3, 127 Stat. 56 (2013) (prohibiting discrimination in certain federally funded programs "on the basis of actual or perceived race, color, religion, national origin, *sex, gender identity* (as defined in [18 U.S.C. § 249(c)(4)]), sexual orientation, or disability" (emphasis added)). These post-Title IX enactments show that Congress knows how to prohibit discrimination based on "gender identity" when it wants to but did not do so in Title IX. *MacLean*, 574 U.S. at 394.

**3.** Minnesota is not seeking to prevent discrimination based on sex, but rather demanding a preferential special "accommodation" based on gender identity. *See Doe 2 v. Shanahan*, 917 F.3d 694, 707 (D.C. Cir. 2019) (Williams, J., concurring) (rejecting challenge to sex-separated military facilities and standards). According to Minnesota, while some males are validly excluded from competing against females, other males must be allowed to do so—despite the objective physiological advantages that they too have as males—merely because they subjectively identify as females. Minnesota turns Title IX upside down by requiring schools to discriminate in favor of

---

[36] *E.g.*, 40 Fed. Reg. 24,137, 24,142-43 (July 4, 1975) (presently at 34 C.F.R. §106.41(b) ("a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.43 ("If use of a single standard of measuring skill or progress in physical education classes has an adverse effect on members of one sex, the recipient shall use appropriate standards that do not have that effect.")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.32(b) (A recipient "may provide separate housing on the basis of sex" provided the housing provided "to students of one sex, when compared to that provided to students of the other sex, shall be" proportionate and comparable.); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.").

some males at the expense of and harm to females; Title IX certainly does not require a school to create a special exemption that *discriminates in their favor. Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) (SFFA) ("Eliminating . . . discrimination means eliminating all of it."). Title IX "[p]rohibit[s]" "discrimination" "on the basis of sex," 20 U.S.C. § 1681(a), which cannot conceivably be construed to *mandate preferential treatment* for male trans-identifying athletes, let alone when that would come at the expense of competitive fairness and safety for women and girls, *cf. SFFA*, 600 U.S. at 287 (Gorsuch, J., concurring) (interpreting Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, to bar preferential treatment for racial minorities)

Thus, in contrast to Minnesota's policies and practices, keeping males who identify as females off female teams or out of women's sensitive spaces does not constitute "discrimination" "on the basis of sex" under Title IX. When it comes to competitive athletics and sensitive spaces, the sexes are not similarly situated given their physiological differences. This remains true whether or not the male identifies as a female. As the teams or spaces are permissibly separated based on biological sex, it does not somehow become prohibited sex discrimination to neutrally apply that valid criterion to "trans-identifying" students like everyone else. Their subjective "gender identity" has nothing to do with the objective biological differences justifying sex-separated teams or sensitive spaces. Accordingly, barring a male who is "trans-identifying" from competing on female teams or invading women's bathrooms is not providing "'less favorable' treatment" than females receive. *Jackson*, 544 U.S. at 174. Rather, it is ensuring equal treatment for both sexes.

### C.      Effect of Conflicting State Law

The MDE and the MSHSL acknowledge they permit male students to compete in interscholastic athletic programs designated for females and indicate they do so because of existing Minnesota state law. Their reliance on a conflicting state law fails to account for their obligations to follow Title IX and all related regulations and Executive Orders as recipients of federal funding, notwithstanding any conflicting state laws or rules of private organizations.

The Title IX implementing regulation at 34 C.F.R. § 106.6(b)-(c) clearly states in relevant part:

> (b) Effect of State or local law or other requirements. The obligation to comply with this part is not obviated or alleviated by any State or local law or other requirement which would render any applicant or student ineligible, or limit the eligibility of any applicant or student, on the basis of sex, to practice any occupation or profession.

> (c) Effect of rules or regulations of private organizations. The obligation to comply with this part is not obviated or alleviated by any rule or regulation of any organization, club, athletic or other league, or association which would render any applicant or student ineligible to participate or limit the eligibility or participation of any applicant or student, on the basis of sex, in any education program or activity operated by a recipient and which receives federal financial assistance.

34 C.F.R. § 106.6(b)-(c).

Additionally, all federal grant recipients are required to comply with all applicable federal laws, including Title IX in this instance, and all related Executive Orders. Specifically, 34 C.F.R.

§ 75.500 states in relevant part: "Each grantee must comply with the following statutes and regulations: . . . Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*), 34 CFR part 106 . . . ." And 34 C.F.R. § 75.700 states:

> A grantee must comply with § 75.500, applicable statutes, regulations, *Executive orders*, stated institutional policies, and applications, and must use Federal funds in accordance with the U.S. Constitution and those statutes, regulations, Executive orders, stated institutional policies, and applications.

34 C.F.R. § 75.700 (emphasis added).

The evidence has established that the MDE, various Minnesota school districts, and the MSHSL have all failed to comply with Title IX and its implementing regulations, as described above. And after being informed by Executive Orders 14,168 and 14,201, and specific guidance that under Title IX from federal agencies and departments, Minnesota has doubled down on their defiance and stated they intend to continue allowing men and boys to participate in interscholastic athletic programs designated for girls and women, despite federal guidance that such actions violate Title IX. These recipients' statements that they plan to continue ignoring the Executive Orders and OCR's warnings because of Minnesota state law is contrary to the assurances that the MDE has submitted to the federal government as a condition of federal funding, and conflicts with the plain language of 34 C.F.R. §§ 75.500, 75.700, 106.4, 106.6.

### D.      Duty to Remedy Past Discrimination

Title IX and its implementing regulations require recipients to commit to taking whatever remedial action is necessary to eliminate existing discrimination on the basis of sex and to eliminate the effects of past discrimination, whether occurring before or after the recipient's request for federal financial assistance. *See* 34 C.F.R. § 106.4(a). This investigation has established that the MDE, various school districts, and the MSHSL have discriminated against female student athletes because of their policies and practices of allowing males to participate in interscholastic athletic programs designated for women and girls and to invade sensitive spaces designated for women and girls. Accordingly, the MDE, various Minnesota school districts, and the MSHSL are obligated to remedy the effects of that past discrimination and to take action to prevent additional discrimination. Their failure to commit to taking whatever remedial action is necessary to eliminate existing discrimination on the basis of sex and to eliminate the effects of past discrimination whether occurring before or after the recipient's request for federal financial assistance is a violation of 34 C.F.R. § 106.4.

## SECTION 2: THE DEPARTMENT OF HEALTH AND HUMAN SERVICES

## I.      HHS finds that the Minnesota Department of Education and the Minnesota State High School League are noncompliant with Title IX.

Pursuant to the authority delegated by the HHS Secretary to OCR, HHS also issues this Notice of Violation to the MDE and the MSHSL. This action is taken under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq.*, and HHS's implementing regulations for Title IX, 45 C.F.R. Part 86, which prohibit discrimination on the basis of sex in any education program or activity that receives Federal financial assistance. Title IX "applies to every recipient and to the education program or activity operated by such recipient which receives Federal financial assistance." 45 C.F.R. § 86.11.

On June 26, 2025, HHS OCR initiated a compliance review of MDE and MSHSL based on the participation of a male athlete in a high school Girls' Softball Championship, as widely reported in multiple media outlets. Minnesota's high school interscholastic athletic policy allows for the participation of this athlete and other biological males in female-only sports, in violation of Title IX, a requirement restated in President Trump's Executive Order 14,201, *Keeping Men Out of Women's Sports*, signed on February 5, 2025. Upon review of publicly available policies and documented athletic results, HHS OCR finds that MSHSL and MDE's sanctioning of participation of male students in competitions that should be female-only discriminates against girls and women and denies female athletes equal opportunity to compete in athletics, in violation of Title IX.

## II.        Findings of Fact

### A.        Governance of High School Athletics in Minnesota

Minnesota public high schools are governed by the state through the MDE, as set forth under Minnesota Statutes Section 127A.05.[37]

The Minnesota Human Rights Act (MHRA) governs civil rights protections in education for the state. The MHRA states that "the opportunity to obtain . . . full and equal utilization of . . . educational institutions without . . . discrimination . . . is hereby recognized as and declared to be a civil right."[38] The MHRA's educational institution section provides that "[i]t is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of . . . gender identity[.]"[39] The MHRA defines "gender identity" to mean "a person's inherent sense of being a man, woman, both, or neither. A person's gender identity may or may not correspond to their assigned sex at birth or to their primary or secondary sex characteristics."[40]

MDE references the MHRA in its 2017 *Toolkit for Ensuring Safe and Supportive Transgender and Gender Nonconforming Students*, which serves as policy guidance for public schools in Minnesota, specifically to "assist schools in establishing or amending school policies to ensure . . . [a] welcoming environment for transgender and gender non-conforming students."[41] The Toolkit states, "Under the [MHRA], schools must allow transgender and gender-nonconforming students to participate fully in all school activities, including . . . athletics."[42] The Toolkit also references Title IX in multiple sections based on now rescinded guidance from ED.

The Minnesota Attorney General affirmed the State's interpretation via a formal legal opinion on February 20, 2025, stating that "[e]xcluding transgender girl athletes [sic] from participating in girls' extracurricular activities . . . denies those students the full utilization and benefit of educational institutions in violation of the MHRA."[43]

---

[37] https://www.revisor.mn.gov/statutes/cite/127A.05.
[38] Minn. Stat. § 363A.13, Subd. 1.
[39] *Id.*
[40] Minn. Stat. § 363A.03, Subd. 50.
[41] 2017 Minnesota Toolkit, at 1.
[42] *Id.* at 9.
[43] Minn. Attorney General Keith Ellison's February 20, 2025 Opinion.

*Page 56 –05254060, 05258901, and 25-626-433-RV-CRR – Letter of Findings (violation)*

MSHSL is a nonprofit corporation organized under Minnesota State law.[44] MSHSL is also a political subdivision of the State of Minnesota for purposes of ensuring equitable compensation and is considered a state agency for purposes of a state law that requires such agencies to transact business in meetings open to the public.[45] It has a 22-member governing board, and four members of that board are appointed by the Governor.[46] The Minnesota Commissioner of Education is entitled to review annually the information about the MSHSL and may also review league activities when such is warranted.[47]

MSHSL provides service, leadership and extra-curricular opportunities to more than 500 member schools.[48] MSHSL is the governing body for youth sports in the state of Minnesota for public high schools, and its membership includes public high schools in the state of Minnesota.[49] In this capacity, and as explained below in the analysis section, MSHSL has the same legal obligations under Title IX as MDE.

Minnesota law expressly allows high schools to delegate control of their athletic activities to MSHSL: "The governing board of a high school may delegate its control of extracurricular activities to the [MSHSL]. A school board may spend money for, and pay dues to, the [MSHSL] . . . . The [MSHSL] may control contests by and between pupils of the Minnesota high schools that are delegated to it under this section."[50]

To be eligible for membership in the MSHSL, "the governing board of each such school must pass a resolution applying for membership for each of its high schools in which it agrees to abide by and enforce the Articles of Incorporation, Constitution, Bylaws and Regulations of the League."[51] Member school districts are required to pay annual membership dues to the MSHSL.[52]

The MSHSL oversees contests by and between pupils of the Minnesota high schools that are delegated to it under state law.[53] The MSHSL establishes, conducts, and regulates championship high school tournament activities and determines the number of classes in all interscholastic athletic activities under its jurisdiction.[54]

In 2014, the MSHSL adopted an appeals process for students who identify as "transgender" and who want to compete against students of the opposite sex in athletic programs designated for the opposite sex.[55] The current appeals process is published under the 2024-2025 MSHSL Handbook, Section 300.00 Bylaws: Administration of Student Eligibility. The hearing procedure is referred to as "Eligibility Appeal Procedures for a Transgender Student."

---

[44] Minn. Stat. § 128C.01, Subd. 1.
[45] Minn. Stat. §§ 128C.15, 128C.22.
[46] Minn. Stat. § 128C.01, Subd. 4.
[47] Minn. Stat. § 128C.20.
[48] https://www.mshsl.org/about
[49] *Id.*
[50] Minn. Stat. § 128C.01.
[51] Constitution of the Minnesota State High School League, 204.01.
[52] *Id.* at 205.00.
[53] Minn. Stat. § 128C.01, at Subd. 3.
[54] Minn. Stat. § 128C.05.
[55] State high school league approves transgender policy.

**B.      Male Student Deprives Female Competitors of Equal Opportunity in Girls' Softball Championship**

The [redacted content] softball team competes in an MSHSL-sanctioned athletic program designated only for female athletes.[56]

It is reported that a male student played the position of pitcher when competing on the [redacted content] girls' varsity fastpitch softball team in the Anoka-Hennepin School District, against all-female teams in the MSHSL Class AAAA Girls' Softball league.[57]

It is reported that the male pitcher was allowed to pitch five consecutive games during the [redacted content] post season to enable [redacted content] to win the [redacted content] MSHSL Class AAAA Girls' Softball Championship, during which he allowed only one earned run in 35 total innings and struck out 27 female batters.[58] In the championship title game, he pitched a complete game shutout, allowing only three hits in a 6-0 victory to defeat the all-girl opposing team in the title game.[59] During the championship tournament, the male pitcher threw three complete games, recorded two shutouts, only gave up two runs, was credited with two wins, and stuck out 13 batters during the three-game stretch.[60] The male pitcher also batted each of those three games hitting and average of .300 with 2 doubles and 1 run batted in.[61] His performance against the all-girl teams resulted in post season honors for the male pitcher including selection for the [redacted content] MSHSL Class AAAA Softball All-Tournament Team.

## III.      Funding Jurisdiction

HHS OCR enforces Title IX, which prohibits discrimination on the basis of sex in any educational program or activity that receives Federal financial assistance (FFA), with respect to entities and programs or activities that receive FFA from HHS. HHS OCR ensures compliance through enforcement activities and periodic reviews of HHS-funded institutions such as MDE. Based on a review of publicly available data, in 2024, MDE received a total of $11,947,984 from HHS, including funding from ACF ($8 million), SAMHSA (over $3 million), and CDC (over $200,000). In 2025, MDE has receiver $2,188,929 from HHS to date. It may not receive FFA if it is in violation of Title IX.

## IV.      Analysis

The MDE receives FFA from HHS. As a recipient of FFA, MDE is obligated to comply with Title IX. MDE has signed contractual assurances acknowledging this obligation, as required by HHS's Title IX implementing regulation, 45 C.F.R. § 86.4. Public school districts within Minnesota are subrecipients of HHS FFA through MDE.

---

[56] https://www.mshsl.org/schools/activities?activity=%22Softball,%20Girls%22

[57] [redacted content]

[58] [redacted content]

[59] *Id.*

[60] *Id.*

[61] The MSHSL published a news release on the MSHSL website, stating in part: "In three state tournament games, the Rebels (24-2) outscored the opposition, 14-2, including shutouts in the quarterfinals and championship game . . . [redacted content] crowning victory came behind . . . another impressive pitching performance by junior [Student 1] . . . who gave up just three hits while striking out six."

MSHSL is the governing body for youth sports in the state of Minnesota for primary and secondary education, and its membership includes public high schools in the state of Minnesota.[62] Its ability to "control contests by and between pupils of the Minnesota high schools" is expressly delegated by statute.[63]

By Minnesota's express delegation, and by assuming control over physical "activities, programs, and services" such as interscholastic competition, MSHSL is subject to Title IX in the same way MDE would be. *See A.B. v. Haw. State Dep't of Educ.,* 386 F. Supp. 3d 1352, 1357-58 (D. Haw. 2019) (finding high school athletic association had controlling authority over many aspects of the DOE's interscholastic athletic programs and was subject to Title IX, independent of funding source); *Horner v. Ky. High Sch. Athletic Ass'n,* 43 F.3d 265, 271-72 (6th Cir. 1994) (because Kentucky's state laws conferred authority to the Kentucky State Board of Education and Kentucky High School Athletic Association to control certain activities for the federally funded Kentucky Department of Education, both entities were subject to Title IX); *Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 735 (W.D. Mich. 2000) (holding that an athletic association that "does not receive any direct assistance from the federal government," and "receives the bulk of its funding from gate receipts generated at [Michigan High School Athletic Association]-sponsored tournaments," was still covered under Title IX, reasoning that "any entity that exercises controlling authority over a federally funded program is subject to Title IX, regardless of whether that entity is itself a recipient of federal aid").

Title IX's prohibition of sex discrimination permits educational programs to separate competitive sports by sex only because the biological differences between the sexes naturally give males an unfair advantage over females. Because of this male advantage, the sexes are not similarly situated in athletics, and separating sports teams by sex is not prohibited "discrimination" when such separation does not treat either sex worse than the other. In comparison, Minnesota's policy violates Title IX because it separates the sexes without a valid basis and treats females worse than males. The policy violates both the underlying biological justification for separating sports and Title IX's overriding command that the sex separation in athletics cannot disadvantage either sex. Contrary to Title IX, the policy jettisons biology as its justification for separation and causes an imbalanced, unfair disadvantage to female athletes.

This conclusion is reinforced by HHS's implementing regulations for Title IX, which bar discrimination on the basis of sex in athletics. 45 C.F.R. § 86.41(a) provides: "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis."

As restated in Executive Order 14,201, allowing boys or men to participate in female-only sports competition discriminates against girls and women on the basis of sex by denying them equal opportunity to participate and excel in competitive sports. "[W]hen Title IX is viewed in its entirety, it is abundantly clear that discrimination on the basis of sex means discrimination on the basis of being a male or female." *Tennessee*, 762 F. Supp. 3d at 623-24.

---

[62] https://www.mshsl.org/schools/activities?activity=%22Softball,%20Girls%22.

[63] Minn. Stat. § 28C.01.

HHS's Title IX regulations also require recipients to provide "equal athletic opportunity for members of both sexes."[64]

Male athletes have a documented physical advantage over female athletes based on demonstrable biological differences. Minnesota law itself recognizes there are reasons that justify some sex segregation in sports: "If two teams are provided in the same sport, one of these teams may be restricted to members of a sex whose overall athletic opportunities have previously been limited, and members of either sex shall be permitted to try out for the other team."[65] The National Federation of State High School Associations, of which MSHSL is a member, requires high school athletic programs to provide sex-separated athletics, and provides different standards for competitive metrics and equipment.[66]

Sex-separated teams allow female athletes an equal opportunity to compete on the basis of physical ability. Indeed, statistical research has shown that, "if sport were not sex segregated, most school-aged females would be eliminated from competition in the earliest rounds."[67]

These physiological differences are why "the Title IX framework effectively requires a recipient to maintain separate sports teams." *Soule*, 90 F.4th 34, 63 & n.8 (Menashi, J., concurring) (collecting cases). "Without a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events." *O'Connor*, 449 U.S. at 1307.

Here, the denial of equal opportunity by allowing unfair competitive advantage is evident. The male softball pitcher's documented dominance in the Class 4A State Championships deprived female athletes of the opportunity to engage in fair competition based on the abilities of their sex.

As a recipient of FFA from HHS, MDE is obligated to comply with Title IX. When a covered entity receiving HHS funds adopts policies that conflict with Federal law, it risks placing itself in violation of Federal funding conditions. *See Pennhurst State Sch. & Hosp.*, 451 U.S. 1, 17 (1981) (holding that states that accept federal funds "agree to comply with federally imposed conditions").

MDE had the choice of accepting or declining to seek federal funds (and not be required to comply with federal law). But since it has accepted federal funds, it is required to comply with Title IX—regardless of Minnesota law. Indeed, "federal law must prevail" where "compliance with both a state law and federal law is impossible," or the state law is an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (citations omitted).

It is thus no answer for MDE to assert that Minnesota state law requires MHSL's policy. MDE's choice to accept federal funds requires that applicable Federal law preempts conflicting

---

[64] 45 CFR § 86.41(c).

[65] Minn. Stat. § 121A.04. Thus, since women's overall athletic opportunities have previously been limited, if two teams are provided in a sport, one team must be all female.

[66] *See e.g.*, nfhs-track-and-field-pre-meet-notes_2023_final.pdf.

[67] Doriane Lambelet Coleman et al., *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination,* Duke J. Of Gender Law & Pol. Vol. 27:69 (2020).

*Page 60 – 05254060, 05258901, and 25-626-433-RV-CRR – Letter of Findings (violation)*

state laws. *See* U.S. Const. art. 6, cl. 2. When a state law, such as Minnesota's MHRA, frustrates Congress's purpose and poses an obstacle to the accomplishment of those purposes, that state law is preempted. *See, e.g.*, *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1021, 1024 (8th Cir. 2015) (affirming preliminary injunction where lower court determined that Missouri law "frustrates Congress' purpose" and "pose[s] an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). "Title IX . . . is rife with exceptions that allow males and females to be separated based on the enduring physical differences between the sexes," *Tennessee*, 762 F. Supp. 3d at 624, highlighting "Congress' goals of protecting biological women in education," *Kansas*, 739 F. Supp. 3d. at 923. This purpose would be thwarted, and Congress's goal in passing Title IX undermined, by failing to protect women in youth sports through adherence to the MHRA. Title IX therefore preempts the MHRA in this area insofar as recipients of federal funds are concerned and there is a conflict between the federal and state law.

## V.        Notice of Violation

Accordingly, HHS OCR has determined that MDE violates Title IX. Because the MDE has thrown out the biological justification for sex separation as to athletics, it is discriminating on the basis of sex by separating the sexes without a valid basis under Title IX in violation of Title IX. The MDE is also violating Title IX by denying female student athletes in the state of Minnesota an equal opportunity to participate in, and obtain the benefits of participation, "in any interscholastic, intercollegiate, club or intramural athletics," in current and future athletic events. 45 C.F.R. § 86.41. Male athletes, by comparison, are not subject to heightened safety or competitive concerns, which only affect females. *See Tennessee*, 737 F. Supp. 3d at 561 ("[I]gnoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities."). Consequently, HHS OCR has also determined that the MSHSL's policy of allowing male athletes to compete against female athletes in high school sports events designated for females violates Title IX.

## CONCLUSION

This concludes ED OCR's and HHS OCR's investigations. This letter of finding of noncompliance and notice of violation should not be interpreted to address the MDE's or the MSHSL's compliance with any other statutory or regulatory provision, or to address any issues other than those addressed in this letter. This letter of findings and notice of violation does not constitute final agency action.

This letter sets forth OCR's determination in individual cases. This letter is not a formal statement of policy and should not be relied on, cited, or construed as such. ED OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.

Recipients must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law or regulation enforced by ED or HHS OCR or files a complaint, testifies, assists, or participates in a proceeding under a law or regulation enforced by ED or HHS OCR. If this happens, the individual may file a retaliation complaint with ED and/or HHS OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If ED or HHS OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

*Page 61 –05254060, 05258901, and 25-626-433-RV-CRR – Letter of Findings (violation)*

This letter is accompanied by a proposed resolution agreement that specifies actions that will remedy current and past discrimination, and to prevent any similar instances where future violative conduct may recur. If OCR determines an agreement will not be reached, ED and HHS may begin enforcement action including referral to the U.S. Department of Justice or other means authorized by law, including the initiation of an action to suspend, terminate, or refusal to grant or continue federal financial assistance.

If you have questions about this letter, you may contact Bradley R. Burke, Regional Director, at ████████████████ or Daniel Shieh, Senior Advisor, at ████████████████. When contacting our offices, please remember to include the case/transaction number, referenced above, that we have given this file.

Sincerely,

/s/
Craig W. Trainor
Acting Assistant Secretary for Civil Rights
U.S. Department of Education

/s/
Paula M. Stannard
Director, Office for Civil Rights
U.S. Department of Health and Human Services

Enclosure